**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | |
|---|---|
| KELLY DAWSEY, <br><br> Plaintiff, <br><br> v. <br><br> BAYERISCHE MOTOREN WERKE AKTIENGESELLSCHAFT and BMW MANUFACTURING CO., LLC collectively d/b/a "BMW GROUP," <br><br> Defendants. | C.A. No. 7:22-cv-03738-TMC-KFM |

<u>**MEMORANDUM IN SUPPORT OF
BMW MANUFACTURING CO., LLC'S MOTION FOR SUMMARY JUDGMENT**</u>

Defendant, BMW Manufacturing Co., LLC ("BMW MC" or the "Company"), by and through its undersigned counsel of record, hereby submits this memorandum in support of its motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## I.    INTRODUCTION

Plaintiff Kelly Dawsey, a former Department Manager in the Human Resources Department at BMW MC, voluntarily resigned from employment in January 2022, after concluding a multi-month search for a new position outside BMW MC with lesser responsibilities. Plaintiff alleges that BMW MC discriminated against her based on national origin by planning to reassign her laterally to a new Department Manager position and by filling her former position with a German national as part of a broader departmental reorganization. To establish a valid claim of discrimination against BMW MC, Plaintiff must prove that she suffered an adverse employment action. Because Plaintiff admits that she was never actually moved out of her prior

1

Department Manager position before the date on which she left BMW MC, her discrimination claims turn on whether she was constructively discharged.

However, her constructive discharge claim is impermissibly based upon speculation that BMW MC's planned reassignment could result in what she viewed as a "possible demotion." Furthermore, Plaintiff attempts to couch her voluntary resignation as a constructive discharge even though:

- She admittedly began her search for new employment outside of BMW MC weeks before she became aware of the plans to move her laterally to a different Department Manager position or to fill her prior position with an international employee.

- She expressed a desire to have a job with less responsibility and stated that she no longer wanted to do the same type of work that she had been doing.

- After being hired as the Director of Human Resources at Madewell Concrete in early December 2021, she continued working at BMW MC for over one month.

Based upon these undisputed facts, Plaintiff cannot meet the high standard of proof for claims of constructive discharge that the Fourth Circuit has repeatedly and consistently articulated and applied. In the absence of any adverse employment action, Plaintiff's national origin discrimination claim fails as a matter of law, and BMW MC is entitled to summary judgment.

Plaintiff also asserts claims for race discrimination and sex discrimination against BMW MC. However, Plaintiff cannot establish the fundamental elements of either of these claims because she did not suffer an adverse employment action and she cannot show that a similarly situated employee outside her protected class was treated more favorably than her. Accordingly, BMW MC is entitled to summary judgment on these causes of action.

## II.    STATEMENT OF THE CASE

Plaintiff filed this lawsuit on October 28, 2022.  (ECF No. 1.)  Plaintiff filed an Amended Complaint on February 9, 2023.  (ECF No. 20.)  Plaintiff asserts causes of action for national origin discrimination, race discrimination, and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000, *et seq*. ("Title VII").  (ECF No. 20 at pp. 13-16.)  She also asserts a cause of action for race discrimination under 42 U.S.C. § 1981 ("Section 1981").  (ECF No. 20 at p. 15.)  BMW MC answered Plaintiff's Amended Complaint on February 23, 2023.  (ECF No. 40.)  The parties have completed discovery, and these claims are now ripe for summary judgment.

## III.    STATEMENT OF FACTS[1]

### A.    BMW MC.

BMW MC operates an automotive manufacturing plant located in Spartanburg County, South Carolina.  (ECF No. 14-3, McCraw Decl. ¶ 5.)  BMW MC is an indirect subsidiary of Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), which is a German corporation.  (ECF No. 14-3, McCraw Decl. ¶ 6.)  The BMW MC production facility is part of BMW AG's global vehicle production network, which is also referred to as the "T" network.[2]  (Engelhorn Dep. 69:3-14.)

---

[1] For purposes of this motion, any facts about which there is an evidentiary dispute have been construed in the light most favorable to Plaintiff.  BMW MC reserves the right to challenge Plaintiff's allegations in the event that summary judgment is denied in whole or in part.

[2] All production plants in this network are designated with a "T" code, and BMW MC is designated as "TX." (Medley Dep. 12:1-6.)  Positions at BMW MC all have a TX code assigned to them depending on the department in which they are located.  (Pl. Dep. Ex. 7.)  For example, the Human Resources Department at BMW MC is known as TX-6 and all positions in that Department have a corresponding code that starts with TX-6.  (Pl. Dep. Ex. 7 at p. 9, Ex. 31 at p. 3.)

Dr. Robert Engelhorn (a German national) became President of BMW MC on September 1, 2021. (Petrasch Dep. 126:4-18.)  In his role as President, Dr. Engelhorn has authority to make all decisions related to the operations of BMW MC, including personnel decisions.  (ECF No. 14-3, McCraw Decl. ¶¶ 11, 15.)

Non-production jobs at BMW MC are graded and assigned a Function Level, designated by Roman Numeral, which is determined by a variety of factors, including the amount of responsibility that the position involves.  (Pl. Dep. Ex. 4, p. 2.)  However, the Function Level does not determine the compensation and benefits provided to employees. (Pl. Dep. Ex. 4, p. 5.) Instead, employees are given a Personal Grade ("PG") based on their performance.  (Pl. Dep. Ex. 4, p. 5.)  The Personal Grade of the employee determines her salary, bonus, and benefits. (Pl. Dep. 72:12-13, Ex. 4, p. 5.)

**B.    Plaintiff's Employment History at BMW MC.**

Plaintiff was employed in the Human Resources Department (HR) at BMW MC from June 1995 through January 2022.  (Pl. Dep. Ex. 3.)  During this entire time, Plaintiff received her pay, benefits, and bonus from BMW MC.  (Pl. Dep. 302:23-303:4.) Plaintiff resigned from employment with BMW MC effective January 14, 2022, more than one month after she had accepted a Director of Human Resources position with another local company. (Pl. Dep. 287:25-288:8, 303:9-20, Ex. 44 at Dawsey 2810, Ex. 54.)

From June 1995 through February 2015, Plaintiff worked in several areas of HR (Pl. Dep. 49:20-50:9, Ex. 3.)   In February 2015, BMW MC promoted Plaintiff to the position of Department Manager for Human Resources Planning and Steering, a role in which she managed human resources planning and steering, compensation and benefits, associate wellness, and BMW MC's medical facilities.  (Pl. Dep. 55:1-5, Ex. 3.)  When she took over that role, Plaintiff

replaced Moritz Kippenberger (a German national) who was ending his international assignment at BMW MC.  (Pl. Dep. 57:2-14.)  She remained in this position from February 2015 until her resignation from employment in January 2022.  (Pl. Dep. 64:21-25.)

