

**In the United States District Court**
**District of South Carolina**
**Greenville Division**

|  |  |
|---|---|
| Kelly Dawsey, | 7:22-03738-TMC-KFM |
| Plaintiff, | |
| v. | Plaintiff's Opposition to Defendant BMW MC's Motion for Summary Judgment |
| Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC collectively d/b/a "BMW Group," | |
| Defendants. | |

## I. Introduction

BMW MC ignores direct evidence. It improperly frames the issues. It even ignores an entire claim. If that was not enough, BMW MC confuses the timing of key issues, claims that undisputed facts are "patently false," and it relies on disputed facts and immaterial arguments. In the end, BMW cannot escape its own policies or its several acknowledgments that it was removing Dawsey from her position and demoting her based on her nationality. The result of that is for the jury to decide.

## II. Facts

### A.     Background on Dawsey

After gaining years of human resource ("HR") experience, Dawsey joined BMW in 1995 as a staff associate relations associate. [Dawsey Dep. 36:15 – 37:24; DE 92-2 at 67; Dawsey 2nd Decl. ¶¶ 2-3]. Over a twenty-six-year career at BMW, Dawsey's professional accomplishments grew along with the plant. She held various HR positions,

eventually becoming TX-60, Department Manager of HR Planning.[1]  [Dawsey Dep. 40:8 – 41:1; see *id.* 43:14-24; *id.* 45:16 – 49:2; *id.* 49:9 – 50:9; *id.* 55:1-5; DE 92-2 at 65-67]. TX-60 covers HR planning and steering, compensation[2] and organization, benefits, associate family health center, associate wellbeing, and OFCCP compliance.  [Dawsey Dep. 59:10-12; DE 92-2 at 91-94; Dawsey Dep. 102:6-12; *id.* 104:18-20; Exh. 12]. Dawsey served as TX-60 from February 2015 until January 14, 2022.  [Dawsey Dep. 55:1-5; *id.* 56:21-23; 64:22 – 65:8; DE 92-2 at 65-66].

Dawsey reported to TX-6, the vice president of human resources.  [Dawsey 2nd Decl. ¶ 4].  During the relevant period, Christina Petrasch occupied TX-6.  [Petrasch Dep. 8:20-24].  Dawsey performed exceptionally well, earning at least the highest performance ratings from Petrasch.  [*Id.* 124:3-7; *id.* 124:15-17; *id.* 124:23 – 125:1; *id.* 125:13-16; Exhs. 20-22.  Before the challenged decisions, BMW MC considered Dawsey to be a possible nominee for TX-6.  [Dawsey 2nd Decl. ¶ 31; Dawsey Dep. 87:8 – 91:23; Petrasch Dep. 145:1 – 146:22; *id.* 147:9 – 148:16; *id.* 149:13 – 149:4].

---

[1]     BMW uses a plant code separated by a position number for naming positions.  TX is the designation for Spartanburg.  Previously BMW designated the plant as TS.  [Medley Dep. 12:1-4].    TX-6 is the human resource department.  Positions reporting directly to the vice president (TX-6) with have a two-digit number beginning with 6, such as TX-60, TX-61, or TX-64.  [See DE 45-1 at 25].  Positions with a three-digit number report to the second level within TX-6, and the three-digit number will begin with the two-digit number to which the position reports.  For example, TX-600 would report to TX-60, which reports to TX-6.  [Dawsey 2nd Decl. ¶ 6].

[2]     This includes determining compensation for employees on the BMW payroll, as well as those employed as the contingent workforce through companies like MAU. [Gilmore Dep. 20:4-13; id. 21:13-22:15; Bailey Dep. 27:18 – 29:23; id. 53:22 – 55:22; id. 56:13 – 61:22; Keiser Dep. 34:15 – 35:5].

**B.     BMW's documented policy of using nationality to fill positions.**

BMW maintains a written policy to fill positions based on nationality.   BMW requires, for example, that Germans and Americans alternate in the TX-6 and TX-60 roles.   Johannes Trauth, the former TX-6, codified the practice in a document entitled "Expat Guidelines for Plant Spartanburg" ("Expat Guidelines").   [Exh. 23; Dawsey Dep. 192:2-6; *id.* 210:12-17; DE45-1 ¶ 20; Dawsey Dep. 193:18-24; *id.* 195:14-20; *id.* 196:25 – 197:6; *id.* 197:17 – 198:2].

The Expat Guidelines document breaks down positions in Spartanburg and color codes them by nationality.   [*See, generally*, Dawsey Dep. 192:21 – 194:25].[3]   It distinguishes positions by whether they can be held by "domestics"/"locals" or "expats/internationals."   The terms "domestic" and "local" in Spartanburg refers to U.S. citizens.   [Engelhorn Dep. 19:24 – 20:2]. "Expat" and "international" refer to German nationals sent by BMW AG to work in Spartanburg.   [Dawsey Dep. 218:19-22; Dawsey 2nd Decl. ¶ 8); DE 45-1 at 6 ¶ 20(c)].   The term "global" means a candidate from any other country in the BMW Group network.   [DE 45-1 at 6 ¶ 29(c)].   The term "inbound" means an expat/international or global employee transferred from another country. [Dawsey 2nd Decl. ¶ 8].

The document begins with an acknowledgment that BMW fills positions based on nationality: "In general there is an alternating reporting structure of international and domestic below the Senior Management level."   [*Id.* at 4 (second row of the second column); DE 46 at 4; DE 45-1 at 6 ¶ 20(a)].   It then describes how that policy applies to

---

[3]     Green means international or domestic, red means domestic only, and orange means global.   [*See* Exh. 23 at 6 (right side)].

TX-60.  [Exh. 23 at 6; DE 45-1 at 6 ¶ 20(b)].  Along the left column of BMW MC 236, "Option 1" and "Option 2" documents the alternating nationality requirement for TX-60 and TX-6.  [Exh. 23 at 6][4]  The rationale for bringing in a German is stated in the top right corner of the page: "T[X]-60 has a need for an international inbound (Planner or Dept. Mgr ideally from AG – tie to network) and should follow the status of T[X]-6."  [*Id.*][5]

BMW has followed this practice for many years:

| TX-6 | TX-60 |
|---|---|
| Anne Marie Higgins (American) | Moritz Kippenberger (German) |
| Johannes Trauth (German) | Kelly Dawsey (American) |
| Christina Petrasch (German) | Kelly Dawsey (American) |
| Sherry McCraw (American) | Eva Burgmeier (German) |

[Dawsey 2nd Decl. ¶ 12; DE 45-1 at 6 ¶ 23; Dawsey Dep. 56:2-6; *id.* 57:10-14].

The use of nationality to fill positions is not limited to TX-6/TX-60 or other FL II-III positions.  [Petrasch Dep. 63:13 – 64:2 & Exh. 24 at BMW 426 – 27 (first columns)].  One time, for example, Petrasch informed Dawsey that BMW AG would fill a position underneath Dawsey with an expat.  [Exh. 25; Dawsey 2nd Decl. ¶ 10].  When the German incumbent was originally appointed, BMW gave Dawsey a list of German candidates from which she could choose.  [Dawsey 2nd Decl. ¶ 10].  Even the documents BMW has filed

---

[4]     BMW MC 236 also illustrates how positions are color-coded based on nationality. [DE 45-1 ¶ 20(b); *see also* DE 46 at BMW MC 237-39].  "TS" has been changed to "TX" for the reasons explained in footnote 1.

