

**In the United States District Court**
**District of South Carolina**
**Greenville Division**

| | |
|---|---|
| Kelly Dawsey, | **7:22-03738-TMC-KFM** |
| Plaintiff, | |
| v. | |
| | **Plaintiff's Opposition to Defendant BMW AG's Motion for summary Judgment** |
| Bayerische Motoren Werke Aktiengesellschaft and BMW Manufacturing Co., LLC collectively d/b/a "BMW Group," | |
| Defendants. | |

## I. Summary

.Discovery adduced far more evidence than what Dawsey needed to defeat BMW AG's first effort at dismissal.  BMW AG fixates on disputed liability issues,[1] and it refuses to even mention the evidence below.  But that is not surprising.  That is what BMW MC also did in its Motion. [DE 92].

## II. Facts

**A.     BMW AG's legal arguments do not reflect the reality of everyday life at BMW Group**

When asked about BMW AG and BMW MC, even BMW MC president and expat, Robert Engelhorn, could not explain the distinction between the companies.  [Engelhorn Dep. 71:24 – 72:3; *id.* 72:16-23].  He stated that one would have to "ask the lawyers,"

---

[1]     For example, BMW AG continues to repeat mantras, such as the proposed move from TX-60 to TX-64 was a "lateral move," when that has nothing to do with jurisdiction or the integrated employer analysis.  [See DE 97 at 9-10].

what they are.  [*Id.* 73:3-6].  The best he could do was, "BMW Group is all the entities and everyone working for this brand."  [*Id.* 73:11].

The BMW companies present themselves collectively as "BMW Group," and they maintain a common website: https://www.bmwgroup.com.  BMW AG manages the group through a common "Board of Management" and "Supervisory Board," both of which are in Germany.  [*See* Exh. 10 at 12-31].  While claiming here to operate wholly independently, BMW Group boasts of the integrated nature of its affiliates.  For example:

> You want to work in an amazing environment? Welcome to our universe. From our newly opened, highly innovative Autonomous Driving Campus in Munich to our latest world leading production plants in Mexico and China, we continue to invest in state-of-the-art facilities that are designed according to the needs of our talents. We want our everyone to feel comfortable wherever they work – which can be anywhere around the world. With a production network spanning 30 locations in 15 countries and operations in over 140 more worldwide, we are as local as we are international. There is a good reason why today's BMW Group is a global player – and comprises many different brands and diverse entities geared to provide the full range of future mobility solutions.[2]

BMW MC does not have its own board of directors, and Engelhorn reports directly to this BMW AG colleagues.  [Engelhorn Dep. 70:11-18; *id.* 71:17-18; *id.* 71:22 - 72:3; *id.* 73:1-3; *id.* 15:16-17; *id.* 69:3-7; *id.* 79:19 – 80:1 (noting that he came from BMW AG); DE 45 at 3].

**B.    TX-60 and the rest of human resources regularly report to BMW AG.**

Not even BMW Group's most ardent witnesses could support BMW AG's attempt to claim that BMW AG is a hands-off parent.   As the current vice president of human resources (TX-6), put it: "We report most of what we're doing to Germany."  [McCraw

---

[2]      https://www.bmwgroup.jobs/en/discover-our-world.html; *see also* https://www.bmwgroup.com/en/company/locations.html

Dep. 80:18]. But as the evidence shows, it goes further than reporting. BMW AG actively involves itself in almost every HR related decision. BMW MC can do little at all without BMW AG's in-depth review and approval.

As TX-60, Dawsey regularly communicated and sought permission for "day-to-day human resource decisions in Greer." [DE 45-1 ¶ 8; *id.* ¶ 14]. Engelhorn and former VP for HR, Christina Petrasch, confirmed that TX-60 interacts with BMW AG "on a regular basis," which means "sometimes daily." [Engelhorn 57:17 – 58:20; Petrasch Dep. 142:8-15]. In fact, Engelhorn's his entire rationale for displacing Dawsey with a German (Eva Burgmeier) was to create a "bridge to Germany." [DE 61:24 – 62:5; *id.* 63:6-13; *id.* 70:6-16; *id.* 99:9-15; *id.* 101:9-118; *id.* 102:24 – 103:11; DE 45-1 ¶ 7; DE 92-2 at 103]. Such a bridge would be unnecessary if, as BMW AG now asserts, it plays no role in decision-making at BMW MC.

The Engelhorn and Petrasch testimony is buttressed by Burgmeier herself. She also claims that, as TX-60, she interacts with her BMW AG colleagues at least weekly. [Burgmeier Dep. 34:23 – 35:1; *id.* 35:25 – 36:4]. Burgmeier describes BMW AG departments, such as organizational development (FO), as a "consulting partner" regarding how BMW MC organizes the HR department. [*Id.* 38:15 – 39:4]. She discusses *any* changes at Spartanburg with BMW AG. [*Id.* 40:5-12]. She also consults with BMW AG regarding issues about HR policy and legal compliance.

As Dawsey established, it is not merely a matter of "consulting." BMW AG approval was required for routine staffing decisions and even day-to-day issues. [45-1 ¶ 8].

## C.    The P Circle's controls over BMW MC's human resource function

Each management discipline at BMW Group is managed directly from Germany by a designated "circle." The head of each circle is a director and member of the Board

of Management of BMW AG. [DE 45-1 ¶ 5(i)]. Human resources, or personnel, is overseen and directed by the "P circle." [DE 45-1 ¶ 6(a)]. The P-circle (a/k/a P-Kreis) consists solely of German management located at BMW AG. [DE 45-1 ¶ 5(g); *id.* ¶ 6(b); Engelhorn Dep. 70:8-10; Petrasch Dep. 11:12; *id.* 44:24 - 45:4].

Ilka Horstmeier and her direct reports at BMW AG constitute the P Circle. [Petrasch Dep. 11:11-14; 113:17 – 114:5]. This includes Barbara Burghardt, Uwe Bald, Claudia Kopnik, and individuals from information technology and finance. [*Id.* 12:3-6; *id.* 13:16-25; *id.* 26:23 – 27:3; *id.* 89:2-11]. The P-Circle consists solely of BMW AG personnel. [*Id.* 13:12-15]. Even though the P-Circle makes decisions for BMW MC, nobody from BMW MC participates in P-Circle meetings. [*Id.* 19:17-22; Engelhorn Dep. 70:8-10].

1.    **BMW AG controls the planning and structure of BMW AG's human resources function.**

    a.    **BMW AG creates the "master structure" for BMW MC and others.**

The organizational development group (FO) within BMW AG's finance department develops a master structure for the BMW Group, including BMW MC. [Petrasch Dep. 32:8-15; *id.* 33:4-10; *id.* 42:1-2]. The head of FO reports directly to the head of finance (F), Johannes Trauth, who is the creator of the ExPat Guidelines that classify positions at BMW MC based on nationality. [*Id.* 42:3-16; *see* 97-23; DE 97-4 at 54:2 – 55:6]. The FO Circle, for example, had to "confirm" the organization of BMW MC's human resource department. [Petrasch Dep. 43:23 – 44:7; *id.* 44:20-23; DE 97-24; Exh. 11; DE. 97-24 at 3 (header); *id.* at 2 (yellow tag header)]. The review aligns the positions "according to HR Master Plants." [*Id.* at 3 (final text in red box); *see also* Dawsey Dep. 202:24 - 203:11 (discussing Exh. 12].