**C.    BMW MC's Human Resources Department (TX-6).**

During calendar year 2021, the Vice President of HR at BMW MC was Christine Petrasch (a German national).  (Petrasch Dep. 8:20-9:3.)  At that time, the BMW MC Human Resources Department consisted of five (5) departments.  The department managers and Function Levels of those manager positions were as follows:

| DEPARTMENT | FUNCTION LEVEL[3] | MANAGER | PERSONAL GRADE |
|---|---|---|---|
| HR Planning and Steering, Compensation and Benefits (TX-60) | III | Kelly Dawsey | 11 |
| HR Management, Associate Relations (TX-61) | IV | Corey Epps | 10[4] |
| HR Services (TX-62) | IV | Michelle Keith | 9 |
| Recruiting, Health Management, Occupational Safety, Food Services (TX-64)[5] | III | Scott Medley | 11 |
| Talent Programs, Training (TX-65) | IV | Paul Sinanian | 9 |

---

[3] The TX-60 Department, managed by Plaintiff, was responsible for grading the positions at BMW MC to determine Function Level.  (Pl. Dep. 127:8-11.)

[4] In October 2021, Mr. Epps was promoted to Personal Grade 11 at the direction of Ms. Petrasch. (Pl. Dep. 240:9-241:17, Ex. 38.)  Plaintiff objected to this promotion because BMW MC did not have any associates with a Personal Grade 11 who were in a Function Level IV position. (Pl. Dep. 135:1-10, Ex. 37.)  Ms. Petrasch told Plaintiff to promote Mr. Epps because he would be in a Function Level III position within twelve (12) months.  (Pl. Dep. 136:14-19, Exs. 37-38.)

[5] The Human Resources Department at BMW MC was reorganized in December 2019 to create the TX-64 department. (Pl. Dep. Ex. 8; Medley Dep. 29:16-30:3.)  At that time, Mr. Medley moved laterally from Department Manager of TX-61 to Department Manager of the newly created TX-64, and Mr. Epps was promoted to Department Manager of TX-61.  (Medley Dep. 25:25-26:2.) Although Plaintiff admits that she never formally graded the TX-64 position at any time prior to her resignation, that position was considered a Function Level III position in 2021. (Pl. Dep. 127:12-15, 262:24-263:3, Ex. 26.)

(Pl. Dep. 96:1-16, Ex. 7 at p. 9, Ex. 41 at BMW MC 253.)

**D.    The 2021 Proposed Reorganization of BMW MC's Human Resources Department.**

In 2021, two events necessitated changes to the HR Department at BMW MC.  First, Ms. Petrasch was scheduled to end her international assignment in Spartanburg and return to Germany at the end of 2021, so BMW MC needed to fill the role of Vice President of Human Resources.  (Petrasch 126:4-18.) Second, during the first half of 2021, BMW MC created an HR special project to focus on issues related to hiring and retention of employees given the challenging labor market and the anticipated upcoming need for additional associates at BMW MC to staff new operations related to the production of electric vehicles.  (Pl. Dep. Ex. 36 at slide 3; Engelhorn Dep. 43:16-44:1.)   Ms. Petrasch selected Mr. Medley to lead this special project, which was scheduled to start at the beginning of 2022.   (Pl. Dep. Ex. 41 at BMW MC 258; Petrasch Dep. 18:9-17.)  Mr. Medley's assignment to this special project resulted in an open Department Manager position in HR.  (Pl. Dep. Ex. 41 at BMW MC 258.)

In early September 2021, Dr. Engelhorn decided that Sherry McCraw (an American national), who at the time was the Vice President of Assembly at BMW MC, would become the next Vice President of HR.  (Engelhorn Dep. 59:2-9.)  However, because Ms. McCraw was unable to transition into her new position in HR until April 2022, Ms. Petrasch agreed to remain in the Vice President of HR position at BMW MC through March 31, 2022.  (Petrasch Dep. 8:22-24; McCraw Dep. 23:23-24:1.)

In July 2021, while still working in Germany, Dr. Engelhorn met Eva Burgmeier (a German national), a department manager in the central Human Resources Department at BMW AG, who

was interested in an international assignment.[6]  (Burgmeier Dep. 45:5-14.)  On September 9, 2021,

Dr. Engelhorn had a teleconference meeting with Ms. Burgmeier.  (Burgmeier Dep. 45:5-46:11.)

During that meeting, he told Ms. Burgmeier that there would be a Department Manager opening

at BMW MC in early 2022 and asked if she was interested in taking an international assignment

to work at BMW MC. (Burgmeier Dep. 45:5-46:11.) Dr. Engelhorn did not indicate which position

she would fill in the BMW MC Human Resources Department.  (Burgmeier Dep. 46:3-7.)

Ms. Burgmeier did not learn that she would be placed in the TX-60 position until she spoke with

Ms. Petrasch later in September.  (Burgmeier Dep. 44:10-22; Petrasch Dep. 126:19-127:12.)

Plaintiff testified that on September 15, 2021, she received a phone call from Ms. Petrasch

in which she informed Plaintiff that Ms. McCraw would be the next Vice President of HR and that

"a German" would be coming to the HR Department on an international assignment. (Pl.

Dep. 209:13-210:5.)  At that time, Plaintiff did not know the name of the person coming to

BMW MC on international assignment or the position in which that person would be working. (Pl.

Dep. 211:18-212:1.)  Plaintiff states that it was not until a meeting with Ms. Petrasch on

September 30, 2021, that she learned that Ms. Burgmeier was the person coming to BMW MC on

international assignment, that Ms. Burgmeier would become the TX-60 Department Manager, and

that Plaintiff would be moved laterally to a different Department Manager role in the HR

Department.  (Pl. Dep. 224:4-11, 226:6-11, Ex. 35 at Dawsey 2660.)