[5]     BMW also designated TX-65 as a position that alternates based on the nationality of TX-6.  [*Id.* at 9].  By contrast, positions like TX-61, TX-62 are not alternating, but are slated as domestic only.  [*Id.* at 7-8].

shows that individuals and positions are color-coded by nationality. [DE 92-2 at 79, 81-82 (see top right corner); *id.* 83-89 (bottom right)]

## C.    BMW appoints American TX-6 and replaces Dawsey with a German national.

In 2021, Petrasch told Dawsey that BMW MC's new president, Dr. Robert Engelhorn, was moving a German national into the vice president of assembly position (TX-4). [DE 45-1 at 4 ¶ 10]. As a result, BMW was moving the TX-4 incumbent, Sherry McCraw (American), to TX-6. [*Id.*] There is no question that BMW used nationality in making that decision. Dr. Engelhorn freely admits that he wants a domestic/local in the TX-6 position. [Engelhorn Dep. 22:15-17].

Under the Expat Guidelines discussed above, the handwriting was on the wall because the American Dawsey could not remain in TX-60 when another American occupies TX-6. On September 15, Petrasch told Dawsey that BMW would remove Dawsey from TX-60 and replace her with a German named Eva Burgmeier. [Dawsey Dep. 106:9-18; *id.* 209:13-15; *id.* 210:24 – 211:10; *id.* 237:7-12; Burgmeier Dep. 7:21-22]. Petrasch never proposed to move Dawsey out of TX-60 before Engelhorn gave her Eva Burgmeier's name. [Petrasch Dep. 139:25 – 140:3].[6]

---

[6]    Dawsey questioned Petrasch about whether BMW considered the people in the positions, and Petrasch responded, "no" and that "they don't care." [Dawsey Dep. 227:19-23; DE 45-1 ¶ 7; DE 92-2 at 103].

**D.    BMW admits that it replaced Dawsey with Burgmeier based on nationality.**

Petrasch told Dawsey why BMW was replacing Dawsey with Burgmeier.[7] Petrasch cited the rule discussed above that a German national must be in TX-60 if there is a domestic TX-6.  [Dawsey Dep. 209:24 – 210:5].  Petrasch confirmed that the only way BMW could get a domestic employee into TX-6 was to have a German in TX-60 to serve as a "bridge to Germany."[8] [Dawsey Dep. 209:24 – 210:5; *id.* 212:6-13; *id.* 226:6-16; *id.* 313:9-15; *id.* 315:9-118; *id.* 316:24 – 317:11; DE 45-1 ¶ 7; DE 92-2 at 103].

On November 11, 2021, Dr. Engelhorn, Petrasch, and McCraw met with the HR management to announce changes.  In addressing Dawsey's position, Petrasch reiterated that a German national needs to be in TX-60 when an American occupies TX-6.  [Dawsey 2nd Decl. ¶ 11].  Dr. Engelhorn also told the HR management group that BMW needed an expat on the team so that Spartanburg's HR function had a connection with Munich.  [*Id.*]

BMW has never shrunk from this position.  It defends the perceived need to use nationality as the sole factor in filling Dawsey's position.  Corey Epps occupied TX-61, which included succession planning for Spartanburg plant.  He not only explained how the practice of designating positions by nationality applied to the removal of Dawsey, but he also explained that the practice is rampant at BMW:

---

[7]    BMW contends that Petrasch was a decision-maker in terms of the decision to remove Dawsey from TX-60.  [DE 45-2 at 2-5 (Supp. Resp. to Int. 3) (emphasis added)].

[8]    Burgmeier as a bridge between Spartanburg and Germany makes no actual sense.  Burgmeier had not worked in any county other than Germany.  [Burgmeier Dep. 48:16-18].  She admits there is no reason to believe that she communicates with BMW AG any more than Dawsey did.  [*Id.* 114:4-10].  Burgmeier had no experience dealing with Spartanburg, and she does not remember dealing with Dawsey.  [*Id.* 114:11-16].  In contrast, Dawsey worked with Germany on a weekly basis.  [DE 45-1 at 5 ¶ 14].

Q.    All right.  Did Ms. Petrasch tell you why she was proposing that Kelly be moved?

A.    So the person that was coming was a domestic, so it was -- this was Sherry.  Sherry was a domestic.  **And a normal practice and considered somewhat of a best practice, but not the law, rule, or regulation, but a normal practice is that when you have a domestic, you try to put an international so you can keep your tie-in to the market.  You can keep your tie-in to Germany on the international side, and you can keep your tie-in to the American side.  So certain roles are pegged to kind of mirror that way.**  It just depends on the department what those roles are.  Usually around planning, usually around structure, those type of roles.

      * * *

Q.    And so Ms. McCraw is a domestic, correct?

A.    She is a domestic.

Q.    Okay.  And TX-60 was the planning role?

A.    It was planning.

Q.    And where did you learn about this best practice?

A.    So I've lived it for 23 years.

Q.    And I understand that.  I'm just trying to be a little more specific.  Do you recall where you first learned of it?

A.    I mean, we -- I mean, you saw it -- I saw it in the TX-4 organization.  I saw it in the TX-5 organization.  I saw it in the TX-1 organization, you know, and -- but I also saw it -- it wasn't there in the TX-3 organization.  It wasn't there in other organizations.  So, again, it was either -- it was a best practice to keep your international ties.

[Epps Dep. 38:14 – 39:3 (emphasis added); *id.* 39:9-25].

      Dr. Engelhorn continues to defend the practice.  He testified that, in alignment with the policies from Germany, BMW wants a "clear link to the international network," that requires at least one international candidate.  [Engelhorn Dep. 53:24 - 56:7; *id.* 59:23 – 61:2].  Petrasch and Burgmeier confirmed that Dr. Engelhorn followed the guidelines to

fill TX-60 with a "bridge to Germany" because the new VP would be domestic.  [Petrasch

Dep. 126:4-18; *see also id.* 131:4-6; Burgmeier Dep. 45:18 – 46:14; id. 47:2 – 23].

But it was not just the depositions.  BMW also defended its use of nationality in its

written discovery responses:

> In early September 2021, Dr. Robert Engelhorn met with Christine Petrasch to discuss succession planning in the TX-6 Department since Ms. Petrasch's international assignment was scheduled to end in early 2022. During that meeting, **Dr. Engelhorn informed Ms. Petrasch that he preferred to have a local BMW MC associate in the TX-6 position (Vice President of Human Resources).**
>
> * * * *
>
> Dr. Engelhorn and Ms. Petrasch reviewed the five managerial positions that reported directly to the Vice President of Human Resources at BMW MC (the "direct report manager" roles).  **Dr. Engelhorn and Ms. Petrasch determined that an international associate should be brought in to fill one of the direct report manager roles in TX-6. Since Plaintiff had been in the TX-60 role for almost seven years, Dr. Engelhorn and Ms. Petrasch made the decision to move her to a different direct report manager role in the TX-6 Department and bring in an international associate to fill the TX-60 role.**  BMW AG provided potential international candidates for the TX-60 role. Dr. Engelhorn interviewed Eva Burgmeier for the TX-60 role by video and in person (in Germany).

[DE 45-2 at 2-5 (Supp. Resp. to Int. 3) (emphasis added)].  BMW further claims that the

decision to have an international (German) employee is a "business need":

> BMW MC's decision to move Plaintiff to the TX-64 direct report manager role was based upon the business needs of the Company. After deciding that Sherry McCraw would take over the TX-6 Vice President role, **Dr. Robert Engelhorn and Christine Petrasch determined that an international associate should be brought in to fill one of the direct report manager roles in the TX-6 Department.**

[*Id.* at 5 (Supp. Resp. to Int. 5) (emphasis added)].