4

BMW AG dictates how many positions a BMW MC business unit may have. [DE 97-1 at 5 ¶ 20]. BMW AG is so rigid in its organizational mandates that Dawsey could not even alter a form to more accurately describe her position when she submitted information as part of BMW AG's "HR Compact." [Exh. 13 at 1 (10/7/21 6:20 a.m. email)]. Petrasch explained that the purpose of the Compact was to create benchmarks for every HR department globally. [Petrasch Dep. 98:9-14; *id.* 99:1 – 101:8 (discussing Exh. 13)]. But BMW AG would not even allow BMW MC to describe a position on a form unless that description comported fully to how the position exists in Germany. [Dawsey Third Decl. ¶ 4].

More recently, BMW Group split the TX-64 function at BMW MC. As a recent TX-64 incumbent explained it: "[I]t was more of a process that was coming from Germany. We were trying to align with what the German plants were doing . . . ." [Bailey Dep. 32:10-21]. Burgmeier and McCraw, "told our whole department that central in Germany, they were looking at aligning the HR department different, but they wanted all of the plants -- Mexico, Germany, Spartanburg -- all of us to be on the same accord." [*Id.* 33:16-20].

Bailey's successor in TX-64 discussed the TX-66 position that grew out of the divided TX-64 position. He also explained that the creation of TX-66 aligned BMW MC with the master structure or, as he put it, the move "aligned" BMW MC with the "blueprint." [Gilmore Dep. 10:4-15]. TX-66 was another topic of discussion where Petrasch needed to clear proposals with BMW AG. Petrasch communicated with Burghardt and Batz, and she involved Dawsey in the preparation of job descriptions. [Petrasch Dep. 84:20 – 85:1; *id.* 85:13 – 86:15 (discussing Exh. 14]. Petrasch explained to Dawsey that she needed BMW AG's approval to create a new position and code, which usually had to be in the

master structure.  [Dawsey Third Decl. ¶ 5].  BMW AG must approve even positions that already exist in the master structure.  [*Id.*]

BMW AG also required Dawsey and TX-6 to submit leadership positions so that BMW AG could determine what positions remain.  [DE 45-1 ¶ 19; see DE 97-24; Petrasch Dep. 46:7-12].  Again, BMW AG's control is not limited to upper management.  Exhibit F to Dawsey's First Declaration [DE 46-3] shows, for example, that Dawsey had to provide information to BMW AG before BMW Manufacturing could make even floor-level hiring decisions, as BMW AG held the purse strings.  [DE 45-1 ¶ 8; DE 46-3].

In another example, BMW moved a prior TX-64 incumbent, Scott Medley, to a special project.  BMW MC had to vet that move, like every other, with BMW AG.  This includes submitting charts and information for approval.  [Petrasch Dep. 51:20-24; *id.* 52:3-7; *id.* 52:22 – 53:4; *id.* 53:18 – 54:7; *id.* 55:6-24 (discussing Exh. 15; Petrasch Dep. 115:12 – 116:24 (discussing Exh. 16); Engelhorn Dep. 61:9-22].  Although this was part of succession planning, BMW MC's head of succession planning was not even involved. [Petrasch Dep. 116:25 – 117:2].  Petrasch provided Kopnik information on the move for BMW AG's internal discussions on BMW MC candidates.  [Petrasch Dep. 75:2 – 77:4].  That much is also clear from the fact that all the communications are all in German.

BMW AG even had an International Committee to approve FL IV positions, a function below department manager.  [DE 97-1 at 2 ¶ 7; Exh. 17].  Petrasch explained that the "International Grading FL IV Approval Committee" is involved, "because of our size and production network, and we were working all over the world, this is where we have an International Grading Committee for Function Level IV to align functions so that it doesn't matter where we have a function, we get an orientation."  [Petrasch Dep. 33:15

– 34:10]. That committee is so removed from BMW MC that Petrasch does not know of anyone at BMW MC participating in the International Committee. [Petrasch Dep. 34:13-17; *id.* 35:1-3].

BMW AG's control has become so complete that BMW MC cannot even create its own organization charts. Only BMW AG may create them. [DE 45-1 ¶ 17; *see* asterisk at bottom 45-1 at 25 (noting the discontinuation of "Local Plant Spartanburg" org chart publications)].

With the proposals to staff the department after Dawsey's departure, Petrasch again had to consult Kopnik and Bald because Kopnik "coordinat[es] the HR network, and Uwe Bald . . . coordinat[es] the production network." [Petrasch Dep. 27:7-8 (discussing Exh. 18]. Again, this was not unusual because Petrasch, like Dawsey, regularly reported possible moves and decisions to BMW AG. [See Petrasch Dep. 72:25 – 74:11; *id.* 40:4-19 (discussing Exh. 11)].

> **b.    BMW AG is directly involved in setting policies for BMW MC.**

BMW AG routinely issued policies that Petrasch would forward to managers like Dawsey. For example, Exhibit C to Dawsey's First Declaration shows a directive from the "P Circle," signed by BMW AG officials. [DE 45-1 ¶ 6(d); DE 45-1 at 14-17]. Petrasch merely forwarded the email to Dawsey and others. [DE 34-1 at 14]. The email announces a new HR system for all companies under control of the P Circle. [DE 45-1 at 16-17]. It touts that "HR becomes even more international" and states that BMW affiliates must use the advantages of the "HR network" for ideas. [*Id.* at 3-4 ¶ 2]. The third topic explains how BMW must use the "close cooperation" between the affiliates to move employees between affiliates. [*Id.* at 4 ¶ 3].

One bone of contention for the new vice president of HR, Sherry McCraw, was BMW's implementation of a policy that aligned personal grades with function levels. But that just led to more evidence of BMW AG's involvement with routine BMW MC issues. BMW AG dictated that Dawsey develop that policy to reduce the personal grades of an associate if he or she remained in a position where the personal grade was higher than the range for that function level. [DE 97-1 at 5 ¶ 21]. McCraw acknowledged that Dawsey reported to Germany on the issue. [McCraw Dep. 80:8-18]. Indeed, BMW AG was directly involved, and it imposed the function level quotas on BMW MC. [Dawsey Dep. 191:2-8]

> Germany put quotas on our levels, and we had individuals that were outside of ranges for levels. They were on project positions, and Germany said, you need to place them now in the structure. So the personal grade guidelines are how those individuals that were outside of normal structure would be managed. The next page is an overview of all of those individuals, and the next page is the targets from Germany of leveling in Plant Spartanburg.

[*Id.* 187:1-10 (discussing DE 97-32].

In another example, BMW AG sets the policy for the plants that their total compensation be within the top 1/3 of the appropriate market. [Burgmeier Dep. 97:8 – 98:2; McCraw Dep. 11:17-24; *id.* 83:4-13].

The BMW Group also uses "common and aligned" standards for recruiting employees. [Engelhorn Dep. 58:17-20].

German rules also apply in Spartanburg regarding the processing of promotions. [DE 45-9 (Petrasch resolving promotional issue: "There is a rule in Germany, if there is a position within next 12 month on the horizon – there is no problem!"). BMW Manufacturing even uses Germany's forms for human resources. [*E.g.*, DE 45-10].

BMW AG also dictated the HR strategy targets for BMW MC, three of which it announced were "fixed." [DE 45-1 ¶ 22; DE 46-4]. BMW AG even prohibited BMW Manufacturing from customizing the SAP system to meet the unique needs of an operation in the United States. Instead, BMW AG mandated that BMW Manufacturing use SAP in the precise manner that BMW AG uses it for uniformity purposes. [DE 45-1 ¶ 16].