On September 23, 2021, Ms. Petrasch prepared a draft document outlining the proposed

reorganization of the HR Department.  (Pl. Dep. Ex. 34; Petrasch Dep. Ex. 1.) According to that

draft, Ms. Burgmeier would assume the TX-60 Department Manager role, Plaintiff would move

---

[6] At the time of the July 2021 meeting, Dr. Engelhorn was the Director of Plant Munich in Germany
but had already been formally announced as the next President of BMW MC starting September 1,
2021.  (Burgmeier Dep. 46:20-47:1.)

to Department Manager of TX-61 (Associate Relations), Mr. Epps would move to Department Manager of TX-64 (Recruiting, Health Management, Occupational Safety, and Food Services), and Mr. Medley would move to the Special Project. (Pl. Dep. Ex. 34; Petrasch Dep. 18:9-17, Ex. 1.) At the end of September 2021, Ms. Petrasch met with Dr. Engelhorn and Ms. McCraw to discuss her proposed reorganization. (Engelhorn Dep. 23:20-24:3; McCraw Dep. 15:24-16:9.) During that meeting, Ms. McCraw expressed concerns with the proposal to move Plaintiff to the TX-61 Department Manager role. (McCraw Dep. 16:10-18:20.) Ms. McCraw testified that Mr. Epps was doing a good job in that role and had been in the position for less than two years. (McCraw Dep. 18:12-18.) She further testified, based upon her experience working with Plaintiff, that the TX-64 Department Manager position was a better fit for Plaintiff. (McCraw Dep. 16:14-17:1.) As a result, Ms. McCraw recommended that Mr. Epps remain in the TX-61 Department Manager position and that Plaintiff be moved to the TX-64 Department Manager role. (McCraw Dep. 16:2-5.) Dr. Engelhorn agreed with Ms. McCraw's recommendation. (Engelhorn Dep. 23:13-19, 66:15-67:18.) On October 1, 2021, Ms. Petrasch prepared an updated chart reflecting that Ms. Burgmeier would assume the TX-60 Department Manager role, Plaintiff would move to Department Manager of TX-64, and Mr. Medley would move to the Special Project. (Pl. Dep. Ex. 36; Petrasch Dep. 18:9-17, Ex. 2.)

In 2021, prior to the reorganization, the HR Department was structured as follows:



(Pl. Dep. Ex. 41 at BMW MC 253.)   Based on the proposed reorganization, the HR Department

was to have the following structure effective February 2022:



(Pl. Dep. 250:17-251:3, Ex. 41.)

On November 11, 2021, Dr. Engelhorn, Ms. Petrasch, and Ms. McCraw met with all of the HR Department Managers to inform them of the proposed reorganization.  (Pl. Dep. 244:9-245:8, 249:15-250:4.)  During that meeting, Ms. Petrasch used a presentation which showed the new structure of the HR Department, including Plaintiff's lateral move to the TX-64 Department Manager position.  (Pl. Dep. 250:17-251:3, Ex. 41.)  Plaintiff admits that she did not express concerns about the proposed organizational changes to anyone in the November 11, 2021, meeting. (Pl. Dep. 250:7-9.)

**E.    Plaintiff's Search for a New Job Starts on September 8, 2021.**

On September 8, 2021, **one (1) week before** she allegedly learned that "a German" was coming to the Human Resources Department at BMW MC and **three (3) weeks before** she allegedly learned that Ms. Burgmeier would be moving into the TX-60 Department Manager position, Plaintiff reached out to a recruiter, Sherrill Miller, to assist her in finding another job. (Pl. Dep. 269:2-13, Ex. 44 at p. 1.) When asked why she contacted a recruiter on September 8, 2021, Plaintiff testified that "communications were chaotic" so she "started really praying hard about what my positions should be, what I should do, and very ironically, my husband met Sherrill Miller at a job because she was the neighbor of an elderly woman that he was working on her house. . . . And so, at this point, I am of the opinion looking to see what is out there is something that I should do."  (Pl. Dep. 269:20-270:9.)

Plaintiff had an initial meeting with Ms. Miller on September 10, 2021.  (Pl. Dep. 270:10-271:6.)  During that meeting, Plaintiff told Ms. Miller that she wanted to slow down and was looking for a job with less responsibility.   (Miller Dep. 38:23-39:8, 88:13-89:4.)   Ms. Miller specifically recalled Plaintiff telling her that she "didn't really want to do what she had done so deeply in the past. She really was looking for new avenues to be created for all of her experience

and knowledge." (Miller Dep. 89:5-13.) The following Monday, September 13, Plaintiff sent an e-mail to Ms. Miller regarding some job postings in which she was interested and detailing the companies for which she would be interested in working, as well as the companies where she did not want to work.  (Pl. Dep. 271:7-14, Ex. 44 at pp. 5-8.) (Pl. Dep. Ex. 44 at p. 9.) On the evening of September 15, 2021, Ms. Miller sent a services contract to Plaintiff which she signed.  (Pl. Dep. 274:14-25, Ex. 44 at pp. 16-19.) (Pl. Dep. 283:6-24, Exs. 46-47.)

From September through December of 2021, Plaintiff was engaged in an active search for other employment outside of BMW MC.  (Pl. Dep. 276:10-282:2.)  On November 30, 2021, Plaintiff had an initial interview for the position of Director of Human Resources at Madewell Concrete.  (Pl. Dep. 285:12-24, Ex. 49 at Dawsey 2807.)  On Friday, December 3, she had an in-person interview with executives of Madewell.  (Pl. Dep. 285:16-287:2, Ex. 49 at Dawsey 2811.) The following Monday, December 6, Madewell offered Plaintiff the position of Director of Human Resources.  (Pl. Dep. 287:11-18.)  Plaintiff accepted the offer on December 10, 2021. (Pl. Dep. 287:25-288:8, Ex. 44 at Dawsey 2810.)

**F.    Plaintiff's Resignation from BMW MC in January 2022.**

Although Plaintiff accepted the job offer from Madewell on December 10, she admits that she did not immediately tell anyone at BMW MC.[7]  (Pl. Dep. 289:3-10.)  The following Monday, December 13, 2021, Plaintiff met with all of her team members in TX-60 and informed them of the upcoming organizational changes.  (Pl. Dep. 252:12-254:13, 288:9-289:2, Ex. 42.)  During that meeting, Plaintiff showed her team members the presentation stating that she would be moving to the TX-64 Department Manager position.  (Pl. Dep. 253:14-254:13, 288:23-289:2.)  Following

---

[7] When asked in her deposition why she did not immediately notify BMW MC that she had accepted another job, Plaintiff stated, "I didn't think it was any of their business."  (Pl. Dep. 289:8-10.)

Plaintiff's meeting with the TX-60 team, she participated in a meeting with the entire HR Department, during which Ms. Petrasch informed the entire Department of the reorganization plan, including Plaintiff's lateral move to the TX-64 Department Manager position. (Pl. Dep. 257:10-258:1.)