**E.     BMW tells Dawsey that it will demote her.**

The second action at issue is BMW's subsequent decision to transfer and demote Dawsey to a FL IV position. It would not have been, as BMW argues, a "lateral transfer." [DE 92-1 at 1, 2, 10, 12, 15, 16]. And BMW is wrong to suggest that Dawsey ever used that term. [*See id.* at 15]. BMW has always designated TX-60 as an FL III position. [Dawsey 2nd Decl. ¶ 23; McCraw Dep. 111:9-10; Epps Dep. 15:24 – 16:1; Exhs. 12 - 13].[9] At first, Petrasch told Dawsey that BMW would move her to TX-61 and keep her at FL III. [Dawsey Dep. 219:1-4; *id.* 219:19-22; *id.* 224:7-10; *id.* 233:9-15; *id.* 236:17-20; *id.* 265:10-16; Dawsey 2nd Decl. ¶ 22][10] Epps was the incumbent in TX-61. Petrasch planned to move Epps to TX-64, a FL IV position. [Petrasch Dep. 118:24 – 119:13; (92-14 at 4; DE 92-2 at 103].[11] Petrasch could not, however, commit as to whether BMW would transfer Dawsey to another FL III position. Petrasch mentioned the possibility that BMW might demote Dawsey to FL IV. [Dawsey Dep. 293:23 – 294:24].

By October, however, the picture became clear after McCraw weighed in. [*See* DE 92-2 at 106-10]. Petrasch told Dawsey that BMW would not move her to TX-61 (FL III). Instead, BMW would move Dawsey to TX-64 and that it would be a demotion to FL IV. [DE 20 ¶ 56; Dawsey Dep. 258:9-11; *id.* 260:23-25; *id.* 266:23 – 267:1; *id.* 313:21 – 314:9; Petrasch Dep. 31:7-17 (discussing Exh. 26); Dawsey 2nd Decl. ¶ 9].

---

[9]     A position's function level appears in the fourth line of the box at the top of the JFDS.

[10]     Although this also was a FL III position, Dawsey did not agree with it as she opposed having to vacate her position just so that it could be filled by someone who is German. [Dawsey Dep. 219:5-7; *id.* 219:23-25].

[11]     As discussed below, this would have been consistent with his personal grade. [*Infra* § III(G)(1)].

**F.      TX-64 is materially different from TX-60 and has a lower function level.**

TX-64 is not only rated lower, it also does not require any HR experience.  [McCraw Dep. 58:24 – 59:2].  The position did not involve the strategic planning, compensation, and benefits work of TX-60.  [*Supra* § II(A)].  Instead, it involved day-to-day recruiting and managing functions such as food service.  [DE 92-2 at 97; Exh. 27; Medley 26:7-12].

Just as Petrasch had said, BMW relegated TX-64 to FL IV status and filled it with inexperienced managers at lower personal grades, who made significantly less than Dawsey.  [Bailey Dep. 26:14-21; Gilmore Dep. 8:20-22; *id.* 9:23-25; *compare* Exhs. 28 (Bailey - sealed) - 29 (Gilmore - sealed), *with* Exh. 30 (Dawsey)].  Neither of the first two individuals chosen for TX-64 under McCraw had notable HR experience, especially in recruiting.  The first person hired by TX-64 was Clarence "Eddy" Bailey.    [Bailey Dep. 32:5-6; *id.* 23:5-8].  His experience in HR was limited to a non-management FL V training position, working with engineering interns and co-ops.  [Bailey Dep. 16:15-24; *id.* 18:10 – 19:7; *id.* 21:25 – 22:21; *id.* 17:17-21].   Even after Bailey became TX-64, he was not involved in recruiting for non-exempt positions.  [Bailey Dep. 31:6-20].  Bailey served for less than a year before resigning.  [*Id.* 27-2-5; *id.* 26:17- 27:1].  BMW then appointed Neal Gilmore.  [*Id.* 15:6-7].  Gilmore had no HR experience: "I've never worked in a human resource department."  [Gilmore Dep. 23:2-3].  Nor had he ever been responsible for a recruiting function.  [*Id.* 19:23-24; McCraw Dep. 58:22-23].

## G.    The significance of function level and personal grade designations

"Function Levels (FL) define the value of the job."  [Exh. 18 at BMW MC 1714]. They are based on "competencies, accountabilities, and requirements, as outlined in the job description (Job Function Data Sheet/JFDS)."  [*Id.*][12]    And there are significant differences between FL III and FL IV.[13]  FL III consists of department managers.  [Exh. 18 at 1716].  FL III has "[m]anagement level responsibility for multiple functional areas and/or leads a single functional area with full operational responsibility."  [*Id.*].  They "typically manage[] multiple  managerial direct reports."  [*Id.*]

In contrast, FL IV consists of managers.  [*Id.*].  Contrary to BMW's effort to characterize both FL III and FL IV as "department managers," FL IV does not carry the department manager title.  [Dawsey 2nd Decl. ¶ 7].  FL IV incumbents manage one or several functional areas of first-line supervision or work highly independently on specialized tasks.  [*Id.*]  Unlike FL III, they do not manage managers.

The distinctions between function levels are so important to BMW that BMW AG personally reviewed and approved candidates for both levels.  [DE 45-1 at 2 ¶ 5; Petrasch Dep. 33:15-20; *id.* 33:25 – 34:10; id. 35:1-3; id. 113:6 – 115:3; Exh. 31].  BMW AG also

---

[12]    The subject matter expert regarding compensation and grading is Dawsey.  One of Dawsey's responsibilities in TX-60 was to grade positions subject to the approval of TX-6 and BMW AG.  [Dawsey Dep. 173:16-18; Dawsey 2nd Decl. ¶ 5; McCraw Dep. 102:11-15; *id.* 112:4; Dawsey Dep. 127:8-11 (confirming that Dawsey was responsible for facilitating the grading system through Germany)].

[13]    BMW now also denotes positions within function levels ("FL") as being on expert level ("EL") or leadership level ("LL") tracks.   That change, however, is immaterial to any issues raised in the Motion.  For instant purposes, FL III includes EL III and LL III and FL IV includes EL IV and LL IV.  [Dawsey 2nd Decl. ¶¶ 14-15, 17].

set strict parameters on how many FL III and FL IV positions BMW MC may have in HR and the other areas.  [Dawsey 2nd Decl.  ¶ 20].

### 1. Both function level and personal grade affect compensation.

Each function level at BMW has a salary range.  It essentially creates a band for compensation.  [Dawsey Dep. 258:16-20].  The salary range for FL III is higher than for FL IV.  [Dawsey 2nd Decl. ¶ 27].  In other words, an employee's salary potential is higher at FL III.

While BMW grades positions into function levels, each associate has a personal grade based on their qualifications.  [Exh. 18 at 4].  BMW limits what personal grades could serve at the various function levels.  In relevant part:

| Function Level: | Personal Grade: |
|---|---|
| III | 12 |
| | 11 |
| | 10 |
| IV | 9 |
| | 8 |

[Exh. 18 at 5*; Burgmeier Dep. 71:23 – 72:4].  An individual's personal grade determines where their salary will fit within the function level's salary range.  [Dawsey Dep. 258:16-20; Dawsey 2nd Decl. ¶¶ 16, 18, 28].

### 2. BMW AG required that personal grades be aligned with function level.

In 2021, BMW AG dictated that BMW MC align personal grades with function levels.  [Dawsey Dep. 187:1-10].  In other words, if an individual's personal grade exceeded the range for a function level (*e.g.*, a PG 11 in an FL IV position), his or her personal grade would be reduced.  [*Id.* 190:24 – 191:8; Dawsey 2nd Decl. ¶ 21)].