BMW Group also implemented a chief diversity officer position at each operating entity. [Bailey Dep. 24:20 – 25:4; *id.* 38:11-17; *id.* 50:5-20]. BMW AG set the goals and policies for diversity and inclusion through the P-Z function in Munich. [Petrasch Dep. 88:20 – 90:20 (discussing Exh. 19)]. The goals were set by Bald and others in the "international network." [*Id.* 94:2 – 97:16].

Ironically, the person at the center of ths control is Claudia Kopnick, who earlier claimed that BMW AG did not involve itself in BMW MC operations. [See DE 42-3]. Within the P-Circle in Germany, Kopnik (PM-6) is responsible for HR management and leads the implementation of best practices, information sharing, and alignment throughout the BMW Group. [Petrasch Dep. 14:24 – 15:6; *id.* 15:21 – 16:4; *id.* 28:9-11].

### c.    BMW AG makes promotion decisions at BMW MC.

Exhibit A to Dawsey's First Declaration [DE 45-1 at 10], is a policy on promotions for BMW Manufacturing developed by BMW AG. [DE 45-1 ¶ 5(a)–(d)]. The document describes the decision-making process BMW AG imposed for promotions to levels IV, III, and II. [*Id.* ¶ 5(f), (j)]. It also mandates that such decisions are "subject to the verification of the department circle." [*Id.* ¶ 5(e), (h)]. As discussed above, BMW AG maintains an International Committee that does not include any BMW MC personnel for approving candidates at BMW MC. [*Supra* § II(C)(1)(a)].

9

        **d.**      **BMW AG does the actual succession planning for BMW MC.**

BMW AG also makes succession plans for BMW Manufacturing. Exhibit B to Dawsey's First Declaration [DE 45-1 at 12] is an email from Dawsey's eventual successor, Eva Burgmeier, while she was in Germany. [DE 45-1 at 2 ¶ 6]. Burgmeier sent the memo to Dawsey and others, telling them to update their information because "[t]he P-circle will discuss succession planning next Monday . . . ." [DE 45-1 at 12]. BMW did not include Dawsey in these discussions, which occurred solely among members of the "P circle" in Munich. [DE 45-1 at 2 ¶ 6].

The P-Circle indeed meets alone to discuss succession planning (Nachofolge) and candidates for positions at BMW MC. [Petrasch Dep. 113:6-16; *id.* 114:6 – 115:3 & DE 97-31]. So not only is BMW AG involved, it is exclusively involved.

    **2.**      **BMW AG is directly involved in routine day-to-day personnel decisions for BMW MC**

As noted above, there is a reason why TX-60 communicates with BMW AG daily or weekly: BMW AG directs day-to-day human resource activities in Greer, including the promotion and placement of managers at BMW Manufacturing. The following are some more examples:

        **a.**      **Validating Americans to serve in positions at BMW MC**

Besides dictating what FL IV positions BMW MC may have, BMW AG validates who may serve in them. Corey Epps (TX-60) described the use of BMW AG's process to "validate" Americans to hold positions as low as FL IV in Spartanburg.

Q.    What is a German validation process?

 A.    So to be a function level IV, III, or II, you would have to go through a formal interviewing process that's set up through a standard, and it was adapted to all markets, so international markets, the German market as the home department, but then it was adapted to every

market.    Same process, same format, so you could be
interchangeable within wherever.  So you could be validated, as they
would call it, as a function level IV, function level III, or function level
II, but they were all ran at different times throughout the year.

[Epps Dep. 48:19 – 49:5].  Epps also explained that BMW Group validates all candidates,

"local" and "international,"  in one process.  [*Id.* 49:13 – 50:2].

### b.    Specific appointments to lower-level management positions at BMW MC

BMW AG's P-Circle was directly involved in the 2021 reorganization decisions for

the BMW MC human resources department.  Petrasch provided the information for P-

Circle consideration (that excluded BMW MC personnel).  [Petrasch Dep. 10:22 – 11:4;

*id.* 14:2-21;  *id.* 18:24-19:11 (discussing Exh. 20); Petrasch Dep. 17:5-10; *id.* 17:14-16

(discussing Exh. 21)].

BMW AG regularly placed Germans on the BMW Manufacturing staff even at

lower-management levels.   Stephan Dombrowski, for example, worked in Dawsey's

department.  [*See* DE 46-1].  Dombrowski was chosen from a list of Germans that BMW

gave Dawsey.  [DE 97-1 at 2 ¶ 10].  In March 2021, Petrasch informed Dawsey: "Germany

is planning to replace Stephan with an expat!!!"  [*Id.*; DE 45-5; Dawsey Dep. 207:19 –

208:5].  That word came down from Daniela Pekar, who reports to Horstmeier.  [Petrasch

Dep. 106:18 – 107:6; *id.* 108:10-12 & DE 97-25].

Likewise, after Dawsey resigned, Petrasch immediately involved Horstmeier,

Burghardt, and Bald, who provided instruction on how to proceed.  [Petrasch Dep. 25:24

– 26:22; *id.* 28:12 – 29:22; *id.* 29:25 – 30:1 (discussing Exh. 18); Petrasch Dep. 20:10-23

(discussing DE 97-26].    Petrasch cleared her plans on how to staff the department

temporarily with Burghardt.  [Petrasch Dep. 26:8-11; DE 45-6 to -7].  Petrasch also sought

approval from Germany regarding the planning and structure of the HR department.  [DE 45-8].

BMW AG's P Circle announces its appointment decisions to the rest of the company.  Exhibit D to Dawsey's First Declaration, for example, shows the P Circle's appointment international appointments, including Eva Burgemeir to TX-60.  [DE 45-1 ¶ 4; DE 45-1 at 21].

### c.    Grading of positions at BMW MC

BMW AG controls the grading of BMW MC positions through its P-Z function in Germany.  [Dawsey Dep. 126:24 – 127:11; Petrasch Dep. 35:23-25; *id.* 26:3-9].

BMW AG also must be involved if there are any changes to the grades or function levels at BMW MC.  When, for example, BMW MC wanted to broaden the number of personal grades that could fall within a function level, BMW torpedoed the idea and BMW MC had to change course.  [DE 97-1 at 4 ¶ 18].

BMW AG even dictated the renaming of career paths at BMW MC so that function levels were designated by expert level and leadership level.  [DE 97-1 at 4 ¶ 17].

### d.    Changes in salary and benefits

Another area in which Dawsey continually worked directly with BMW AG was salary and staff planning.  [DE 45-1 ¶ 14.  If, for example, Dawsey wanted to make any changes in benefits, salary, structure, or bonuses, she had to obtain approval from BMW AG.  [*Id.* ¶ 17].

### e.    Headcount decisions for BMW Manufacturing

BMW AG makes staffing and headcount decisions for BMW MC.  For example, BMW AG mandated a headcount reduction in Dawsey's department.  [DE 45-1 ¶18 & DE 46-3].  During the planning phase for the new press shop in Spartanburg, BMW AG also

dictated headcount and from where employees could be hired (*e.g.*, internal vs. external). This included even floor-level hourly positions. [DE 445-1 ¶ 8 & DE 46-3].

**D.     BMW AG was involved in the two adverse actions at issue.**

**1.     BMW AG was involved in the removal of Dawsey.**

On or about September 15, 2021, Petrasch told Dawsey that BMW replaced Petrasch with Sherry McCraw, an American. [DE 97-4 at 61:13-15].[3] Petrasch repeatedly expressed the long-standing rule that a German national must be at Level III if there is a domestic VP (Level II). [DE 97-4 at 61:24 – 62:5]. She confirmed that the only way BMW could get a domestic employee into the HR VP position in Spartanburg was to have a German in TX-60 to serve as a "bridge to Germany." [*Id.* 70:12-18].