On January 3, 2022, Plaintiff called Ms. Petrasch, who was in Germany for the holidays, and resigned from employment. (Pl. Dep. 300:11-301:20.) Plaintiff followed up with a written resignation letter, in which she stated that her last day of work at BMW MC would be Friday, January 14, 2022, less than two weeks later. (Pl. Dep. 303:9-20, Ex. 54.) When Plaintiff notified her long-time coworkers, Scott Medley and Kathy Keiser, of her resignation, she told them that a great job opportunity had been presented to her that she could not pass up, and she thought it was a sign from God. (Pl. Dep. 304:25-305:5; Medley Dep. 84:3-9; Keiser Dep. 69:1-5.) Plaintiff told Ms. Miller that she was sad to be leaving BMW MC but was looking forward to the new opportunity at Madewell. (Miller Dep. 86:15-87:5.) At the time Plaintiff left BMW MC on January 14, 2022, she was still in the TX-60 Department Manager position. (Pl. Dep. 313:16-20.)

As a result of Plaintiff's abrupt resignation in January 2022, the reorganization plan was put in disarray as Mr. Medley had to continue performing the TX-64 Department Manager duties for several months in addition to beginning the special project. (Engelhorn Dep. 87:4-13; Petrasch Dep. 23:11-24:10, 168:3-20; Medley Dep. 76:22-77:20.) Dr. Engelhorn testified that he was disappointed by Plaintiff's decision to resign because it left a vacancy in the TX-64 Department Manager position, a role that he viewed as critical to the organization given the need to increase the workforce to support the $1.7 billion investment that had been made at BMW MC to build electric vehicles in South Carolina. (Engelhorn Dep. 24:4-25:11, 87:2-13, 88:23-89:9.) Following the completion of the special project on November 1, 2023, Mr. Medley moved back into the

TX-64 Department Manager position. (Medley Dep. 20:1-19, 27:8-11.)  Mr. Medley currently remains at a Personal Grade 11.  (Medley Dep. 87:17-18.)

## IV.    STANDARD OF REVIEW

The Supreme Court has held that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (citation omitted).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[s]ummary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 962 (D.S.C. 2018) (quoting Fed. R. Civ. P. 56(a)).  In deciding a summary judgment motion, one must view the facts and inferences in the light most favorable to the non-moving party.  *See Matshushita Elect. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 579-88 (1986).  The moving party has the burden to establish that, based on the pleadings, affidavits, and discovery on file, it is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby,* 477 U.S. 242, 248-49 (1986); *Celotex Corp.,* 477 U.S. at 324; *Ruffin v. Shaw Indus.*, 149 F.3d 294, 301 (4th Cir. 1998).

"Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Turner v. BFI Waste Servs.*, 268 F. Supp. 3d 831, 835 (D.S.C. 2017) (citing *Anderson*, 477 U.S. at 252; *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997)).  "[T]o defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact."  *Pruitt*, 318 F. Supp. 3d at 962 (citing Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 256).  The non-moving

party must show more than some "metaphysical doubt" that genuine and material factual issues exist. *See Matsushita*, 475 U.S. at 586. The "mere existence of a scintilla" of evidence is insufficient to circumvent summary judgment. *Anderson*, 477 U.S. at 252. Instead, the non-moving party must show that, upon the record taken as a whole, a rational trier of fact could find for the non-moving party. *Id.* at 248-49. For the reasons set forth below, the undisputed record evidence and controlling law establish that BMW MC is entitled to judgment as a matter of law on Plaintiff's claims.

## V.    LEGAL ARGUMENT

### A.    BMW MC Is Entitled to Summary Judgment on Plaintiff's National Origin Discrimination Claim.

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Relying on the statutory language in Title VII, the Fourth Circuit has held that a plaintiff must show the existence of an adverse employment action to establish a valid claim of employment discrimination. *See, e.g., Ali v. Alamo Rent-A-Car, Inc.*, 8 F. App'x 156, 158 (4th Cir. 2001)(unpublished); *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999); *see also Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004) (requiring the plaintiff to establish an adverse employment action to support a Section 1981 claim). According to the Fourth Circuit, an adverse employment action is an action "that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). The adverse employment action requirement "seeks to

differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 431 (4th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). In the absence of any adverse employment action, Plaintiff's discrimination claims fail as a matter of law.

In the First Cause of Action in her Amended Complaint, Plaintiff alleges that BMW MC removed her from her position as TX-60 Department Manager because of her national origin, informed her "of a possible demotion to another job, which never materialized," and "never offered Plaintiff employment to remain at BMW." (ECF No. 20, ¶¶ 69-71.) However, discovery in this case has proven these allegations to be patently false. Plaintiff admits that she was not removed from the TX-60 Department Manager but instead remained in that position until the date she left BMW MC (January 14, 2022). (Plaintiff Dep. 313:16-314:14.) Moreover, Plaintiff testified that she was aware of BMW MC's plan to laterally move her to the TX-64 Department Manager position at the time she resigned, and she admittedly informed her TX-60 Department team members of that planned move in a meeting on December 13, 2021. (Pl. Dep. 250:17-251:3, 253:14-254:13, 288:23-289:2, Ex. 41.) Having contradicted the core allegations of her complaint that BMW MC removed her from her position and did not offer her employment to remain at BMW MC, all that is left for this Court to consider is Plaintiff's disputed claim that she was constructively discharged based on the alleged statement of an outgoing superior at BWM MC that she would possibly be demoted. (ECF No. 20, ¶ 70; *see also id.* ¶¶ 76 ("possible demotion"), 82 ("would be demoted").)

The Fourth Circuit requires two elements to establish a constructive discharge in an employment discrimination case. First, the plaintiff must prove that her "'working conditions became so intolerable that a reasonable person in the employee's position would have felt

15

compelled to resign.'" *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) (citing

*Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016)) (quoting *Pennsylvania State Police v. Suders*,

542 U.S. 129, 148 (2004)).  Second, the plaintiff must show that she resigned because of those

conditions.  *Green*, 136 S. Ct. at 1777-78.  For the reasons set forth below, Plaintiff cannot clear

the high legal hurdle to establish such a claim.