BMW implemented guidelines that reduced the personal grade of individuals whose personal grade exceeded the range for the function level of their position. [*See* Exh. 32; *see* Dawsey Dep. 264:1-11; Dawsey 2nd Decl. ¶ 21]. As the guidelines state, reducing personal grade reduces salary, benefits (including bonus, vehicle, etc.), and personal time off (PTO). [Exh. 32 at 4 (chart headers)]. A reduction in personal grade directly affects one's bonus multiplier. [*See* Exh. 18 at 7 (bottom line of chart)]. By 2022, this policy had reduced pay and benefits for several employees working in jobs where the function level was lower than their personal grade would allow (*e.g.*, a PG 11 in an FL IV). [McCraw Dep. 23:7-14; *id.* 29:16-19; *id.* 29:4-8].[14]

Relegation to FL IV status also affects one's ability to advance. FL II executives are eligible for OFK designation. [Petrasch Dep. 49:3-15]. "OFK is an acronym to describe the company's top leaders, referred to in German as "'Obere Fuehrungskraefte.'"[15] As a FL III manager, Dawsey was eligible to be a candidate for FL II and OFK status, she expressed an interest in such a promotion, and BMW had considered her once. [Dawsey Dep. 87:8 – 91:14; Dawsey 2nd Decl. ¶ 31; *supra* § II(A)].

BMW does not, however, promote FL IV incumbents into FL II positions. [Dawsey 2nd Decl. ¶ 31; Burgmeier Dep. 72:13-16]. Accordingly, a downgrade from FL III to FL IV also affects one's eligibility for promotion.

---

[14]    McCraw testified that she complained to Petrasch about the policy, but her complaints "fell on deaf ears." [McCraw 76:21 – 77:1]. McCraw claims she later revoked the policy after Dawsey had left BMW. [*Id.* 28:3-10]. She never told Dawsey, however, that she planned to do so. [*Id.* 28:11-13; *id.* 28:19-22].

[15]
https://www.reuters.com/article/idUSKBN1AK1A1/#:~:text=OFK%20is%20an%20acronym%20to,German%20as%20%22Obere%20Fuehrungskraefte.%22

**H.    Burgmeier was unqualified for TX-60.**

Unlike Dawsey's decades of credentials and experience, Burgmeier had never worked in the U.S.  [Burgmeier Dep. 7:23 – 8:13; *id.* 22:2-15].  Unlike Dawsey, Burgmeier has no SHRM[16] certifications [*Id.* 65:6-7; Dawsey Dep. 18:7-10; *id.* 18:21-22; *id.* 19:6-10].  And unlike Dawsey,[17] Burgmeier had no experience in the required areas for TX-60.[18]

Burgmeier also was a surprise because BMW never identified her as a candidate for any position in Spartanburg, let alone TX-60.  [Petrasch Dep. 132:4-6].  Epps, who

---

[16]    https://www.shrm.org/ This designation requires expertise in the strategic planning aspects of HR.  [Dawsey Dep. 20:8 – 21:22].

[17]    *See* Dawsey 2nd Decl. ¶ 32.

[18]    This includes experience in ERISA [Burgmeier Dep. 65:17-23], dealing with the OFCCP [*id.* 66:6-8], maintaining knowledge or understanding of U.S. regulations [*id.* 62:10-13], maintaining current knowledge or understanding of South Carolina regulations [*id.* 62:14-17], maintaining current knowledge and understanding of new developments and laws regarding HR in the U.S. or South Carolina.  [*id.* 62:18 – 63:2], with reporting requirements [id. 63:3-9], in directing the preparation of information requested to comply with laws in the U.S. or South Carolina [*id.* 63:12-16], in designing, evaluating, and modifying policies to ensure compliance with U.S. or South Carolina law [*id.* 63:17-22], in obtaining cost-effective employee benefits and monitoring the benefits environment in the U.S. [*id.* 63:23-64:3], in complying with reporting requirements and government rules, including those related to ERISA [*id.* 64:4-8], in leading competitive market research to establish pay practices and pay bands [*id.* 64:4-8], in contributing to compensation strategies in the U.S. or South Carolina [*id.* 64:15 – 65:1], or in using the Mercer system used by BMW [id. 65:13-16].  Burgmeier not only had no experience dealing with HIPAA, but she still does also not know what it is.  [Burgmeier Dep. 66:9-12].

All of Burgmeier's legal training and education relates to Bavarian and German law, and she never studied U.S. law.  [*Id.* 58:15 – 59:13].  Nor did she study HR or personnel development that related to practices in the U.S.  [*Id.* 57:8-15].  Burgmeier also agrees that compensation systems in Germany are nothing like they are here.  In Germany, wages are agreed upon between employer and worker representatives to a works council.  [*Id.* 66:23 – 67:13; *id.* 59:20 – 60:18; *id.* 67:14 – 68:4].  In Spartanburg, BMW alone determines the wages.  [*Id.* 69:9-12].  Likewise, Germans do not have employer-sponsored healthcare.  Instead, the government provides those benefits.  [*Id.* 23:21 – 24:4].

was over succession planning, had never heard of Burgmeier.  [Epps Dep. 40:15-24; *id.* 30:13-15; id 40:7-10].  McCraw also knew nothing about Burgmeier and had no input into the decision.  [McCraw Dep. 8:2-4; *id.* 8:8-16; *see also* Petrasch Dep. 128:3-4; *id.* 130:22 – 131:1].  Burgmeier never visited Spartanburg before the reorganization decision. [Burgmeier Dep. 22:16-19].  Rendering the move even more surprising is that Burgmeier's appointment is temporary, and BMW AG must take her back.  [*Id.* 50:16 – 52:10].

## I.  Dawsey took the only offer she had after BMW never offered her a job.

After BMW announced that it was removing Dawsey from TX-60, BMW never offered Dawsey a position in human resources or in any other department.  [Dawsey 2nd Decl. ¶ 37].  Petrasch told Dawsey to look for other jobs outside of HR.[19]  [Dawsey Dep. 234:8-13; *id.* 230:18 – 231:15; id. 242:9-243:16; *id.* 244:1-3; *id.* 258:24 – 259:3; id. 259:9-10; *id.* 266:1-6].  Petrasch mused that McCraw did not want to work with the experienced HR managers.  [Dawsey 2nd Decl. ¶ 36; *see also* DE 92-2 at 106 (Petrasch forwarding the reorganization Plan as approved by McCraw to Germany and lamenting that McCraw did not even want to work with the department's long-time assistant);[20] *see* Dawsey 2nd Decl. ¶ 44].   In another harbinger, Petrasch arranged for Dawsey to interview in other departments.  [Dawsey Dep. 242:9 – 243:16; Dawsey 2nd Decl. ¶ 40].

---

[19]    At the time, Petrasch was critical of the moves and sympathetic to Dawsey. [Dawsey Dep. 225:18-25].  Petrasch told Dawsey to let Petrasch know what she wanted. She also told Dawsey, "do not show any fear because honestly they don't deserve you." [*Id.* 232:14-18; id. 234:8-12; DE 92-2 at 105].

[20]    "sie will noch nich einmal mit unserer langjaehrigen TX-6 Assitenz arbeiten" (Google translator).

After Dawsey informed Petrasch of her resignation, Petrasch remarked to BMW AG executive Karl Hacker,[21] "Sherry and Kelly doesn't work." [Petrasch Dep. 22:3-4; Exh. 33]. Petrasch attributed this statement to "tension between Sherry and Kelly." [Petrasch Dep. 22:7-13; *id.* 22:20-24 ("I was not sure if they both could have a relationship on a professional level to work together."). Petrasch described the unlikelihood that McCraw and Dawsey could coexist:

> So the relationship between Sherry and Kelly was something for me which I didn't know if this would stay on a professional level, if they could work together, because this was the point where Kelly realized or was a direct report to -- would be a direct report to Sherry, and this is what I could not— I had no—it was difficult for me to judge if this would happen or not.