Petrasch confirmed to Dawsey that two executives/directors of BMW AG participated with Englehorn. Petrasch specifically cited "T" and "P." "T" is a reference to Milan Nedelijkovic, the head of manufacturing and a BMW AG board member (Germany); "P" is Horstmeier. [DE 97-11 at 9:8-11; DE 45-1 ¶ 7(b)-(c); DE 97-4 at 70:14-16 ("The only way to get a local TX-6 is to have an international TX-60 to be a bridge to Germany. It is already discussed with T and P and it's done.")]. Dawsey documented the conversation at the time. [DE 46-2 at 2]. Petrash left no doubt that BMW Group in Germany was making the decision. In fact, Petrasch complained that the executives from Germany had called her on a Sunday about the decision. [DE 45-1 ¶ 3]. BMW MC confirms that, in making the decision, "Dr. Engelhorn communicated by telephone with

---

[3]     Petrasch told Plaintiff that BMW Manufacturing's president, Robert Englehorn, wanted a German in the manufacturing vice president position, which BMW filled with Philip Heinrichsdorff. [DE 45-1 ¶ 10]. Because McCraw was in that position, Defendants moved her to the HR vice president role. [*Id.*]

Ilka Horstmeier regarding his decision to place Ms. McCraw in the TX-6 role." [DE 45-2 at 3].

### 2. BMW AG also directly involved in the selection of Eva Burgmeier for TX-60

The German national that BMW Group chose to replace Dawsey is Eva Burgmeier. [DE 97-4 at 35:12-14]. Engelhorn states that he made the decision to appoint Burgmeier at BMW MC after speaking to Horstmeier and Burghardt. [Engelhorn Dep. 51:1 - 53:7; *see also* DE 45-7].

So from where did BMW MC get the candidates to replace Dawsey? According to Petrasch, "BMW AG collected candidates for this position." [Petrasch Dep. 119:20 – 120:2; *see also id.* 122:12-23; *id.* 123:10-18]. Specifically, Kopnik decided who would be candidates for TX-60 at BMW MC. [*Id.* 120:3-20]. And, consistent with BMW's policies of excluding Americans from TX-60 when an American sits in TX-6, none of the candidates included Americans. [Petrasch Dep. 123:19-21 (discussing Exh. 16)].

### E. A BMW AG employee dictated the policy of using nationality to fill positions.

Defendants have maintained a practice of ensuring that a German national is either the head (Level II) or in a secondary role (Level III) in HR. Johannes Trauth (German), BMW Manufacturing's fourth HR vice president, announced the initiative. [DE 45-1 ¶ 20]. Defendants have even documented the plan. [DE 97-23 at BMW MC 236; DE 45-1 ¶ 20(a)-(b); *see also* DE 97-23 at BMW MC 237-39].

### F. Expats on assignment to BMW MC are still BMW AG employees

BMW AG never severs its employment ties when an associate like Petrasch is assigned to BMW MC. BMW AG employees are still employed by BMW AG while working on assignment at BMW MC. [Dawsey Third Decl. ¶ 2]. BMW AG still pays them, and

they still get their German benefits in addition to other benefits not provided to other BMW MC employees such as the same amounts of vacation they get in Germany.  [*Id.* ¶ 2(a)-(f); Burgmeier Dep. 23:1-16; *id.* 23:21 – 24:4].  The BMW AG employees have a contract that requires BMW AG to reassign them back to BMW AG.  [DE 97-3 13:16 – 15:10; Engelhorn Dep. 7:9 – 8:17].

### III.  Argument

**A.    Personal jurisdiction.**

**1.    BMW AG is subject to specific jurisdiction**

"A federal district court may exercise personal jurisdiction over a foreign corporation only if: (1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather,* 773 F.3d at 558 (citing *ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 391 (4th Cir. 2012)); *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009).[4]  "South Carolina has interpreted its long-arm statute to extend personal jurisdiction to the constitutional limits imposed by federal due process . . . ." *Foster v. Arletty 3 S.A.R.L.*, 278 F.3d 409, 414 (4th Cir. 2002).  Thus, the only question is whether an exercise of that jurisdiction violates due process.  *Id.*  In other words, "the statutory inquiry merges with the constitutional inquiry." *Geometric Ltd.*, 561 F.3d at 277.

---

[4]    The focus is on the forum state, and not whether other state's jurisdiction statutes would permit suit in the other state.  *Receiver for Rex Venture Grp., LLC v. Banca Comerciala Victoriabank SA*, 843 F. App'x 485, 490 (4th Cir. 2021) (citing *Universal Leather*).

The foreign company's contacts with the forum state must be "purposeful" to support jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Further, its conduct and connections with South Carolina should cause it to anticipate being haled into court here. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *Sneha Media & Entm't, LLC v. Associated Broad. Co. P. Ltd.*, 911 F.3d 192, 198 (4th Cir. 2018).

The Fourth Circuit "has synthesized the due process requirements for asserting specific personal jurisdiction in a three part test." *Geometric*, 561 F.3d at 278.

> We consider (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002) (quotations and citations omitted).

*Id.*

A simple application of the three-part *Geomotric* test yields only one conclusion: BMW AG is easily subject to specific jurisdiction.

### a.     BMW AG conducts activities in the State.

Under the first *Geometric* factor [*Supra* § II(A)(1)(a)], special jurisdiction exists because of BMW's direct involvement in the decisions at issue. Discovery confirmed that BMW AG is directly involved in all aspects of BMW MC's structure, including whether BMW MC can create a position, how positions are filled, the evaluation of employees, and the policies affecting pay and benefits. [*Supra* § I(C)]. Likewise, while Engelhorn and Petrasch may have made the challenged decisions while on assignment from—but still employed by – BMW AG, there is ample evidence of BMW AG providing the names of candidates and being involved in the selection of Burgmeier. [*Supra* § I(D)(2)].

There is, to say the least, "substantial collaboration," by BMW AG, and that is all that is necessary. "[A] foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant '**substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.**'" *Universal Leather*, 773 F.3d at 560 (emphasis added) (quoting *Tire Eng'g & Distribution, Ltd. Liab. Co. v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012)); *see also Rickman*, 538 F. Supp. 3d at 433.

### b. Dawsey's claims center on the activities BMW AG directs towards South Carolina.

The second *Geometric* factor also supports jurisdiction. BMW AG directed its actions towards BMW MC's plant in Greer, South Carolina.

### c. The exercise of personal jurisdiction over BMW AG would be constitutional.

As for the third *Geometric* factor, an exercise of jurisdiction would be constitutional as Dawsey is relying on BMW AG's actions directed to this forum and the long-arm statute extends fully. As the Court has already recognized, this factor simply merges with the minimum contacts inquiry. [DE 90 at 4].[5]

---

[5]    BMW AG offers nothing of substance to show otherwise. For example, it claims South Carolina has no interest in permitting jurisdiction. [DE 103 at 19]. South Carolina courts would have no interest in providing a forum to remedy the violation of federally-protected civil rights of a South Carolinian? That would be an unprecedented finding to say the least. And BMW can recite boilerplate about "comity," but how is "comity" threatened by treating German companies the same as anyone else for the decisions they make about the employment of Americans in the United States?