### 1.    Plaintiff Cannot Establish a Constructive Discharge Based on a Perceived, Future Demotion.

To prove a constructive discharge in the Fourth Circuit, Plaintiff must first establish

"intolerability."  *Perkins*, 936 F.3d at 211-12. In *Perkins*, the Court wrote that the burden of proof

for "intolerability" is an extremely high standard:

> 'Intolerability' is not established by showing merely that a reasonable
> person, confronted with the same choices as the employee, would have
> viewed resignation as the wisest or best decision, or even that the
> employee subjectively felt compelled to resign. *Blistein v. St. John's
> Coll.*, 74 F.3d 1459, 1468 (4th Cir. 1996), *overruled on other grounds
> by Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 118 S.Ct. 838, 139
> L.Ed.2d 849 (1998), *as recognized by Adams v. Moore Bus. Forms,
> Inc.*, 224 F.3d 324, 327 (4th Cir. 2000). Instead, intolerability 'is assessed
> by the objective standard of whether a 'reasonable person' in the
> employee's position would have felt *compelled* to resign,' ... that is,
> whether he would have had *no choice* but to resign. *Id* . (internal citations
> omitted) (emphasis in original) (quoting *Bristow v. Daily Press, Inc.*, 770
> F.2d 1251, 1255 (4th Cir. 1985)).

*Id.* at 212.

Constructive discharge cases arise almost exclusively as part of hostile work environment

claims, *e.g.*, *Perkins*, 936 F.3d at 212 (discussing cases), which is a claim that Plaintiff does not

assert in this case.  (*See generally* ECF No. 20.)  Instead, Plaintiff asserts here that BMW MC's

plan to transfer her laterally to another Department Manager position, which she perceived as a

possible demotion, forced her to resign.  (ECF No. 20, Compl., ¶¶ 70-72.)  Though Fourth Circuit

decisions have acknowledged the theoretical possibility of a constructive discharge in a situation

where an employee is demoted, each discuss the exceedingly high standard applicable to those claims—and no Fourth Circuit decision has recognized a factual circumstance in which an alleged demotion constituted even a triable issue on the claim of constructive discharge in part because of the "no choice but to resign" standard. *See, generally, Batten v. Grand Strand Dermatology, LLC*, Civil Action No. 4:18-cv-0616-MGL-TER, 2019 U.S. Dist. LEXIS 230813, at *19 (D.S.C. Dec. 20, 2019) (quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)) (granting summary judgment on constructive discharge by demotion claim).

In *James v. Booz-Allen & Hamilton, Inc.*, for example, the Fourth Circuit affirmed entry of summary judgment on a Title VII claim that "center[ed] on the reassignment of [plaintiff] from his role as Project Manager." 368 F.3d 371, 372 (4th Cir. 2004). There, the Black plaintiff asserted that the hiring of a white male to take on his project manager role, in combination with comments from a supervisor about his diminished prospects for promotion, compelled his resignation. *Id.* at 376-378. The Court of Appeals observed, however, that from the time of his reassignment to his resignation, the plaintiff remained at the same seniority grade and "received the same pay, benefits and other terms and conditions of employer." *Id.* at 377. The Fourth Circuit recognized that "[d]emotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal." *Id.* at 378 (quoting *Carter* 33 F.3d at 459). Nevertheless, "a slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient evidence of constructive discharge. *James,* 368 F.3d at 378 (quoting *Jurgens v. EEOC*, 903 F.2d 386, 391-92 (5th Cir. 1990)). Despite the plaintiff's ostensible loss of supervisory duties, his unaltered pay and benefits foreclosed his constructive discharge claim. *James*, 368 F.3d at 378. The Fourth Circuit concluded that the plaintiff "had produced no evidence that he faced the kind of harsh working conditions that would compel any reasonable employee to quit." *Id.*

17

Similarly, in *Honor*, the Court of Appeals affirmed the entry of summary judgment against an employee's constructive discharge claim.  383 F.3d at 180.  There, the plaintiff alleged that his managers told him that he would be fired and that he could not continue in his current position. *Id.* at 183.  Yet because the plaintiff voluntarily resigned before his employer took any of the threatened actions, the Fourth Circuit held that his resignation was voluntary as a matter of law. *Id.* at 186.  The court likewise held that the plaintiff could not press a claim of constructive discharge because he failed to cite sufficient evidence that his working conditions were intolerable. *Id.* at 187.  <u>Among the factors cited by the court in reaching this conclusion were the plaintiff's search for other employment that began before the employer's challenged decisions and the resignation communications</u>, which did not allude to any compulsion in his resignation.  *Id.* at 188.

Having resigned her employment before the "possible demotion" about which she complains in this lawsuit, Plaintiff cannot pursue a claim based on constructive discharge.  Indeed, her testimony establishes that she suffered no adverse action at all in this case—she remained in her TX-60 position at the time of her resignation, having suffered no change in compensation, benefits, seniority, or any other term or condition of employment.   (Pl. Dep. 313:16-20.) Nevertheless, Plaintiff attempts to assert the right to resign and claim constructive discharge based on the disputed forecast of a "possible demotion."   (ECF No. 20, ¶¶ 70, 76, 82.)   However, BMW MC is not aware of any federal court in the Fourth Circuit that has ever recognized a claim for constructive discharge based upon a *possible* demotion.[8]   Instead, the Fourth Circuit has explicitly stated that "speculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute.  Inasmuch as [plaintiff] left the company before he even

---

[8] In the cases that acknowledge the theoretical possibility of such a constructive discharge claim involving a demotion, the plaintiff was demoted before resigning. *See, e.g.*, *James*, 368 F.3d at 378; *Carter*, 33 F.3d at 455.

came up for promotion, we are left to guesswork and conjecture as to what his prospects would have been." *James*, 368 F.3d at 377.

In applying the standards of the Fourth Circuit, courts have explained that "an employee's perception of the new position as a demotion is close to irrelevant." *Cole v. Wake Cty. Bd. of Educ.*, 494 F. Supp. 3d 338, 345-346 (E.D.N.C. 2020) (citations omitted). In *Cole*, a school principal was prospectively transferred to a school district Director position. The plaintiff did not report to the position and instead filed a grievance and charge of discrimination. *Id*. at 343. The court held that the plaintiff could not defeat summary judgment regarding the transfer decision as her understanding of the transfer as a demotion did not create an adverse employment action, there was no direct evidence of loss of job title and responsibility, and her argument that the transfer hurt her chances at promotion were speculation. *Id.* In rejecting the speculative claims of plaintiff for the Director position, the court stated that her argument "asks the court to assume her career trajectory for a job in which she failed to report to work, and to speculate that if she had reported to work as [Director], then she would not have received a promotion." *Id.* at 346.