*Id.* 163:7-15. McCraw must have been the source of the "tension." Dawsey never told Petrasch that she could not work with McCraw and was unaware of any problems. [Petrasch Dep. 22:25 – 26:2; Dawsey Dep. 214:24 – 215:5]. At the same time, however, McCraw never spoke to Dawsey during the reorganization. [McCraw Dep. 19:9-18; *id.* 19:24-25; *id.* 20:15-18].

The reorganization and Petrasch's departure was known since the Spring of 2021. Dawsey explored the job market only after communications about the reorganization became chaotic, and she felt the need to see if there were alternatives if she was left out. [Dawsey 2nd Decl. ¶¶ 13, 33; Dawsey Dep. 269:20 – 270:2]. More importantly, Dawsey accepted employment elsewhere in December only after: (1) BMW informed her in September that it was removing her from TX-60; (2) BMW informed her in October that it would be demoting her to TX-64; (3) BMW announced the moves in November; and (4)

---

[21]    Petrasch Dep. 20:4-5.

BMW AG announced Burgmeier's move on December 2nd.  [Dawsey 2nd Decl. ¶¶ 33-35; DE 45-1 at 1 ¶ 4 & DE 45-1 at 21; Burgmeier Dep. 44:10 – 22].

To continue her career, Dawsey found another job after being advised by Petrasch to seek work outside of HR.  [Dawsey Dep. 261:17-20; DE 45-1 at 6 ¶ 21].  Dawsey ended up accepting her only job offer, which also allowed her to stay in her field.  [Dawsey 2nd Decl. ¶¶ 35, 37-39].

### III.  Argument

Dawsey has pled her National Origin claims under both Section 703(a)(1)[22] and 703(a)(2) of Title VII.  [DE 20 at 13 ¶¶ 67-68].  Her race claims are pled under both Section 703(a)(1) and Section 1981.  Her sex claim is pled under Section 703(a)(1).

### A.    Section 703(a)(2) claim (nationality)

BMW MC never cites or addresses Section 703(a)(2).    Thus, the Court should deny the Motion as to this claim because BMW MC has not moved for judgment.

Section 703(a)(2) prohibits classifying and limiting employees because of their national origin:

> It shall be an unlawful employment practice for an employer . . . to limit. . . or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

*Id.* § 2000e-2(a)(2); 1 Barbara T. Lindemann, Paul Grossman, and Geoff Weirich, Employment Discrimination Law 6-9 (6th ed. 2020).  "Classification in this respect means

---

[22]    Section 703(a)(1) is the broader provision, which prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1).

to categorize the employee or the job for a reason, or in a manner, prohibited under Title VII." EEOC Guidance CM-618: Segregating, Limiting, and Classifying Employees § 618.7(a) (10/1/83) ("EEOC Guidance");[23] *id.* § 618.1(a). Limiting employees . . . means limiting the actual number of individuals in a position based on a prohibited basis. EEOC Guidance § 618.6(a).

The evidence here is not only black and white: BMW color-coded it. [*Supra* § II(B)]. Employers cannot have some positions for whites and other positions for blacks. They cannot have some positions for men and other positions for women. And they cannot have some positions for Americans and other positions for non-Americans. The statute draws no distinction between the protected characteristics (*e.g.*, race vs. national origin).[24] BMW's national origin discrimination is no less of a Title VII violation than if the policy stated that a black person could not serve in TX-60 while another black person served in TX-6. BMW not only *classifies* employees unlawfully based on national origin, but it also *limits* their opportunities on the same basis. The violations are plain.

---

[23]    Available at https://www.eeoc.gov/laws/guidance/cm-618-segregating-limiting-and-classifying-employees.

[24]    There is no "business need" defense. Employers cannot decide that one nationality must fill a certain position. EEOC Guidance § 618.8. If there was a defense it would have to be pled and proven under Section 703(3) as a bona fide occupational qualification ("BFOQ") affirmative defense. 42 U.S.C. § 2000e-2(e); *Burwell v. E. Air Lines*, 633 F.2d 361, 380 (4th Cir. 1980). BMW MC never pled such a defense, which is waived. *EEOC v. Ecurie Alford, Ltd.*, Civ. A. No. 91-113-NN, 1993 U.S. Dist. LEXIS 21735, at *22 (E.D. Va. July 15, 1993). Pleading the defense would have been futile because BMW MC appoints Americans to TX-60, and nothing about the position renders Americans unqualified to perform the job functions. *Int'l Union v. Johnson Controls*, 499 U.S. 187, 201 (1991). Pleadings aside, BMW does not move for judgment based on a BFOQ argument.

**B.    Section 703(a)(1) claims (nationality, race, sex)**

    **1.    BMW MC's arguments as to all Section 703(a)(1) claims**

        **a.    BMW MC improperly claims that Dawsey quit before BMW MC implemented its decision.**

BMW MC argues that Dawsey cannot win on any Section 703(a)(1) claim because she quit before BMW carried out its announced reorganization. [DE 92-1 at 15, 18]. BMW also argues that it is "speculative" to believe it would have demoted Plaintiff to TX-64 as announced. [*Id.* at 2, 18-20, 28-29]. BMW MC's argument fails on both legal and factual grounds.

        **1.    BMW's argument fails as a matter of law[25]**

BMW cannot support its argument that Dawsey had to wait for BMW to implement its unlawful decision. Dawsey became the victim of a discriminatory policy when BMW announced its decision to replace her with a German, and not when Dawsey would have felt the effects of the change. *Delaware State College v. Ricks*, 449 U.S. 250, 256-58 (1980) (claim arose when professor notified of denial of tenure and pending termination and not when the resulting termination occurred); *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981) ("[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful."*); Hospodor v. Burlington Indus.*, No. 99-2017, 2000 U.S. App. LEXIS 2679, at *3 (4th Cir. Feb. 23, 2000) (termination claim arose when the plaintiff "received notice that he was to be terminated"); *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) (noting that discriminatory act was the employer

---

[25]    BMW's argument does not apply to Dawsey's Section 703(a)(2) national origin claim because Dawsey does not base the classification claim on the termination of employment (although the discrimination can result in damages from the loss of employment). [*Supra* § III(A)].

informing plaintiff of his removal as branch manager) (citing *Ricks*); *Smith v. Univ. of Md. Balt.,* 770 F. App'x 50, 50 (4th Cir. 2019).[26]

### 2.    Facts preclude the argument.

Even if the law allowed BMW's argument, it fails factually for two reasons.  First, the decision to remove Dawsey from TX-60 was complete and announced in September and again in November.  [Supra § II(I)].  BMW AG had also announced Burgmeier's move on December 2nd.    [*Id.*]  Second, BMW's assertions are contradictory.  When Dawsey requested an admission that BMW had not offered Dawsey the TX-64 position, BMW MC denied the request based on its announcement in November 2021.  [Exh. 34 at 2 (Resp. to RTA 6)].  Now BMW wants to muddy that picture, an odd tactic for a summary judgment motion.

BMW's contradictions, however, do not end there.  In the same brief where BMW now claims that the move was "speculative," it complains—two years later—that Dawsey's resignation forced it to change course and keep Medley in TX-64.  [DE 92-1 at 12 ("As a result of Plaintiff's abrupt resignation in January 2022, the reorganization plan was put into disarray as Mr. Medley had to continue performing the TX-64 . . . duties . . . .")   How can BMW claim that it *changed* a plan two years ago that is merely speculative?  As for the downgrade of TX-64, there is no need to speculate: BMW implemented its decision to downgrade TX-64 back to FL IV just as it said it would.  [*Supra* § II(F)].