**d.**     **The same facts establishing integrated employer status establish personal jurisdiction.**

The integrated employer analysis can establish specific jurisdiction under Title VII, especially when the same disputed facts relate to liability and jurisdiction. *Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 602-03, 607 (D. Md. 2014). Two years after *Gilbert*, the Fourth Circuit emphasized: "[W]hen a material jurisdictional fact is disputed and that fact overlaps with a fact that needs to be resolved on the merits by a jury might a court defer its legal ruling on personal jurisdiction to let the jury find the overlapping fact." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) ("where the jurisdictional facts are intertwined with the facts central to the merits of the dispute . . . the entire factual dispute is appropriately resolved only by a proceeding on the merits."); *e.g.*, *Good v. Am. Water Works Co.*, Civ. Action No. 2:14-01374, 2016 U.S. Dist. LEXIS 131309, at *38 (S.D. W. Va. Sep. 26, 2016).

Both the integrated employer and specific jurisdiction tests measure the parent's involvement in day-to-day affairs of the subsidiary. Although the result of the integrated employer analysis may not be decisive as to specific jurisdiction, the common facts are relevant. *Gilbert*, 32 F. Supp. 3d at 607.

The specific jurisdiction "analysis is 'flexible,' and depends on several factors that courts consider case-by-case. *Universal Leather, LLC*, 773 F.3d at 560. There is ample Title VII authority, on top of *Gilbert*, that integrated and single employer can be a basis for finding specific jurisdiction. *E.g.*, *Manning v. Erhardt+Leimer, Inc.*, No. 17-CV-348, 2020 U.S. Dist. LEXIS 25136, at **12- 22 (W.D.N.Y. Feb. 7, 2020) (personal jurisdiction over foreign parent warranted where the parent decides on management positions for the subsidiary, the parent controls transfer of executives, the parent holds itself out as running

the operations of the various subsidiaries and refers to them as one, and the parent controls operational policies of the subsidiary and jurisdiction was proper under long arm statute and allegations that the parent discriminated against the employee was enough to establish prima facie showing of personal jurisdiction notwithstanding existence of evidence to the contrary); *id.* at ** 23-25 (exercise of jurisdiction is constitutional because parent's actions that affected the plaintiff in the forum state made it reasonable for the parent to be haled into court there); *Wang v. GM, LLC*, No. 18-10347, 2020 U.S. Dist. LEXIS 138323 (E.D. Mich. Aug. 4, 2020) (affiliates represent themselves on website as part of an integrated operation); *Williams v. PMA Cos.*, 419 F. Supp. 3d 471, 488 (N.D.N.Y. 2019) (allegations that corporations shared work and that the plaintiff received some of his benefits from parent enough to show transaction of business, allegation that parent participated in the termination decision and that the plaintiff suffered harm in the forum state was enough to show sufficient nexus and exercise of personal jurisdiction was constitutional); *EEOC v. Foster Wheeler Constructors, Inc.*, No. 98 C 1601, 1999 U.S. Dist. LEXIS 10565, at *18 (N.D. Ill. July 6, 1999) (decision-maker at parent made decisions for parent and subsidiary, subjecting parent to personal jurisdiction).

**2.     BMW AG's other arguments cannot absolve it of personal jurisdiction.**

**a.     This Court should disregard all witness/declaration evidence from BMW AG.**

Summary judgment arguments must be based on admissible evidence only. *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993).  If the form offered would not be admissible at trial, the moving party must at least be in a form that materials that could be put into admissible form at trial.  *U.S. Dep't of Hous. & Urb. Dev. v. Cost*

*Control Mktg. & Sales Mgmt. of Virginia, Inc.*, 64 F.3d 920, 926 n.8 (4th Cir. 1995)16 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

BMW AG's hid the ball during discovery and refused to offer any witnesses.   BMW AG's position has never changed:  "AG does not anticipate calling any fact witnesses."  DE 37 at 2, question 2.

> **b.     McCraw cannot testify as to BMW AG's accounting and tax issues.**

Even when BMW AG offers affidavit support --- from a BMW MC employee no less --- it relies on individuals without any personal knowledge.  For example, BMW AG has relied on Sherry McCraw – the vice president of human resources for BMW MC.  She signed a sworn statement about the accounting and finance of BMW AG.    [DE 42-2]. How, if BMW AG is so removed from BMW MC, does its subsidiary's employee attest to BMW AG financial management?

> **c.     This Court's ruling on BMW AG's Motion to Dismiss was based on evidence, and not allegations.**

BMW AG urges the Court to not follow its Rule 12(b)(1) ruling because it was based on pleadings, and not on evidence.  That is not true.  For the 12(b)(1) Motion, Dawsey provided evidence, as did BMW AG.  [DE 42-2 to -3; DE 45-1 to -11; DE 52-1; DE 59-1; DE 61-1].  But there has been robust discovery since then that further undercuts BMW AG's argument that it does not maintain sufficient contact with South Carolina.

> **d.     Dawsey's testimony is based on her first-hand knowledge.**

There is no witness with as much first-hand knowledge about BMW MC's HR operations than Dawsey.  Yet BMW AG argues that the Court may only consider BMW AG's self-serving declarations, and that Dawsey's somehow must be disregarded altogether.    That argument ignores the mandates that summary judgment cannot be

based on credibility determinations, that all factual disputes must be resolved in favor of Dawsey, and that non-moving party's testimony counts just as much as anyone else's. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations . . . are jury functions, not those of a judge"); *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 882 (4th Cir. 2019); *EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 331 (4th Cir. 2010) (collecting cases); *EEOC v. Warfield-Rohr Casket Co., Inc.*, 364 F.3d 160, 164 (4th Cir. 2004).

> **e.    BMW's admissions and statements against interest are not hearsay.**

BMW AG's hearsay arguments presume that, while assigned to BMW MC, BMW AG employees such as Engelhorn, Petrasch, and Trauth are not agents of BMW AG. But not even that premise is true. Even while on an international assignment, BMW AG still employs the expats, provides their benefits, and is contractually obligated to reinstaste them at the end of their assignments. [*Supra* § I(F)].

> **3.    If BMW AG is correct, then jurisdiction may be exercised under Rule 4(K)**

BMW AG denies personal jurisdiction in every case, regardless of the state.[6] If BMW AG is correct that no state can exercise jurisdiction, then Rule 4(k)(2) provides an independent basis for jurisdiction:

---

[6]    E.g., *Braman Motors, Inc. v. BMW of N. Am., LLC*, No. 17-23360-CIV, 2022 U.S. Dist. LEXIS 27939 (S.D. Fla. Feb. 16, 2022) (Florida); *Mahurin v. BMW of N. Am. LLC*, Civil Action No. 20-1351, 2022 U.S. Dist. LEXIS 49048, at *18 (W.D. Pa. Mar. 18, 2022) (Pennsylvania); *Thornton v. Bayerische Motoren Werke AG*, 439 F. Supp. 3d 1303 (N.D. Ala. 2020) (Alabama); *Brown v. BMW of N. Am.*, LLC, No. 1:14-cv-00931-JMS-DML, 2016 U.S. Dist. LEXIS 13209 (S.D. Ind. Feb. 4, 2016) (Indiana); *Johnson v. Bayerische Motoren Werke Ag*, No. 1:17-CV-2367-MHC, 2019 U.S. Dist. LEXIS 239684, at *21 (N.D. Ga. Nov. 22, 2016) (Georgia).

Federal Claim Outside State-Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2); *see, generally*, *Grayson*, 816 F.3d at 271 (citing and quoting *Base Metal Trading, Ltd. v. OJSC*, *"Novokuznetsky Aluminum Factory,"* 283 F.3d 208, 215 (4th Cir. 2002)).