Here, just as in *James, Honor*, and *Cole*, Plaintiff's claims rely on guesswork and conjecture as to what her prospect would have been if she had stayed at BMW MC. Her decision to leave the company before her transfer to a new position precludes any assessment of how it might have affected her and thus precludes a constructive discharge claim. Plaintiff felt no effects of a transfer, and her subjective, anticipatory thoughts do not meet the standard for constructive discharge. *James,* 368 F.3d at 377 (explaining that plaintiff's "speculations about the impact of his reassignment on his opportunities for professional development are merely that—stark assertions that are not sufficient to survive summary judgment"). **Plaintiff's claim of constructive discharge relies solely on speculation about what might have happened had she**

19

**actually transferred to the TX-64 Department Manager position**. This Court is not allowed to rely on speculation, guesswork, or conjecture in establishing the existence of an adverse employment action.  *James*, 368 F.3d at 376; see also *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) ("[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another").  Plaintiff has failed to establish that her working conditions at BMW MC were so intolerable that she had "no choice" but to resign and thus summary judgment should be awarded to BMW MC.

> **2.     The Record Evidence Conclusively Establishes That Plaintiff Did Not Resign Because of the Alleged Intolerable Conditions.**

Even assuming that Plaintiff can prove the existence of intolerable conditions, which BMW MC disputes, Plaintiff can establish constructive discharge only if she can also prove that she resigned because of the alleged intolerable conditions.  *Green*, 136 S. Ct. at 1777-78.  However, the undisputed facts establish that Plaintiff's resignation from BMW MC had nothing to do with the conditions on which she bases her constructive discharge claim.

In this case, Plaintiff resigned because she pursued and found another job. The undisputed evidence shows that Plaintiff engaged a recruiter and began her job search on September 8, 2021, **one (1) week before** she learned that a German was coming to the Human Resources Department at BMW MC and **three (3) weeks before** she learned that Ms. Burgmeier would be moving into the TX-60 Department Manager position.  (Pl. Dep. 269:2-13, Ex. 44 at p. 1.) The evidence also reveals that Plaintiff told her recruiter that she wanted to slow down, was looking for a job with less responsibility, that she did not want to do the same work she had been doing any longer, and that she would accept a cut in pay.  (Miller Dep. 38:23-39:8, 48:21-49:4, 88:13-89:13.)  It is

undisputed that Plaintiff was in an active search for employment outside of BMW MC from September through December 2021. (Pl. Dep 276:10-282:2.)

Plaintiff accepted a job offer from Madewell Concrete on December 10. (Pl. Dep. 287:25-288:8, Ex. 44 at Plaintiff 2810.) Although Plaintiff would lead this Court to believe that her working conditions were so intolerable that she had no choice but to resign, Plaintiff waited more than one month after accepting the job at Madewell before she resigned from BMW MC.[9] (Pl. Dep. Ex. 54.) During that time period between accepting the Madewell job and leaving BMW MC, Plaintiff did not tell anyone at BMW MC in December that she had accepted another job and was leaving the Company. Instead, Plaintiff met with her team members on December 13 (mere days after accepting the Madewell job to the Director of Human Resources) and informed the team of the organizational changes to the Human Resources Department, including the fact that she would be moving to the TX-64 Department Manager position in the new organization. (Pl. Dep. 252:12-254:13, 288:9-289:2, Ex. 42.) Plaintiff led and attended these meetings knowing that she was leaving BMW MC to become the Director of Human Resources for Madewell.

Plaintiff has failed to present evidence that she resigned *because of* supposedly intolerable work conditions. Instead, the evidence is undisputed that Plaintiff began seeking other employment *weeks before* she learned about the possibility that BMW MC might transfer her from the TX-60 position. (Pl. Dep. 269:2-13, Ex. 44 at p. 1.) She expressed a desire to reduce her responsibilities and therefore sought a job paying a lower salary outside BMW MC. (Miller Dep. 38:23-39:8, 48:21-49:4, 88:13-89:13.) Then, having accepted new employment in December 2021, Plaintiff

---

[9] If Plaintiff's working conditions were so intolerable that she had no choice but to resign, one must ask why she continued to work in such an intolerable place for almost five (5) weeks after accepting another job? Plaintiff admits that she only needed to give BMW MC a two-week notice of her resignation. (Pl. Dep. Ex. 54.) Therefore, she could have exited BMW MC prior to Christmas 2021, but instead continued to work until mid-January 2022.

continued working for BMW MC for more than a month before finally departing. (Pl. Dep. 287:25-288:8, Ex. 44 at Plaintiff 2810.)  Plaintiff's months-long search for new employment and continued employment after accepting another job eviscerate any contention that she resigned because of any intolerable conditions related to BMW MC's challenged decisions. See *Honor*, 383 F.3d at 186 (holding that the plaintiff's conduct precluded a reasonable jury from concluding he was forced to resign where he began using a recruiter to solicit new employment before he was removed from his position and repeatedly referred to his departure as a "resignation").

Plaintiff left BMW MC because of her own life choices and her own personal desires to move away from a new Departmental reorganization and new leadership at BMW MC.  *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989) ("Because the claim of constructive discharge is so open to abuse by those who leave employment of their own accord, this circuit has insisted that it be carefully cabined.").  Moreover, when she announced that she was leaving BMW MC, she told her supervisor and colleagues that she was resigning because a great job opportunity had been presented to her that she could not pass up, and she thought it was a sign from God. (Pl. Dep. 304:25-305:5; Medley Dep. 84:3-9; Keiser Dep. 69:1-5.) Based upon the evidence in the record, Plaintiff cannot prove that she had *no choice* but to resign and that she did resign *because of* intolerable working conditions at BMW MC.  Therefore, BMW MC is entitled to summary judgment on Plaintiff's cause of action for national origin discrimination.

**B.    BMW MC Is Entitled to Summary Judgment on Plaintiff's Race Discrimination Claim.**

Plaintiff next asserts causes of action for race discrimination under Title VII and Section 1981. (ECF No. 20, ¶¶ 73-78.)  Plaintiff's race discrimination claim is based upon her allegation that Corey Epps, an African-American Department Manager in the Human Resources Department at BMW MC, was treated more favorably than her when he was promoted to PG 11

in October 2021.  (Pl. Dep. 133:1-135:10.)  Because Plaintiff has not presented any direct evidence of race discrimination, claims under Title VII and Section 1981 are decided using the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).[10]  For the reasons detailed below, Plaintiff cannot establish a valid claim of race discrimination related to the promotion of Mr. Epps.