---

[26]    *Cf. Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 367-68 (1977) (implementation of unlawful policy of filling positions on the basis of a prohibited basis is actionable even in the absence of a showing that the plaintiff applied for the position).

### b. BMW MC's argument that there was no adverse employment action.

BMW MC also seeks dismissal as to all claims because there was never an adverse employment action. Even under Section 703(a)(1),[27] BMW's arguments fail as a matter of law. At a minimum, there are significant issues of material fact.

### 1. BMW MC mis-identifies the adverse actions.

BMW MC does not address the actual adverse actions at issue. There are two. First, BMW decided to remove Dawsey from TX-60 and to replace her with a German national. *E.g., Price*, 694 F.2d at 965. Second, BMW later decided to demote/transfer Dawsey to TX-64, an FL IV position. BMW made the first decision before it made the second. [McCraw Dep. 16:3-5; id. 22:9-13; *see also supra* § II(E) (noting that the original plan was to move Dawsey to another FL III position)].

### 2. Even a lateral transfer would be actionable under Title VII.

The Supreme Court will soon supplant Fourth Circuit Section 703(a)(1) jurisprudence on adverse employment actions. The Court will likely issue its decision in *Muldrow v. City of St. Louis*, No. 22-193 while this Motion is pending,[28] and it is widely predicted that the Court will rule that even lateral transfers are actionable under Title VII.

---

[27]     Again, this argument would not apply to Section 703(a)(2). The cases relied on by BMW all interpret Section 703(a)(1)'s "compensation, terms, conditions, or privileges of employment" provision. 42 U.S.C. § 2000e-2(a)(1). That language does not exist in Section 703(a)(2).

[28]     The question in *Muldrow* is: "Does Title VII prohibit discrimination in transfer decisions absent a separate court determination that the transfer decision caused a significant disadvantage?" *Muldrow*, Docket Entry June 30, 2023. https://www.supremecourt.gov/docket/docketfiles/html/public/22-193.html The case was argued on December 6. https://www.supremecourt.gov/oral_arguments/audio/2023/22-193

[*See* Exh. 35].  BMW's decision to remove Dawsey from TX-60 is actionable because the most fundamental term or condition of employment is the job one holds.  *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022); *Threat v. City of Cleveland*, 6 F.4th 672, 678-79 (6th Cir. 2021); *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000); *see Ortiz-Diaz v. United States HUD*, 867 F.3d 70, 81 (2016) ("As I see it, transferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes discrimination with respect to 'compensation, terms, conditions, or privileges of employment' . . . .") (Kavanaugh, J., concurring).

### 3.    There was no lateral transfer.

No matter how often BMW uses the phrase, "lateral transfer," that is not what happened.  [*Supra* §§ II(E)-(F)].  BMW never offered Dawsey a job in human resources or any other department.  Nor has BMW claimed that it offered her a FL III position, even if that mattered.

TX-64 would have been a demotion for Dawsey that affected status, pay, and benefits.  Dawsey understands that, until and unless the Supreme Court clarifies the standard in *Muldrow*, current Fourth Circuit case law requires that a challenged decision be "adverse."  But that is still an easy hurdle for Dawsey to clear:

> An adverse employment action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." [*James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)] (internal quotation marks omitted). . . . . There must be some significant detrimental effect and "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).

22

*Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *E.g.*, *Webster v. Rumsfeld*, 156 F. App'x 571, 579 (4th Cir. 2005).[29]

BMW's announcement to Dawsey and then others of the transfer/demotion to TX-64 affected "level of responsibility," "compensation," and "opportunity for promotion." *See* [*Supra* § II(G)(1)]. A personal grade reduction (under BMW policy) also constitutes an adverse action because personal grade also directly dictates salary, bonus, and benefits. [*Id.*] So either downgrade qualifies as an adverse employment action under *Holland* and *James*.

BMW MC's heavy reliance on *James v. Booz-Allen* is misplaced. In *James*, the plaintiff's position (senior associate), pay, and benefits remained the same. *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004). *James* does not apply when the position changes. *Spriggs v. Senior Servs. of Se. Va.*, No. 2:11cv182, 2012 U.S. Dist. LEXIS 74110, at *17 (E.D. Va. May 29, 2012). BMW MC also improperly relies on *Cole v. Wake Cty. Bd. of Educ.* In *Cole,* the defendant transferred a school principal to another administrative position of importance. *Cole v. Wake Cty. Bd. of Educ.*, 494 F. Supp. 3d 338, 343 (E.D.N.C. 2020). The *Cole* Court rejected the plaintiff's unsubstantiated assertion that a lateral transfer was a demotion, which did not square with the evidence. *Id.* at 346. It also rejected the plaintiff's speculation that the lateral transfer could affect future promotions. *Id.* at 347. There is no speculation here. FL IV is lower than FL III. And there is no speculation about the effects of moving from FL III to FL IV. [*Supra* §§ II(F), II(G)(1)-(2)].

---

[29]    Much of this rationale is based on pre-*Burlington Northern* caselaw regarding what is an "adverse employment action" for purposes of retaliation. *See id.*

BMW's admission that Dawsey's national origin was a motivating factor ends the inquiry for this Motion. Dawsey is entitled to a jury trial. 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that . . . national origin was a motivating factor"). None of BMW's other arguments foreclose a trial on this claim. *Id.* § 1981a(c)(1).

### c. BMW swings and misses with its constructive discharge argument.

BMW MC devotes the greatest amount of space in its brief trying to knock down a straw man. BMW MC argues that Dawsey's "constructive discharge claim is impermissibly based on speculation" [DE 92-1 at 2], that she "attempts to couch her voluntary resignation as a constructive discharge," [*id.*] and that she cannot prove constructive discharge [*id.* at 16-22]. That is all a dispute-riddled diversion.

Dawsey's discrimination claims focus on being subjected to unlawful classification and limitation, on BMW's decision to demote her, and on the disparate treatment accorded Epps and Medley (discussed more fully below). [DE 20 at 9-10 ¶¶ 42-50; *id.* at 11 ¶¶ 56-59; DE 38 at 1]. Put simply, Dawsey doesn't have to prove constructive discharge, and it never was the gravamen of her Complaint.

The moving party on summary judgment cannot prevail by ignoring the non-moving party's theory of the case, or by trying to re-cast the claims in a way the moving party finds more beneficial. *Orth v. Powers*, Civil Action No. 11-323 Erie, 2015 U.S. Dist. LEXIS 82638, at **13-16 (W.D. Pa. June 25, 2015); *Hyde v. Ferrellgas, Inc.*, No. 4:13-CV-0162-HLM-WEJ, 2014 U.S. Dist. LEXIS 193021, at *4 (N.D. Ga. Jan. 27, 2014); *Walters v. Wash. State Dep't of Corr.*, No. C06-1448-JCC, 2008 U.S. Dist. LEXIS 14210, at *21

(W.D. Wash. Feb. 25, 2008). Because BMW chose not to address the actual issues, its Motion should be denied outright.

Likewise, because BMW makes no argument about damages from the adverse actions relied on by Dawsey, she need not address her entitlement to a jury trial under the 1991 Civil Rights Act for compensatory and punitive damages. 42 U.S.C. § 2000e-5(g)(1). Nor need she address the other damages flowing from the fact that she ultimately accepted the only job offered to her as of the date of her resignation.[30] Finally, Dawsey need not emphasize that BMW bears the burden as to any mitigation argument had it made one, which it didn't. *Miller v. AT & T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001) (citing *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir.1995)).