"Jurisdiction under Rule 4(k)(2) has three prerequisites: (1) the defendant must be served or file a waiver of service, (2) the defendant must not be subject to jurisdiction in any state, and (3) exercising jurisdiction must be consistent with due process." *Receiver for Rex Venture Grp., LLC v. Banca Comerciala Victoriabank SA*, 843 F. App'x 485, 492 (4th Cir. 2021). BMW AG does not contest service. [DE 42-1 at 11; *see also* DE 33 ¶¶ 2; *id.* at 1 n. 1 (noting that no defenses were raised as to sufficiency of process or as to insufficient service of process)]. If the Court finds that the second element is met, jurisdiction is nonetheless appropriate given the third element under *Geometric* discussed above in Section II(A)(1)(c).

### 4. BMW AG's other arguments do not foreclose personal jurisdiction.

#### a. Petrasch's statements are not hearsay.

BMW AG argues that Petrasch's statements about Burgmeier being assigned to TX-60 to fulfill the alternating German-American requirement cannot be attributed to it because she was on BMW MC's payroll at the time. [DE 103 at 16-16]. BMW AG's argument is as pointless as it is wrong. Nobody has ever disputed why Burgmeier was brought in to displace Dawsey.

22

Even so, Petrasch's statements are not hearsay because they are statements of an opposing party under Rule 801(d)(C) and 801(d)(2)(D).  First, Petrasch and Engelhorn were not divorced from BMW AG.  They were still BMW AG OFK executives who, like Burgmeier, received instruction, compensation, and benefits from BMW AG.  Again, it was BMW AG that decided the candidates for TX-60, and Engelhorn and Epps both testified that the alternating German-American requirement is an established BMW Group (BMW AG) requirement.  For purposes of Rule 801(d)(2)(C), Petrasch was "a person whom the party authorized to make a statement on the subject."  For purposes of 801(d)(2)(D), Petrasch regularly worked with and received direction from Horstmeier ("P"), Burhardt, and others.  [*Supra* § I(B)-(C)].  With this specific decision, Petrasch was carrying out BMW AG's approvals ("T" and "P"), and she was speaking as Dawsey's boss when she made the statement.[7]  *See Yates v. Rexton, Inc.*, 267 F.3d 793, 802 (8th Cir. 2001) (discriminatory statement by parent corporation executive admissible against subsidiary under Rule 801(d)(2)(D) because the declarant need only be significantly involved in the process) (citing *EEOC v. Watergate at Landmark Condo.*, 24 F.3d 635, 640 (4th Cir. 1994)).

As for the standard for establishing "agent or servant concerning a matter within the scope of the agency or employment," a declarant need not be a decision-maker.  In

---

[7]     Rule 801(d)(2)(D) defines as not hearsay any statement that "was made by the party's agent or employee *on a matter* within the scope of that relationship and while it existed."  Fed. R. E*vid*.  801(d)(2)(D) (emphasis added).   "The statement itself is not required to be within the scope of the declarant's agency. Rather, it need only be shown that the statement be related to a matter within the scope of the agency."  *United States v. Petraia Mar. Ltd.*, 489 F. Supp. 2d 90, 96 (D. Me. 2007) (citing *Larch v. Mansfield Mun. Elec. Dep't*, 272 F.3d 63, 72 (1st Cir.2001)).

*Watergate at Landmark Condo.*, the Fourth Circuit approved of the admission of inculpatory statements under Rule 801(d)(2)(D) of non-decisionmakers "whose involvement in the process here was palpable, though concededly not that of ultimate decisionmakers." *Id.* at 640 (emphasis added); *see also Taylor v. Fluor Corp.*, Civ. A. No. 6:17-cv-1875-BHH-KFM, 2019 U.S. Dist. LEXIS 168964, at *46 (D.S.C. July 17, 2019).

Another BMW case provides a different example as to how statements by a subsidiary are attributed to a parent. In *Big Apple BMW*, BMW North America tried the same argument to avoid the effect of a statement of one of its subsidiaries, BMW Credit. The Third Circuit rejected that effort, noting: "The statement of a subsidiary may be attributed to its corporate parent, consistent with agency theory, where the parent dominates the activities of the subsidiary." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1373 (3d Cir. 1992). The term "dominance" may be an understatement. *In re BankAtlantic Bancorp, Sec. Litig.*, No. 07-61542-CIV, 2011 U.S. Dist. LEXIS 48057, at *96 (S.D. Fla. Apr. 25, 2011).

Even if one assumed that Petrasch had to be speaking only for BMW MC, one authority relied on by BMW AG still shows that the statements are admissible against BMW AG. [See DE 103 at 16 n. 7.] In *Zenith Radio*, the Eastern District of Pennsylvania stated that, when attributing a statement by a subsidiary to a parent corporation:

> [T]he proponent of the evidence must show either that the subsidiary had authority to make a statement concerning the subject, under rule 801(d)(2)(C), or that the subsidiary acted as the parent's agent and the statement concerned a matter within the scope of its agency, under rule 801(d)(2)(D).

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1247 (E.D. Pa. 1980). BMW nowhere challenges Petrasch's authority to make the statements, informing her subordinate that she was being replaced and why. Further, because BMW AG was

24

involved with Engelhorn (a BMW expat) in making the decision, Petrasch was acting on their behalf in carrying out the decision.

BMW AG's reliance on cases such as *Colebrook* is misplaced. The *Colebrook* decision does not discuss the gist of the purported statements. *Colebrook v. T-Mobile U.S.*, Civ A. No. 2:20-00397-RMG-MGB, 2021 U.S. Dist. LEXIS 110902, at *7 (D.S.C. May 26, 2021) (citing DE 44-6 at 1, 3). A review of that affidavit fails to reveal what the issues were, but the facts alleged in that affidavit bear no resemblance to any issues here. 2:20-cv-00397-RMG DE 44-6.

### b.    The Expat Guidelines

BMW AG argues that nothing in the Expat Guidelines is probative because, for example, "[t]here is no mention of BMW AG in the document." [DE 103 at 17]. Not only is AG mentioned, but one particular mention relates directly to Dawsey's position where it states, "a need for an international inbound (Planner or Dept. Mgr **ideally from AG** . . . and should follow the status of T[X]-6." [DE 97-23 at 6 (emphasis added)]. The Guidelines were codified in Spartanburg by BMW AG expat, Johannes Trauth. [DE 45-1 ¶ 20; DE 97 at 3].

BMW AG also argues that the Guidelines were never updated. But it does not show any reason they would have been. Again, Engelhorn, Epps, Petrasch, and Burgmeier all agree that the alternating German-American rule applied, as it does throughout the company. [DE 97 at 6-8]. Nobody claims they were revoked or not followed. Remarkably, BMW continues to defend the classification of employees by nationality.

**B.    BMW AG is an integrated employer.**

The integrated employer factors are: (1) common management; (2) interrelation between operations; (3) centralized control of labor relations; and (4) degree of common ownership/financial control." *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999).[8] "[N]o single factor is conclusive. Nevertheless, control of labor operations is the most critical factor." *Id.* (citation omitted).