### 1.    Plaintiff Cannot Establish a Prima Facie Case of Race Discrimination.

To establish a *prima facie* case of race discrimination, Plaintiff must present evidence that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the job and [her] performance satisfied [her] employer's expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees outside [her] protected class received more favorable treatment." *Bradley v. U.S. Foods, Inc.*, 2015 U.S. Dist. LEXIS 117751, at *25 (D.S.C. June 30, 2015) (citing *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).  Here, Plaintiff cannot establish that she suffered any adverse employment action or that a similarly situated African-American employee received more favorable treatment.

---

[10] Under the *McDonnell Douglas* proof scheme, Plaintiff must first establish a "prima facie" case of discrimination. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992). If Plaintiff establishes a prima facie case, a *rebuttable* presumption of discrimination arises, and the burden shifts to BMW MC to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* Defendant "'is not required to prove absence of a discriminatory motive, but *merely articulate some legitimate reason* for its action.'" *Id.* (quoting *EEOC v. Western Elec. Co.*, 713 F.2d 1011, 1014 (4th Cir. 1983) (citation omitted) (emphasis added)).  It is simply a burden of production, not of persuasion. *Clay Printing*, 955 F.2d at 941.  If BMW MC articulates a legitimate reason for the discharge, then the presumption created by the prima facie case is rebutted and "'drops from the case.'"  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S. Ct. 2742 (1993) (citation omitted).  Plaintiff must then produce evidence establishing that the Company's stated reason for the adverse action was mere pretext for unlawful discrimination.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48, 120 S. Ct. 2097 (2000); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 248 (4th Cir. 2000). Under the *McDonnell Douglas* shifting-burden analysis, the plaintiff always has the ultimate burden of persuading the trier of fact that the defendant engaged in discrimination. *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997) (citation omitted).

> ### a.  Plaintiff Did Not Suffer Any Adverse Employment Action When Corey Epps Was Promoted to Personal Grade 11.

An adverse employment action in the discrimination context is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761).  The adverse employment action requirement "seeks to differentiate those harms that work a 'significant' detriment on employees from those that are relatively insubstantial or 'trivial.'" *Adams*, 789 F.3d at 431 (citing *White*, 548 U.S. at 68) (ADA case).  Here, the alleged harm on which Plaintiff bases her race discrimination claim cannot be characterized as anything other than "trivial."

Plaintiff alleges that BMW MC discriminated against her based on race by promoting Mr. Epps to PG 11 in October 2021.  (Pl. Dep. 134:4-11, 240:9-241:17, Ex. 38.)  Plaintiff claims that the promotion of Mr. Epps was outside of BMW MC guidelines because no employee had ever been promoted to a PG of 11 while in a Function Level IV position. (Pl. Dep. 135:1-10, Ex. 37.)  Plaintiff asserts that this promotion outside of guidelines prevented her from doing her job, since she was responsible for compensation at BMW MC. (Pl. Dep. 140:9-15.)  However, even accepting that allegation as true, Plaintiff cannot show that she suffered any adverse employment action as a result of the promotion of Mr. Epps to PG 11.

The evidence in the record establishes that in October 2021, Plaintiff had already been at PG 11 for several years and her salary was over $30,000 per year more than Mr. Epps' salary.  (Pl. Dep. 133:6-134:3, Ex. 10.)  Importantly, during her deposition, Plaintiff could not explain how she suffered any harm, much less any "significant" harm, because of Mr. Epps' promotion to PG 11:

> Q.  Did you suffer any specific damage as a result of your allegations that Corey was treated differently?

MR. MURPHY: Object to the form.

THE DEPONENT: Repeat the question.

Q.    Did you suffer any specific damages as a result of your allegation that Corey Epps was treated differently?

A.    Can you –

MR. MURPHY: Same objection.

THE DEPONENT: Can you define damages?

Q.    Yes, ma'am. Did you have a loss of wages?

A.    We've reviewed my wages.

Q.    And I asked you a question. Did you have a loss of wages?

A.    No.

Q.    Did you have a loss of benefits?

A.    No.

Q.    Did you have any specific monetary loss as a result of you alleging Corey Epps was treated differently?

A.    I have indicated my reasons Corey was treated differently. I was responsible for upholding standards across the facility. I was not able to do that.

Q.    Is the answer to my question, no, I didn't have any money loss?

MR. MURPHY: Object to the form.

Q.    That's all I asked.

A.    We have looked over my history.

Q.    And did you have –

A.    There is not a loss.

> Q.     Thank you, ma'am. Did Ms. Petrasch discipline you as a result of you sending an e-mail objecting to Corey Epps receiving this exception?
>
> A.     No.

(Pl. Dep. 145:2-146:12.)

Taken in the light most favorable to Plaintiff, the evidence reveals that the promotion of Mr. Epps to PG 11 did not in any way alter Plaintiff's employment status with BMW MC. As a result, Plaintiff cannot establish that she suffered any adverse employment action resulting from the promotion of Mr. Epps.

> **b.     Plaintiff Cannot Establish That a Similarly Situated Employee Outside of Her Protected Class Received More Favorable Treatment.**

Plaintiff must also present evidence that a similarly situated employee outside of her protected class received more favorable treatment than her.  *Bradley*, 2015 U.S. Dist. LEXIS 117751 at *25.  As the Fourth Circuit has ruled, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C*, 545 F.3d 260, 265 (4th Cir. 2008).  Here, Plaintiff argues that Mr. Epps was treated more favorably than her by being promoted to PG 11 in October 2021. However, Plaintiff concedes that she had already been at PG 11 for approximately four-and-a-half years prior to the promotion of Mr. Epps to PG 11. (Pl. Dep. 112:8-14, Ex. 10.)  The promotion of Mr. Epps simply made him equivalent to Plaintiff in terms of Personal Grade.  Accordingly, since Mr. Epps was not treated more favorably than her, Plaintiff cannot establish the final element of the prima facie case of race discrimination.

2.      **BMW MC Can Articulate a Legitimate, Nondiscriminatory Reason for the Promotion of Corey Epps to Personal Grade 11, and Plaintiff Cannot Establish That the Reason is Pretextual.**

Even assuming that Plaintiff can establish a prima facie case of race discrimination, which BMW MC denies, Defendant can articulate a legitimate, nondiscriminatory reason for promoting Mr. Epps to PG 11. Plaintiff admits that when she expressed concerns about Mr. Epps being promoted to PG 11 while in a Function Level IV position, Ms. Petrasch explained that the promotion was proper because Mr. Epps would be in a Function Level III position within twelve (12) months. (Pl. Dep. 136:14-19, Exs. 37-38.)