### 2. Nationality

#### a. This is a direct evidence case and BMW never addresses its burden of proof.

This is a rare direct evidence case in which the employer's motive is irrefutable.[31] *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *Richards v. Schaeffler Grp. U.S.*, No. 0:20-02024-SAL-KDW, 2021 U.S. Dist. LEXIS 249365, at *16-19 (D.S.C. Dec. 21, 2021); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring) ("[D]irect evidence of intentional discrimination is hard to come by."); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716-17 (1983) ("There will seldom be "eyewitness" testimony as to the employer's mental processes.").

---

[30] *See Scott v. Ameritex*, 7:99-cv-00173-HMH DE 46 at 6-7 (D.S.C. March 16, 2000) (backpay is not limited to termination or constructive discharge situations) (citing and quoting *Hansel v. Public Serv. Co.*, 778 F. Supp. 1126, 1135 (D. Colo. 1991)).

[31] BMW seemingly now tries to refute its own reasoning, which only creates another disputed issue of material fact.

BMW removed Dawsey from her position and decided to transfer and demote her based on nationality. (S*upra* §§ II(C)-(E)). Because Dawsey has presented direct evidence or, at a minimum, evidence that is more than sufficient under *Costa*,[32] the burden of proof shifts to BMW. *Hill*, 354 F.3d at 284; *Rowland v. American General Finance, Inc.*, 340 F.3d 187, 193 (4th Cir. 2003).

And that should end this Motion because summary judgment is inappropriate in mixed-motive cases. *Bielawski v. Davis Roberts Boeller & Rife, P.A.*, No. 2:18-cv-758-FtM-29MRM, 2020 U.S. Dist. LEXIS 94829, at *13 (M.D. Fla. June 1, 2020) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) and *McCabe v. Excel Hosp., Inc.*, 294 F. Supp. 2d 1311, 1313 (M.D. Fla. 2003)); *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998) (citing *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997)).

That is especially true here because BMW never pled a *Price Waterhouse* affirmative defense or made such an argument in its Motion. 42 U.S.C. § 2000e-5(g)(2)(B).

>    **b.    BMW makes no other McDonnell Douglas argument about the Section 703(a)(1) national origin claim.**

Other than its arguments that there was no adverse employment action [*supra* § III(B)(1)(b)], BMW makes no *McDonnell Douglas* argument about Dawsey's national

---

[32]    Dawsey need not produce direct evidence to shift the burden of proof to BMW. *Desert Palace v. Costa*, 539 U.S. 90, 99-100 (2003); *Diamond v. Colonial Life Accident Ins., 416* F.3d 310, 317 (4th Cir. 2005); *Rowland v. American General Finance, Inc.*, 340 F.3d 187, 193 (4th Cir. 2003); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294-95 (4th Cir. 2010).

origin claim.  It does not provide any arguments about prima facie case, legitimate nondiscriminatory reason, or pretext.  [DE 92-1 at 14-22].

### 3.     Race

Dawsey alleges race discrimination in Counts II (Title VII) and III (Section 1981). [DE 20 at 14-15].[33]

#### a.     BMW MC's prima facie arguments

BMW argues that Dawsey cannot show an adverse employment action [DE 92-1 at 23-26], and that there is no evidence of preferable treatment shown to Corey Epps (black) [*id.* at 26].

##### 1.     Adverse employment action

Dawsey has already addressed the adverse employment action element.  [*Supra* § III(B)(1)(b)].  The adverse employment actions here are best understood in terms of the preferential treatment, including BMW announcement to move Dawsey, and not Epps, to TX-64, as well as the corresponding promotion of Epps while BMW was demoting Dawsey.

##### 2.     Preferential treatment

In two ways Epps received preferential treatment.  As discussed more fully below, Epps occupied TX-61, which BMW considered to be FL IV at the time.  [*Infra* § III(B)(4)(a)(2)].  BMW decided not to move Epps laterally to TX-64 (FL IV) based on race. BMW documented its consideration of race in the validation review Petrasch submitted to BMW AG.  BMW MC noted that Epps was the "first and only minority candidate within

---

[33]     The elements for both statutes is essentially the same.  *Love-Lane v. Martin*, 355 F.3d 766, 785 (4th Cir. 2004).

HR firstline" and that it is "very important to keep him in that HR position." [Exh. 24 at BMW MC 426, ¶ 1 under Epps)].[34]  Petrasch explained the entries as meaning that BMW was "happy to develop a minority candidate on the first line," and "it is very helpful for us to keep him to show that we also develop African American people." [Petrasch Dep. 64:23 - 65:16].

While TX-61 was still designated FL IV, Epps received a personal grade promotion outside of normal procedure because the personal grade of 11 did not exist for FL IV positions. [*Supra* § II(G)(1); Dawsey Dep. 134:7 – 135:11; *id.* 136:14-19; *id.* 138:6-7; *id.* 140:10-15; *id.* 144:10-19].  In fact, the move was deemed "not possible" based on potential and, after Dawsey objected, Petrasch had to have a memo created to cover Dawsey in case BMW AG did an audit. [Dawsey 2nd Decl. ¶¶ 19, 30; Exhs. 36-37; Dawsey Dep. 238:1 – 239:24; DE 92-2 at 111-12].

Dawsey received none of the treatment accorded Epps.  BMW was not motivated to show that it was developing whites.  No matter how fashionable BMW's initiative to promote minorities may be, it offends the most basic underpinnings of Title VII.  As Justice Marshall wrote nearly fifty years ago: "Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they [black]." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280 (1976).

---

[34]    Epps was not actually sought after for FL III jobs as BMW has claimed.  Epps did not have offers for FL III positions.  [Epps Dep. 20:5-9].  Epps was offered a position as TX-15 in logistics that he turned down.  [*Id.* 20:15 – 22:7].  Although Epps originally testified that it was a FL III position, he corrected himself and testified that, at the time it was FL IV.  [*Id.* 22:8 – 23:4].

BMW MC posits a frivolous legal theory: That one cannot show an adverse employment action if the favorable treatment shown to another does not result in money damages to the plaintiff.  [DE 92-1 at 24-26].  For example, an employer could have a bonus just for white people, and minorities could not complain because giving preference to someone else did not cost the minorities economically.  But that argument contravenes the very nature of disparate treatment: Providing advantageous terms to an employee based on a protected characteristic is the harm Congress sought to eradicate.  *News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 683 (1983) (requiring only that an employee be treated "'in a manner which but for that person's [protected characteristic] would be different'") (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 711 (1978)).

> What did "discriminate" mean in 1964? As it turns out, it meant then roughly what it means today: "To make a difference in treatment or favor (of one as compared with others)." Webster's New International Dictionary 745 (2d ed. 1954). To "discriminate against" a person, then, would seem to mean treating that individual worse than others who are similarly situated. *See Burlington N. & S. F. R. Co. v. White*, 548 U. S. 53, 59 (2006).

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1740 (2020); *accord Olmstead v. L. C. by Zimring*, 527 U.S. 581, 611 (1999) ("On the ordinary interpretation and meaning of the term, one who alleges discrimination must show that she received differential treatment vis-a-vis members of a different group on the basis of a statutorily described characteristic.") (Kennedy, J., concurring).

And Dawsey conceded nothing at her deposition.  Counsel's questions were whether Dawsey lost wages or benefits *because* BMW promoted Epps.  [DE 92-1 at 24-25].  The entire exchange has nothing to do with any cognizable claim or defense.

### b. BMW MC does not provide a legitimate nondiscriminatory reason.

BMW MC states a reason for its promotion of Epps: A desire to promote him. [DE 92-1 at 27]. That reason, however, is not nondiscriminatory because, as Petrasch testified, BMW desired to promote him to show that BMW develops black first line managers. [*Supra* § III(B)(3)(a)(2)].