### 1.    Dawsey has more than enough evidence to show that BMW AG and BMW MC are an integrated employer.

The integrated employer analysis does *not* turn on who claims to have made the final decision at issue.  Where, as here, "final decisions" are made subject to comply with a related entity's policies and processes, the employers are integrated.  *Pitrolo v. Cty. of Buncombe*, No. 1:06CV199, 2009 U.S. Dist. LEXIS 54567, at *9 (W.D.N.C. June 29, 2009).[9]

---

[8]    *Hukill* was an FMLA case where the factors were established by regulation. *Hukill*, 192 F.3d at 442.  Hukill, however, noted the applicability of the integrated employer doctrine under Title VII.  The Hukill Court cited *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983), which adopted the same four factors from NLRB caselaw.  *Armbruster*, 711 F.2d at 1337 (citations omitted).  *Armbruster* and *Hukill* applied the factors for jurisdictional purposes, which is no longer good law.  *See Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 155 (4th Cir. 2012) (noting that *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) abrogated *Hukill* on the issue of whether the aggregation of employees to meet jurisdictional thresholds is jurisdictional).  The factors, however, apply as well for determining liability.  For example, Congress adopted the same four factors to determine whether a foreign company abroad is controlled by a U.S. firm to extend Title VII's protections overseas.  42 U.S.C. § 2000e-1(c)(3) ("(A) the interrelation of operations; (B) the common management; (C) the centralized control of labor relations; and (D) the common ownership or financial control, of the employer and the corporation.").

[9]    The *Hukill* Court's discussion about who made the final decision was part of its analysis that the numerosity of employees is a jurisdictional issue (i.e. reaching the threshold number).  Hukill, 192 F.3d at 444.

### a. Common management

BMW executives and lower-level managers move seamlessly throughout BMW Group, but remain employed by BMW AG. [Supra § I(F)]. Further, BMW can do nothing – not even create an organizational chart – on its own. BMW AG handles everything from creating and fillng positions, to screening candidates, and to deciding what positions to create. [*Supra* § I(B)-(D)]. BMW AG creates and/or must approve all policies to be applied in Spartanburg. [*Supra* § I(C)(1)(b)]. Outside of this litigation, BMW Group touts its common management as a strength. The first effort to disavow any of this came when Dawsey named BMW AG as a defendant.

### b. Interrelation between operations

Engelhorn vigorously defended BMW AG's need to homogenize policies and processes because BMW Group is an international network with interrelated operations, designs, processes, and even language to build German cars:

> BMW setup is a global setup. We have 10 fully-scaled plants. We have 30 plants all overall, and for us it's vital that we have a close link to the production network in terms of qualification, in terms of having the right international candidate in time, specifically also looking to the launches, to also have a clear view on the compensation andbenefits side, to have a clear view towards business partners in Germany, BMWMC acting as a contract manufacturer for BMW, and these are the skills.
>
> * * * *
>
> BMW is a network companies. We have production facilities worldwide which need common alignment on training, on qualification, on setting up the right schemes and structures on common and agreed level worldwide because there is only one BMW quality, and we need to adhere all to the processes and the needs for car production. Therefore, knowing that the car engineered and designed in Munich, it is vital that we have one common language and understanding of the needs.

[DE 97-5 at 7:16 – 8:2; *id.* 8:12-22].

### c.    Centralized control of labor relations

Dawsey agrees that centralized control of labor relations is the most important factor. It also is the factor on which Dawsey's case is the strongest.  Again, BMW AG dictates and dominates every aspect of HR management at BMW MC.  That is why it must have "bridges" and representatives to ensure that BMW AG's practices are carried out by BMW MC.  As shown above, BMW MC does not merely "consult" with BMW AG, and BMW AG is not merely providing high level supervision.  BMW AG dictates practically everything.

### d.    Degree of common ownership/financial control.

BMW AG does not pretend that it does not exercise financial control over BMW MC.  The money invested here comes directly from BMW AG.  [Englehorn Dep. 90:10-13].  Engelhorn testified that BMW MC does not have its own profit figures.  [*Id.* 90:18-19].  Nor could he answer basic questions about finance and how the money is allocated by BMW AG.  [*Id.* 90:20 – 92:24].   Dawsey has also explained that funding for every position at BMW MC requires consultation with and approval from BMW AG.  [*Supra* § I(C)(1)(a)].

### 2.    The critical question is not which entity claims to have made the decisions.

BMW AG improperly relies on an interpretation of *Trevino* that cannot survive a reading of *Trevino* itself.  The *Hukill* Court cited *Trevino v. Celanese Corp.*, 701 F.2d 397 (5th Cir. 1983) as instructive on the application of integrated employer.  *Hukill*, 192 F.3d at 444.[10]  BMW AG also quotes *Trevino* for the proposition that "the critical question is

---

[10]    *Trevino* is a joint employment case as there is no noted legal relationship between the companies.  But it adopts the same four factors.  Hukill was issued sixteen years

'[w]hat entity made the final decisions regarding employment matters related to the person claiming discrimination.'"  [DE 103 at 24-25 (quoting *Trevino*, 701 F.2d at 404)]. But that is not the proposition adopted by *Trevino*.  The *Trevino* Court noted that other courts distilled the issue that way, but the Trevino Court did *not* accept the argument that the entity claiming to make the final decision was the only employer.  In fact, the *Trevino* Court *denied* summary judgment based on contrary evidence that the larger company "exercised considerable control" over employees of the smaller corporation, that the smaller corporation's employees "considered themselves de facto employees" of the larger company, and that the larger company placed its employees with the smaller company.  *Trevino*, 701 F.2d at 404.  All of that and more is present here.

### 3.    There is no presumption against application of integrated employer.

BMW AG also is wrong to assert that there is a "strong presumption" against application of the integrated employer doctrine.  [DE 102 at 20 (citing *Johnson v. Flowers Indus.*, Inc., 814 F.2d 978, 982 (4th Cir. 1987))].  In *Carter v. Ascend Performance Material Holdings, Inc.*, Civil Action No. 8:20-cv-4379-TMC [DE 75], 2022 U.S. Dist. LEXIS 174832 (D.S.C. Sep. 26, 2022), this Court adopted Judge McDonald's rejection of that principle and the reliance on *Johnson*.  2022 U.S. Dist. LEXIS 174832, at *4, DE 75 at 14-15 (adopting 2022 U.S. Dist. LEXIS 175745, at *20 n.5 [DE 67 at 13 n. 5] (D.S.C. May 20, 2022)).

---

before the Fourth Circuit clarified that a different test applies to the joint employer analysis. *Drive v. Butler Automotive*, 793 F.3d 404 (4th Cir. 2015).

## C.     The Friendship Treaty

BMW AG claims that, as a German corporation, decisions at issue are protected by a treaty while, at the same time, BMW AG claims that it had nothing to do with the decisions.  In its own words: "[BMW] AG has consistently maintained that MC's decisions are the source of Dawsey's claims of unlawful employment discrimination."  [DE 52 at 12] That continues to be its posture in the pending Motion.  [DE 103 at 2 ("[T]he contemplated personnel decisions at issue were directed and controlled by BMW MC personnel . . . .");  *id.* ("BMW AG did not direct or control the personnel plans at issue"); *id.* at 4 ("[D]ecision-making authority on matters that concern BMW MC resides with BMW MC").  If there has been one consistent refrain from BMW AG, it has been that it has no connection to any decisions at issue.[11]

_____

[11]     [DE 42-1 at 6 ("MC alone is ultimately responsible for the employment decisions at the center of Plaintiff's claims."); *id.* ("This litigation concerns a dispute between Plaintiff Kelly Dawsey and her former South Carolina-based employer, Defendant BMW Manufacturing Co., LLC ("MC")."); *id.* at 11 ("The decision to hire Ms. Burgemeier was not made by AG"); DE 52 at 5 ("MC held and exercised the authority to make the personnel decision at issue in this case"); *id.* at 8 ("Plaintiff's claims arise directly from MC's activity in South Carolina, not AG's"); *id.* ("The evidence is clear that MC personnel held and executed the authority to make the decisions that are the genesis of Plaintiff's claims.  In other words, Plaintiff's claims arise directly from MC's activity in South Carolina, not AG's."); *id.* at 11 ("The specific facts in the record show that MC held the ultimate hiring authority  for Plaintiff's  former  position . . . . "  ); *id.* ("There are no facts in the record demonstrating AG's direct involvement in any of these decisions."); DE 61 at 2 ("Plaintiff's self-devised theory of personal jurisdiction rests on the premise that AG made personnel decisions at BMW MC, which has been proven to be factually incorrect . . . .")