Because BMW MC has articulated a legitimate, non-discriminatory reason for the promotion of Mr. Epps to PG 11 in October 2021, the burden shifts back to Plaintiff to prove by a preponderance of the evidence that BMW MC's reason was a pretext for race discrimination. *Reeves*, 530 U.S. at 143. Here, Plaintiff has presented no evidence to dispute the reason given by Ms. Petrasch for promoting Mr. Epps to PG 11.[11] Therefore, since Plaintiff has failed to offer any evidence to establish pretext, BMW MC is entitled to summary judgment on the race discrimination cause of action under Title VII and Section 1981.

**C.      BMW MC Is Entitled to Summary Judgment on Plaintiff's Sex Discrimination Claim.**

In her final cause of action, Plaintiff alleges that BMW MC discriminated against her based on sex. When questioned about this claim in her deposition, Plaintiff testified that she was treated differently based on sex because the Function Level of the TX-64 Department Manager position was potentially going to be downgraded after she moved to that position while the Function Level of the positions held by male employees were protected. (Pl. Dep. 258:8-13.) Since Plaintiff has

---

[11] Moreover, the evidence reveals that Mr. Epps did, in fact, move into a Function Level III position in May 2022, less than twelve (12) months after his promotion to Personal Grade 11. (Epps Dep. 14:12-18.)

offered no direct evidence of sex discrimination, this claim must be evaluated using the *McDonnell Douglas* burden-shifting framework.

To establish a prima facie case of sex discrimination under Title VII, Plaintiff must show (1) she is a member of a protected class; (2) she was qualified for her job, and her performance was satisfactory; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of the protected class were treated more favorably than her. *Love-Lane v. Martin*, 355 F.3d 766, 787 (4th Cir. 2004). Plaintiff cannot meet her burden in this case because she never suffered any adverse employment action, and she cannot establish that a male employee was treated more favorably than her under similar circumstances.

### 1.    Plaintiff Did Not Suffer Any Adverse Employment Action Based On Her Sex.

In support of her sex discrimination claim, Plaintiff alleges that she was told by Ms. Petrasch that the Function Level of the TX-64 Department Manager position would be downgraded from Function Level III to Function Level IV once she transferred into that role. (Pl. Dep. 313:23-314:14.) However, the evidence is undisputed that Plaintiff never transferred into the TX-64 position. At the time that Plaintiff resigned from employment in January 2022, she was still in the TX-60 Department Manager position. (Pl. Dep. 313:16-20.) Therefore, since no demotion ever occurred, the alleged adverse employment action supporting Plaintiff's sex discrimination claim is based solely upon speculation. In *Cole v. Wake County Board of Education,* the plaintiff attempted a similar argument after she was told that she was going to be removed from her position as a principal and placed in an administrative position, which she claimed was a demotion. 494 F. Supp. 3d 338, 345 (E.D.N.C. 2020), *affirmed* 834 F. App'x 820, 821-22 (4th Cir. 2021) (per curiam), *cert. denied*, 141 S. Ct. 2746 (2021). In rejecting this argument, the District Court stated the following:

> Cole's argument, however, asks the court to assume her career trajectory for
> a job in which she failed to report to work, and to speculate that if she had

> reported to work as DIS, then she would not have received a promotion. Cole's speculation about her future prospects for promotion do not suffice. *See, e.g., James*, 368 F.3d at 377. Even viewing the evidence in a light most favorable to Cole, she has failed to raise any genuine issue of material fact concerning whether reassigning her to the DIS position was an adverse employment action. It was not.

*Cole*, 494 F. Supp. 3d at 346.

In the present case, to establish an adverse employment action, Plaintiff asks this Court to speculate about what would have happened had she moved to the TX-64 Department Manager position as planned. However, the Fourth Circuit has clearly held that this Court cannot rely on speculation, guesswork, or conjecture in establishing the existence of an adverse employment action.[12]  *See James*, 368 F.3d at 376; *see also Ennis*, 53 F.3d at 62) ("[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion."). Therefore, Plaintiff cannot meet her burden to establish that she suffered adverse employment action based on her sex.[13]

### 2.    Plaintiff Cannot Establish That a Male Employee Received More Favorable Treatment Under Similar Circumstances.

To support her sex discrimination, Plaintiff alleges that Scott Medley was treated more favorably than her when he took over the newly created TX-64 Department Manager position in 2019. Specifically, Plaintiff claims that when Mr. Medley moved from the TX-61 position to the TX-64 position in 2019, the Function Level III was moved along with him. (Pl. Dep. 126:19-21.) While BMW MC does not dispute that the TX-64 Department Manager position was an ungraded position that was assigned a Function Level III rating when Mr. Medley moved into that role,

---

[12] Moreover, even if the Court were to allow such speculation, there is no evidence in the record to establish that the downgrade of Function Level is an adverse employment action under the prevailing Fourth Circuit standard. As Plaintiff testified, her salary, bonus, and benefits are determined by her Personal Grade, not by Function Level. (Pl. Dep. 72:12-13.)

[13] To the extent that Plaintiff relies on an alleged constructive discharge as the adverse employment action to support her sex discrimination claim, she has failed to meet the high burden to prove constructive discharge as fully set forth in Section V.A. above.

Plaintiff's attempt to use this change as the basis for a sex discrimination claim is misplaced because Plaintiff never actually moved into the TX-64 Department Manager position. As detailed above, Plaintiff voluntarily resigned from employment before ever moving to the TX-64 role. Therefore, she was not similarly situated to Mr. Medley. *See Lightner*, 545 F.3d at 265 ("[t]he similarity between comparators . . . must be clearly established in order to be meaningful").

Since Plaintiff cannot establish a prima facie case of sex discrimination regarding the possible downgrade of the TX-64 Department Manager position, BMW MC is entitled to summary judgment on this cause of action.

## VI.     CONCLUSION

For the foregoing reasons, Defendant BMW MC respectfully requests that the Court grant its Motion for Summary Judgment and enter judgment as a matter of law in favor of BMW MC on all of Plaintiff's causes of action.

Respectfully submitted this the 16th day of February, 2024.

By: *s/ Ellison F. McCoy*
Ellison F. McCoy (Fed. I.D. No. 6389)
ellison.mccoy@jacksonlewis.com
D. Randle Moody II (Fed. I.D. No. 7169)
randy.moody@jacksonlewis.com
Mallory H. Gantt (Fed. I.D. No. 13867)
mallory.gantt@jacksonlewis.com
JACKSON LEWIS P.C.
15 South Main Street, Suite 700
Greenville, SC 29601
(864) 232-7000

*ATTORNEYS FOR DEFENDANT*
*BMW MANUFACTURING CO., LLC*