BMW MC fails to argue that it has a legitimate reason for not transferring Epps instead of Dawsey. As such, there is nothing for Dawsey to address and summary judgment is inappropriate. Because BMW has failed to offer admissible evidence of a legitimate nondiscriminatory reason, the burden of showing pretext never shifts to Dawsey. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Diamond v. Colonial Life & Accident Ins.,* 416 F.3d 310, 318 (4th Cir. 2005) (citing *Burdine*). Nor can BMW MC get a "do over" by raising new *McDonnell Douglas* arguments on reply. *Praigrod v. St. Mary's Med. Ctr.*, No. 3:05-cv-0166-JDT-WGH, 2007 U.S. Dist. LEXIS 4506, at **13-16 (S.D. Ind. Jan. 19, 2007).[35]

### c. BMW MC's pretext argument

As for Epps's promotion, BMW MC argues that Dawsey cannot show evidence of pretext. [DE 92-1 at 27]. Again, BMW's own documents show why Epps got preferential treatment: He's black. [*Supra* § III(B)(3)(a)(2)]. Epps received preferential treatment in terms of his promotion when (1) BMW's policies forbade it; and (2) BMW demanded that

---

[35]     *See, generally*, *Moseley v. Branker*, 550 F.3d 312, 325 n.7 (4th Cir. 2008); *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006); *Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996); *Chesher v. 3M Co.*, 234 F. Supp. 3d 693, 715 (D.S.C. 2017).

Dawsey align positions to avoid the very treatment Epps received.  Again, there is no question why.

### 4.    Sex

Dawsey's final claim is for sex discrimination.  [DE 20 at 15-16].

#### a.    BMW's prima facie arguments

BMW repeats the argument that there was no adverse employment action.  [DE 92-1 at 28].  BMW also argues that Medley and Epps did not receive favorable treatment [id. 29-30].  Neither argument holds water.

#### 1.    Adverse employment action

Again, Dawsey has already addressed the adverse employment action.  [*Supra* §§ III(B)(1)(b);  III(B)(3)(a)].   The adverse employment actions here are inextricably intertwined with the issue of the preferential treatment discussed in the next section.

#### 2.    Preferential treatment

BMW made special exceptions to protect the function levels of men, and it promoted men in violation of its policy while demoting Dawsey.  TX-60 and TX-61 were traditionally the FL III positions in HR.  [Exh. 38; Exh. 14; McCraw Dep. 111:11-12; Epps Dep. 14:12-21; *id.* 15:24 – 16:1].   At the time of the challenged decision, TX-61 was responsible for associate relations, performance management, talent management and succession planning for the Spartanburg plant.  [Exh. 27; Exh. 15].

When BMW announced its reorganization, Scott Medley (white/male) held the TX-64 position.   When Medley previously moved from TX-61 into TX-64, Petrasch allowed him to take TX-61's FL III rating with him, even though TX-64 was never rated FL III and could not qualify for such a rating.  [Dawsey Dep. 126:18-21; *id.* 183:23 – 184:21; *id.* 262:18-19; DE 92-2 at 97-99; Dawsey 2nd Decl. ¶ 24].

When Epps succeeded Medley in TX-61, BMW downgraded TX-61 to FL IV (so that Medley could remain in a FL III position).   [Exh. 15 at BMW MC 310; Petrasch Dep. 101:13 - 102:21; Dawsey Dep. 96:7-9; *id.* 174:3-8; *id.* 179:20 – 180:9; *id.* 180:24 – 181:6; 92-2 at 88; Medley Dep. 16:2-4].

BMW deemed TX-64 an FL III position only when Medley occupied it and would not provide Dawsey equal treatment.   [Dawsey 2nd Decl. ¶ 25; Dawsey Dep. 173:4-8; *id.* 181:25 – 182:3; 92-2 at 88; Medley Dep. 16:12-13; *id.* 16:22-25; *id.* 17:13-14; *id.* 19:19-20; *id.* 20:1-4; *id.* 20:13-19; *id.* 21:7-9; McCraw Dep. 114:18-22].

But BMW protected Epps too.   Epps received the improper personal grade promotion, which essentially treated him as an FL III while serving in a position graded as FL IV.  Again, BMW never provided Dawsey with such treatment.

In sum, Dawsey received the opposite treatment BMW provided the men.  BMW would not preserve TX-64 as an FL III for Dawsey.  Instead, it downgraded the position. And while BMW was cutting Dawsey's status, it was promoting Epps.

> **b.    There are no arguments about legitimate nondiscriminatory reason or pretext.**

BMW relies solely on its prima facie arguments.   Thus, Dawsey has nothing to address regarding a purported legitimate nondiscriminatory reason.   Nor is there any argument required about pretext.   Because Dawsey can easily establish a prima facie case, the Court should deny BMW MC's motion regarding the sex discrimination claim.

**C.    BMW's reliance on immaterial issues cannot warrant judgment as a matter of law.**

**1.    BMW has its timing wrong.**

BMW claims that the timing of Dawsey's job search for employment somehow absolves BMW of intentional discrimination.  BMW falsely implies: (1) that Dawsey had

no idea that there was an issue before September 15; (2) that she decided to leave BMW before BMW announced the adverse action; and (3) that Dawsey left for "life choices" rather than because of discrimination. Putting aside the fact that none of this would excuse BMW's discrimination or impact summary judgment, BMW is wrong to make these implications. [*Supra* § II(I)]. BMW MC's apparent point with this argument was to show there was no constructive discharge. Again, however, that is not the theory. [*Supra* § III(B)(1)(c)].

### 2. Dawsey's professionalism does not prove the lack of discrimination as a matter of law.

BMW also seeks judgment as a matter of law because Dawsey worked hard through the date of her resignation and because she did not signal to anyone she was quitting. The argument is a naked attempt to change the focus from BMW's discriminatory policies and practices to something that makes no difference. Dawsey's professionalism does not disprove BMW's discrimination as Dawsey was trying not to cause any disruption in the department. [Dawsey 2nd Dec. ¶ 43]. And Dawsey did not say she was looking to "slow down." [*Id.* ¶ 41].

Dawsey left BMW because of BMW's unlawful discrimination. [Dawsey 2nd Decl. ¶ 35]. BMW can argue otherwise to the jury, but it presents no argument that could entitle it to judgment as a matter of law regarding Dawsey's motives for a decision not at issue.

As for BMW's other whining on the subject, Dawsey provided a two-week notice, completed a transition memo for Burgmeier with references to relevant databases, and she answered all questions and requests for assistance post-employment. [Dawsey 2nd Decl. ¶ 42; Exh. 39; Keiser Dep. 72:7 – 75:3]. BMW never requested any other assistance. [Dawsey 2nd Decl. ¶ 42].

And, in reality, Dawsey's resignation came as no shock. Petrasch acknowledged that she expected it. [Petrasch Dep. Ex 3; Petrasch Dep. 22:14-16]. To the extent BMW is implying that Dawsey did not believe BMW discriminated against her, it again ignores facts. Dawsey complained privately to Engelhorn that BMW was discriminating against her. [Dawsey Dep. 305:9–21; *id.* 306:18-20]. But again, none of that has anything to do with summary judgment or BMW's discriminatory policies and decisions.

That BMW would focus on these disputed and immaterial issues while it completely ignores its facially unlawful policy speaks volumes. BMW cannot rewrite this case or self-select a theory for it. Because it fails to confront the direct evidence and other compelling circumstantial evidence, BMW cannot begin to illustrate the absence of any disputed and material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

### IV. Conclusion

This Court should deny BMW MC's Motion.

Respectfully submitted this 29th day of February 2024.

         s/ Brian P. Murphy
         Brian P. Murphy
         Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400