BMW AG cites the US-Germany Friendship Navigation and Commerce Treaty ("FCN Treaty") (Exh. 22).[12]   The FCN Treaty covers only actions by BMW AG as to decisions made at German corporations:

> Nationals and companies of either Party shall be permitted to engage, within the territories of the other Party, accountants and other technical experts, executive personnel, attorneys, agents and other specialists of their choice. Moreover, such nationals and companies shall be permitted to engage accountants and other technical experts regardless of the extent to which they may have qualified for the practice of these professions within the territories of such other Party, for the particular purpose of making for internal purposes examinations, audits and technical investigations for, and rendering reports to, such nationals and companies in connection with the planning and operation of their enterprises, and enterprises in which they have a financial interest, within such territories

Treaty Article VIII(1) [*Id.* at 7].

For several reasons, the FCN Treaty does not provide quarter under these circumstances.

### 1.    BMW AG offers no evidence or testimony to establish how the treaty applies.

Application of the treaty is an affirmative defense.  *Urata v. Canare Elec. Co.*, Civil Action No. 12-5704 (JLL), 2013 U.S. Dist. LEXIS 76820, at ** 17-18 (D.N.J. May 10, 2013); *Brune v. Toyota Tech. Ctr. U.S.A.*, CASE NO.: 97-CV-70174-DT, 1997 U.S. Dist. LEXIS 6908, at *6 (E.D. Mich. Mar. 28, 1997).

BMW AG must premises this argument on the falsity of everything it has said to date.  It is the classic, "I didn't shoot him, but if I did it was self-defense" scenario.  But even if BMW AG could change directions 180 degrees, how does BMW AG plan to

---

[12]    The United States entered into a number of such post WWII treaties, including the treaty with Germany in 1954.  *Sumitomo Shoji Am. v. Avagliano*, 457 U.S. 176, 185-86 & n. 16 (1982).

establish its new and contradictory theory?  BMW AG offers no testimony about the appointment, or BMW AG's involvement in the appointment.  Again, doing so would contradict every statement BMW AG has made to date.  And as noted above, BMW AG has identified no witnesses for this case.  [Supra § III(A)(2)(a)].  So it couldn't make the argument if it wanted to.

BMW AG and BMW MC have been steadfast: Engelhorn and others made the decisions after Engelhorn became president of BMW MC and his final decision was made on behalf of BMW MC.  [*Supra* n. 11].   That is the bed BMW has made, and it must now lay in it.

### 2.     BMW AG presents a false choice.

BMW AG suggests that there are two outcomes:  (1) It is not subject to personal jurisdiction; or (2) if it is, then it has immunity.  The second outcome does not follow from a correct resolution of the first.  There is a huge gap between being subject to personal jurisdiction and the notion that the decisions complained of here are covered by a treaty.

### 3.     BMW MC is not covered by the Treaty

Application of an FCN Treaty turns on whether BMW MC is a "company of" Germany.  It is not.  The purpose of such treaties was to recognize the corporate status of foreign corporations.

> As used in the present Treaty, the term "companies" means corporations, partnerships, companies and other associations, whether or not with limited liability and whether or not for pecuniary profit. Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party.

[Treaty Article XXV ¶ 5 (Exh. 21 at 17-18)].  These treaties put foreign corporations on equal legal footing with domestic corporations.  *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 53 (2d Cir. 2010) (citing and quoting *Avagliano*, 457 U.S. at 185-86).

BMW MC is not a German corporation.  BMW MC is a domestic corporation, and AG steadfastly maintains that the TX-60 position is solely within BMW MC.[13]   In *Avagliano*, the Supreme Court held that a wholly owned Japanese subsidiary that is incorporated in the United States "is not a company of Japan under the Treaty and is therefore not covered by Article VIII."  457 U.S. at 183.[14]

BMW AG also has not even attempted to establish how *it* could assert treaty rights when the apparent parent of BMW MC is also a domestic corporation.  As this Court has also noted, BMW AG has always emphasized that BMW MC is an "indirect subsidiary." [DE 90 at 2 (SJ Order)].  Among its 200 direct and indirect subsidiaries, BMW AG claims there are four degrees of separation between it and BMW MC.  [DE 42-1 at 8 (citing and quoting 42-3 at 2 ¶ 6, at 3 ¶ 15 (Kopnik Declaration)).  BMW has identified, for example,

---

[13]     See DE 90 at 1 ("Plaintiff brought this action against . . . BMW AG . . . ,  a German corporation headquartered in Munich, and . . . BMW MC . . ., a Delaware limited liability company which has a principal place of business in Greer, South Carolina."); DE 42-1 at 8; DE 96 at 2 ¶ 4 (BMW AG admitting allegation that BMW MC is a Delaware corporation with a principal place of business in South Carolina); DE 40 at 2 ¶ 4 (BMW MC admitting same); DE 103 at 4 ¶ 5.  This Court also has noted that "BMW AG . . . is not registered to conduct business in South Carolina, does not own real property in South Carolina, and does not maintain an office or other facility in South Carolina." [DE 90 at 2 (citing DE 42-3 at 2 ¶ 7)].

[14]     Numerous cases following *Avagliano* involve whether a domestic subsidiary can assert the treaty rights of a foreign parent.  That issue was left open in *Avagliano*. *Id.* at 189 n. 9.  But that is not an issue here.  For obvious reasons, BMW MC has never sought to assert the treaty on behalf of BMW AG, and it won't.

BMW (US) Holding Corp. as an intermediary.  [DE 42-3 at 3 ¶ 15].  BMW (US) Holding Corp. is a domestic corporation registered in South Carolina.  [Exh. 23].

### 4.    TX-60 is not covered by the FCN Treaty

The position at issue, TX-60, is not covered by the FCN Treaty because its occupants are not "executive personnel."  BMW AG asserts, "The BMW MC President and Vice Presidents are officers of BMW MC."  [DE 103 at 4 ¶ 5 (citing DE 14-3 ¶ 10 (McCraw Decl.)].  Engelhorn testified that the board of management at BMW MC consists of the same group.  [Engelhorn Dep. 70:21 – 71:1].  At BMW, such executives are designated as "OFK,"[15] which covers only Levels I and II at BMW Group.  [Dawsey Third Decl. ¶ 3].  Neither TX-60 nor any other manager positions in human resources fall within the OFK level or are officers of BMW MC.  [Id. ¶ 6].

### 5.    Burgmeier is not covered by the FCN Treaty

BMW AG cannot establish that Burgmeier is a "technical expert" under the treaty. Burgmeier has no experience in American human resources, employment laws, or compensation systems other than Germany's system, which is based on collective bargaining.  [DE 97 at 15 n. 18].

### IV.  Conclusion

For all these reasons, BMW AG's Motion should be denied.

Respectfully submitted this 22nd day of March, 2024.

 s/ Brian P. Murphy
Brian P. Murphy
Attorney for Plaintiff

---

[15]    "OFK is an acroym to describe the company's top leaders, referred to in German as "'Obere Fuehrungskraefte.'" https://www.reuters.com/article/idUSKBN1AK1A1/#:~:text=OFK%20is%20an%20acronym%20to,German%20as%20%22Obere%20Fuehrungskraefte.%22

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400