IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Kelly Dawsey, ) | |
| ) | Civil Action No. 7:22-3738-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Bayerische Motoren Werke ) | |
| Aktiengesellschaft and BMW ) | |
| Manufacturing Co., LLC, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the court on defendant BMW Manufacing Co., LLC's ("BMW MC") motion for summary judgment (doc. 92) and Bayerische Motoren Werke Aktiengesellschaft's ("BMW AG") motion for summary judgment (doc. 102). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civil Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

## I. BACKGROUND AND FACTUAL ALLEGATIONS

BMW MC operates an automotive manufacturing plant in Spartanburg County, South Carolina and assembles certain models of BMW brand vehicles (doc. 42-2, McCraw decl. ¶ 5). BMW MC is an indirect subsidiary of BMW AG, a German corporation (*id.* ¶ 6). BMW MC's production facility is part of BMW AG's global vehicle production network, and all production plants in this network are designated with a "T" code (doc. 92-1 at 3). BMW MC is designated as "TX" (*id.*). Accordingly, positions at BMW MC all have a TX code assigned to them, which varies depending on the department in which they are located (*id.*; doc. 92-2, Dawsey dep. ex. 7). Relevant here, the human resources ("HR") department is known as TX-6, and all positions within the HR department have a code that begins with

TX-6 (doc. 92-2, Dawsey dep. ex. 7). The vice president of HR is TX-6, and positions directly reporting to the vice president, which include department managers and section managers, have a single number following TX-6 (*i.e.*, TX-60, TX-61, TX-62, TX-64, and TX-65) (docs. 45-1, Dawsey decl. ex. G; 97-1, Dawsey 2nd decl. ¶ 6). Additionally, employees that report to the department managers have two numbers following TX-6 (*i.e.*, TX-600 reports to TX-60) (doc. 97-1, Dawsey 2nd decl. ¶ 6).

The plaintiff, a white American, began her employment with BMW MC in 1995 working in staff associate relations (docs. 20 ¶ 2; 97-4, Dawsey dep. 36:15-37:7; 97-1, Dawsey 2nd decl. ¶ 2). After a series of promotions, the plaintiff was ultimately promoted to TX-60, which is the department manager for HR planning, in February 2015 (docs. 97-4, Dawsey dep. 45:16-50:9, 55:1-19, 64:21-25; 92-2, Dawsey dep. ex. 3). TX-60 is responsible for HR planning and steering, compensation and organization, benefits, associate family health center, associate well-being, and compliance (docs. 97-4, Dawsey dep. 59:10-12; 92-2, Dawsey dep. ex. 8).

On September 1, 2021, Robert Engelhorn ("Dr. Engelhorn"), a German who was formerly working for BMW AG, became the president of BMW MC (docs. 92-4, Petrasch dep. 126:4-6; 92-6, Burgmeier dep. 46:24-47:1). At that time, Christina Petrasch, a German, served as TX-6 and was therefore the person to whom the plaintiff directly reported (docs. 97-1, Dawsey 2nd decl. ¶ 4; 97-11, Petrasch dep. 8:20-24). The record reflects that Ms. Petrasch gave the plaintiff high performance ratings (docs. 94-11, Petrasch dep. 124:3-5; 97-20; 97-21; 97-22). At one point, BMW MC considered the plaintiff to be a possible nominee for TX-6 (doc. 97-1, Dawsey 2nd decl. ¶ 31).

Ms. Petrasch's international assignment to BMW MC was scheduled to end at the end of 2021, and she was returning to Germany at that time (doc. 92-4, Petrasch dep. 126:4-11). Accordingly, BMW MC needed to fill the TX-6 role (*see id.*). Also, during the first half of 2021, BMW MC created an HR special project to focus on issues relating

to hiring and retention of employees (docs. 92-2, Dawsey dep. ex. 36; 92-3, Engelhorn dep. 43:16-44:1). This special project was scheduled to begin in early 2022 (doc. 92-2, Dawsey dep. ex. 36). Ms. Petrasch selected Scott Medley ("Mr. Medley"), who was employed at TX-64, to lead this special project (doc. 92-2, Dawsey dep. ex. 41). Accordingly, the TX-64 position also needed to be filled (*see id.*).

The plaintiff testified in her declaration that Ms. Petrasch told her that Dr. Engelhorn wanted a German in TX-4, the vice president of assembly (doc. 45-1, Dawsey decl. ¶ 10). At that time, Sherry McCraw ("Ms. McCraw"), an American, was TX-4 (*id.*). BMW MC then moved Philip Heinrichsdorff from Germany to TX-4 (*id.*). Additionally, in early September 2021, Dr. Engelhorn selected Ms. McCraw for TX-6 (docs. 97-5, Engelhorn dep. 59:5-9; 92-1 at 6). Dr. Engelhorn testified in his deposition that he wanted a local person in the TX-6 position (doc. 97-5, Engelhorn dep. 22:15-17). Because Ms. McCraw was unable to transition to TX-6 until April 2022, Ms. Petrasch agreed to remain as TX-6 until March 31, 2022 (docs. 92-4, Petrasch dep. 8:20-24; 92-1 at 6).

In July 2021, while Dr. Engelhorn was still working for BMW AG, he met Eva Burgmeier ("Ms. Burgmeier"), a German and department manager in the HR department at BMW AG (doc. 92-6, Burgmeier dep. 45:5-14). Although Dr. Engelhorn was still in Germany, he had been formally announced as the next president of BMW MC (*id.* at 45:5-47:1). During this meeting, Ms. Burgmeier expressed an interest in an international assignment (*id.*). Subsequently, on September 9, 2021, Dr. Engelhorn had a teleconference with Ms. Burgmeier (*id.* at 45:5-46:11). Dr. Engelhorn told Ms. Burgmeier that there would be a department manager opening at BMW MC in early 2022 and asked if she was interested in taking an international assignment to work for BMW MC (*id.*). Ms. Burgmeier testified in her deposition that Dr. Engelhorn did not indicate which position she would fill in the BMW MC HR department (*id.*).

3

The plaintiff testified in her deposition that on September 15, 2021, she received a telephone call from Ms. Petrasch and learned that Ms. McCraw would be the next TX-6 (doc. 92-2, Dawsey dep. 209:13-210:2). Ms. Petrasch also told the plaintiff that "there was a rule when TX-6 vice president of HR was a local, that there needed to be a German in the next line" (*id.* at 210:3-5). The plaintiff testified that during this telephone call, Ms. Petrasch did not "indicate . . . what role the German was coming to" (*id.* at 211:22-25). However, the plaintiff also testified at a different time in her deposition that Ms. Petrasch told her on September 15th that Ms. Burgmeier was filling the TX-60 role that the plaintiff occupied (doc. 97-4, Dawsey dep. 106:9-18). Moreover, the plaintiff testified in her deposition that in October, Ms. Petrasch told her to look for jobs outside of HR (doc. 97-4, Dawsey dep. 230:18-234:8-13).

The plaintiff testified that she was aware of the rule that there had to be a German "next in line" if an American was in TX-6 (doc. 92-2, Dawsey dep. 210:7-13, 212:5-13). The plaintiff produced a document from "BMW Group," which is dated January 6, 2016, and entitled "Expat Guidelines for Plant Spartanburg" ("Expat Guidelines") (doc. 97-23). Relevant to these Expat Guidelines, the terms "domestic" and "local" refer to United States citizens and the terms "expat" and "international" refer to German nationals sent by BMW AG to work in Spartanburg (docs. 97-5, Engelhorn dep. 19:23-20:5; 45-1, Dawsey decl. ¶ 20; 97-1, Dawsey 2nd decl. ¶ 8). "Global" refers to a candidate from any other county in the BMW Group network (doc. 45-1, Dawsey decl. ¶ 20). Additionally, "inbound" means an expat/international or global employee transferred from another country (doc. 97-1, Dawsey 2nd decl. ¶ 8).

Under a heading entitled "Topics Taken Into Consideration for Inbound Assignments," the Expat Guidelines state, among other topics, that "[i]n general there is an alternating reporting structure of international and domestic below the Senior Management level" (doc. 97-23 at 4). The Expat Guidelines then describe options for how this alternating

reporting structure would look for TX-60[1] (*id.* at 6). The positions are color-coded based on nationality (*id.*). The Expat Guidelines state that the "T[X]-60 department has a need for an international inbound (Planner or Dept Mgr ideally from AG - tie to network) and should follow the status of T[X]-6" (*id.*). The plaintiff testified in her declaration that the practice of alternating the nationality of TX-6 and TX-60 is longstanding (doc. 97-1, Dawsey 2nd decl. ¶ 12). The plaintiff explained as follows:

> Before I became TX-60, Moritz Kippenberger (German) held TX-60 when Ann Marie Higgins (American) was TX-6. I became TX-60 when Johannes Trauth (German) was TX-6. I remained TX-60 when Christina Petrasch (German) was TX-6. When Sherry McCraw (American) was announced as TX-6, BMW replaced me with Eva Burgmeier (German).

(*Id.*).

On September 23rd, Ms. Petrasch prepared a draft document outlining a proposed reorganization the HR department (doc. 92-4, Petrasch dep. ex. 1). According to that document, Ms. Burgmeier would assume the TX-60 role, the plaintiff would move to TX-61, Corey Epps ("Mr. Epps"), a black male, would move to TX-64, and Mr. Medley would move to the special project (*id.*). Sometime in late September, Ms. Petrasch met with Dr. Engelhorn and Ms. McCraw to discuss her proposed reorganization (docs. 92-3, Engelhorn dep. 23:20-24:33; 92-7, McCraw dep. 15:24-16:13). During that meeting, Ms. McCraw expressed concerns with the proposal to move the plaintiff to TX-61 (92-7, McCraw dep. 16:10-18:20). Ms. McCraw testified in her deposition that Mr. Epps was doing a good job in TX-61 and had been in that position for less than two years (*id.* at 18:12-18). Ms. McCraw also testified that based on her experience working with the plaintiff, the TX-64 position was a better fit for her (*id.* at 16:14-17:1). Therefore, Ms. McCraw recommended that Mr. Epps remain in the TX-61 position and that the plaintiff be moved to TX-64 (*id.* at 16:2-18:18). Dr. Engelhorn agreed with Ms. McCraw's recommendation (doc. 92-3,

---

[1] The Expat Guidelines refer to this position as "TS-60" (doc. 97-23 at 6). BWM MC's codes were "TS" before they were changed to "TX" (doc. 97-10, Medley dep. 12:1-9).

5

Engelhorn dep. 23:13-22, 66:15-67:18).  On October 1st, Ms. Petrasch prepared an updated chart reflecting that Ms. Burgmeier would assume the TX-60 position, the plaintiff would move to TX-64, and Mr. Medley would move to the special project (doc. 92-4, Petrasch dep. ex. 2).

On November 11th, Dr. Engelhorn, Ms. Petrasch, and Ms. McCraw met with HR management to announce the changes (doc. 92-2, Dawsey dep. 244:9-245:8).  During that meeting, Ms. Petrasch used a presentation that showed the new structure of the HR department, including the plaintiff's move to TX-64 (*id.* at 250:19-251:6).  The plaintiff testified in her declaration that in addressing the plaintiff's position, Ms. Petrasch reiterated that an expat needs to be in TX-60 when a domestic is in TX-6 (doc. 97-1, Dawsey decl. ¶ 11).  The plaintiff also testified that Dr. Engelhorn told HR management that they needed an expat in the Spartanburg HR function so that they had a "connection with Munich" (*id.*).

When asked about the restructuring of HR, Mr. Epps testified in his deposition:

> Q. Did Ms. Petrasch tell you why she was proposing that Kelly be moved?
>
> A. So the person that was coming was a domestic, so it was - - this was Sherry. Sherry was a domestic.  And a normal practice and considered somewhat of a best practice, but not the law, rule, or regulation, but a normal practice is that when you have a domestic, you try to put an international so you can keep your tie-in to Germany on the international side, and you can keep your tie-in to the American side. . . .

(Doc. 97-6, Epps dep. 38:14-25). Further, when discussing why Ms. Burgmeier was selected for TX-60, Dr. Engelhorn testified in his deposition that, among other reasons, Ms. Burgmeier had "a clear link to the international network" (doc 97-5, Engelhorn dep. 54:3-5). Dr. Engelhorn testified that it is vital to have this close link and that "BMW setup is a global setup" (*id.* at 54:8-55:2).  Ms. Petrasch also testified in her deposition that Dr. Engelhorn brought up Ms. Burgmeier for TX-60 so that she could "act like a bridge to Germany" (doc. 97-77, Petrasch dep. 126:3-18).  On December 2nd, an employee at BMW AG sent an

email announcing Ms. Burgmeier's international assignment (doc. 45-1, Dawsey decl. ¶ 4 & ex. D).

The plaintiff contends that a transfer from TX-60 to TX-64 would be a demotion (doc. 97-1, Dawsey 2nd decl. ¶ 9). TX-64 does not require HR experience and has different job responsibilities from TX-60 (docs. 97-9, McCraw dep. 58:24-59:2; 92-2, Dawsey dep. ex. 10; 92-5, Medley dep. 26:7-12; 97-27). In addition, the plaintiff asserts that this transfer would result in a decrease in her job's function level ("FL") (doc. 97-1, Dawsey 2nd decl. ¶ 9). Non-production jobs at BMW MC are graded and assigned an FL, which is designated by a roman numeral (doc. 92-2, Dawsey dep. ex. 4). FLs are determined by a variety of factors, including the amount of responsibility that the position involves (*id.*). There are seven FLs, with FL I representing the highest, executive level responsibility for the plant (*i.e.*, the president) and FL VII representing employees who perform work of a standardized nature under direct supervision (*id.*). Relevant here, FL II represents vice presidents/general managers, FL III represents department managers, and FL IV represents section managers (*id.*). FL III involves "[m]anagement level responsibility for multiple functional areas and/or leads a single functional area with full operational responsibility" and "[t]ypically manages multiple direct reports who have managerial responsibility" (*id.*). In contrast, FL IV "manages one or several functional areas and works highly independently on very specialized tasks" (*id.*). TX-60 is classified as FL III (doc. 97-1, Dawsey 2nd decl. ¶ 9). The parties dispute whether, during the relevant period, TX-64 was classified as FL III or FL IV (*id.*; 92-2, Dawsey dep. 262:24-263:3 & ex. 26; 97-11, Petrasch dep. 31:1-25; 97-26).

Moreover, employees are given personal grades ("PG") based on their performance (doc. 92-2, Dawsey dep. ex. 4). PGs are identified by a number – two through fifteen, and they determine salary, bonuses, and benefits (including personal time off, vehicle, etc.) (*id.*; doc. 97-18). Although PGs determine compensation and benefits, each FL has a salary range, and BMW limits which PGs can serve at various FLs (docs. 92-2, Dawsey dep. ex. 4; 97-18 at 5; 97-3, Burgmeier dep. 71:23-72:4; 92-1, Dawsey 2nd decl. ¶¶

7

16, 18). For example, FL III is limited to PGs 10, 11, and 12, and FL IV is limited to PGs 8, 9, and 10 (docs. 92-2, Dawsey dep. ex. 4; 97-18 at 5; 97-3, Burgmeier dep. 71:23-72:4; 92-1, Dawsey 2nd decl. ¶¶ 16, 18). The plaintiff testified in her deposition that this system essentially creates a band of compensation (doc. 97-4, Dawsey dep. 258:16-20). While there is some overlap in the permissible salaries for employees at FL III and FL IV, the overall salary range for FL III is higher than the salary range for FL IV (doc. 97-1, Dawsey 2nd decl. ¶ 27).

The plaintiff testified that FLs also impact an employee's ability to advance (doc. 97-1, Dawsey 2nd decl. ¶ 31). FL II executives are eligible for Obere Fuehrungskraefte ("OFK") designation, which is a designation that represents BMW's top leaders (docs. 97 at 13; 97-11, Petrasch dep. 49:3-15). As a FL III department manager, the plaintiff was eligible to be a candidate for FL II and OFK status (docs. 97 at 13; 97-11, Petrasch dep. 49:3-15; 97-1, Dawsey 2nd decl. ¶ 31). Further, the plaintiff had expressed an interest in such a promotion, and, as set out above, she was previously considered for TX-6 on one occasion (doc. 97-1, Dawsey 2nd decl. ¶ 31). However, the plaintiff testified in her deposition that FL IV employees are not promoted directly into FL II positions, so a downgrade from FL III to FL IV affected her ability for a promotion (*id.*). The plaintiff also testified that since she began working for BMW MC in 1995, she never saw someone who was demoted from FL III to FL IV rise back up to FL II (*id.*).

Also during this time frame, the plaintiff was looking for other employment. Specifically, on September 8, 2021, the plaintiff's husband reached out to a job recruiter, Sherrill Miller ("Ms. Miller"), on the plaintiff's behalf to assist her in finding another job (doc. 92-2, Dawsey dep. 269:2-17). The plaintiff explained that they contacted a recruiter because "communications were chaotic" at BMW MC, so she "started really praying hard about what my positions should be, what I should do, and very ironically, my husband met Sherrill Miller at a job because she was the neighbor of an elderly woman that he was working on her house" (*id.* at 269:20-270:2). The plaintiff had an initial meeting with Ms.

8

Miller on September 10th (*id.* at 270:10-17). Ms. Miller testified in her deposition that during this meeting, the plaintiff told her that "the only reason she was considering looking was to kind of slow down from all the responsibilities that had been assigned over the last couple of years . . . to her, and she wanted to do something different, so to speak" (doc. 92-8, Miller dep. 38:25-39:8). Ms. Miller recalled the plaintiff telling her that she wanted "less responsibility" and "didn't really want to do what she had done so deeply in the past. She really was looking for new avenues to be created for all of her experience and knowledge" (*id.* at 88:13-89:13). The plaintiff, however, testified in her declaration:

> My point to Sherrill Miller was not that I wanted a lesser job or less responsibility. My point to her was that I was not interested in working 12-15 hour days. As my job search indicates, I was looking to see if there were top HR positions available so that I could continue my HR career, which I have done. I did not say that I wanted to "slow down."

(Doc. 97-1, Dawsey 2nd decl. ¶ 41).

On September 13th, the plaintiff sent an email to Ms. Miller regarding some job postings in which she was interested (doc. 92-2, Dawsey dep. 271:7-14). On the evening of September 15th, Ms. Miller sent a services contract to the plaintiff, which the plaintiff signed (*id.* at 274:14-276:5). The plaintiff engaged in a job search, and on November 30th, she had an initial interview for the position of director of HR with Madewell Concrete (*id.* at 285:12-287:4). The plaintiff had another interview with Madewell Concrete on December 3rd, and on December 6th, Madewell Concrete offered the plaintiff a job (*id.* at 285:16-12, 287:11-288:8). The plaintiff accepted Madewell Concrete's offer on December 10th (*id.*).

The plaintiff did not immediately tell anyone at BMW MC about her acceptance of another job offer (doc. 92-2, Dawsey dep. 289:3-10). On December 13th, the plaintiff met with members of her team and informed them of the upcoming organizational changes in the HR department, including that she was moving to TX-64 (*id.*

at 252:12-254:13, 288:1-289:10).  Following that meeting, the plaintiff participated in a meeting with the entire HR department, during which Ms. Petrasch informed the HR department of the reorganization plan (*id.*).

On January 3, 2022, the plaintiff called Ms. Petrasch and resigned from employment (doc. 92-2, Dawsey dep. 300:11-25).  The plaintiff followed up with a written resignation letter, in which she stated that her last day of work at BMW MC would be January 14th (*id.* at 300:11-304:3).  When the plaintiff notified Mr. Medley and Kathy Keizer, her co-workers, of her resignation, she told them that an opportunity was presented that she could not pass up and that she believed it was a sign from God (*id.* at 305:25-305:5; docs. 92-5, Medley dep. 84:1-15; 92-9, Keiser dep. 69:1-5).  The plaintiff testified in her declaration that BMW MC makes offers of employment in writing and, at the time she resigned, she had not received an offer of employment regarding any role (doc. 97-1, Dawsey 2nd decl. ¶ 37).  At the time that the plaintiff left BMW MC on January 14th, she was still in the TX-60 position (doc. 92-2, Dawsey dep. 313:16-20).

The plaintiff filed an amended complaint in this court on February 9, 2023, alleging claims against the defendants for national origin discrimination in violation of Section 703(a)(1) and Section 703(a)(2)[2] of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), race discrimination in violation of Title VII, race discrimination in violation of 42 U.S.C. 1981 ("Section 1981"), and sex discrimination in violation of Title VII (doc. 20).  On February 16, 2024, BMW MC filed a motion for summary judgment (doc. 92).  The plaintiff filed a response on February 29, 2024 (doc. 97), and BMW MC filed a reply on March 7, 2024 (doc. 100).  Additionally, BMW AG filed a motion for summary judgment on

---

[2] BMW MC argues that the plaintiff only brought one national origin discrimination claim under Section 703(a)(1) of Title VII and did not bring a claim under Section 703(a)(2) (doc. 100 at 10).  However, the plaintiff cited to both Section 703(a)(1) and Section 703(a)(2) in her national origin discrimination claim in her amended complaint (doc. 20 ¶¶ 67-68), so the undersigned has considered her claim under both Sections herein.

March 8, 2024 (doc. 102), to which the plaintiff filed a response on March 22, 2024 (doc. 104). BMW AG filed a reply on March 29, 2024 (doc. 106). In light of the opinion issued by the Supreme Court of the United States in *Muldrow v. City of St. Louis, Missouri, et al.*, 144 S.Ct. 967 (2024) on April 17, 2024, the undersigned issued a text order on April 24, 2024, providing the plaintiff and the defendants an opportunity to submit supplemental briefing by May 8, 2024, regarding the impact of the *Muldrow* decision on the defendants' motions for summary judgment (doc. 108). The plaintiff filed a supplemental brief on May 7, 2024 (doc. 110), and BMW MC filed a supplemental brief on May 8, 2024 (doc. 111). BMW AG filed a supplemental brief on May 8, 2024, adopting BMW MC's supplemental brief (doc. 112). Accordingly, these matters are now ripe for review.

## II. APPLICABLE LAW AND ANALYSIS

**A. Standard of Review**

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold

11

demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## B. Adverse Employment Action

BMW MC argues that it is entitled to summary judgment on all of the plaintiff's claims because she cannot show that she suffered an adverse employment action (doc. 92 at 14-30).  BMW AG has adopted this argument in its motion for summary judgment (doc. 102 at 1-2).

Regarding the plaintiff's claims for national origin discrimination in violation of Section 703(a)(1) of Title VII, race discrimination in violation of Title VII and Section 1981, and sex discrimination in violation of Title VII, the undersigned agrees with the defendants. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (noting, in the Title VII context, that "[a] plaintiff can survive a motion for summary judgment by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor such as race motivated the employer's *adverse employment decision*. . . . Alternatively, a plaintiff may proceed under [the *McDonnell Douglas* ] pretext framework, under which the employee, after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an *adverse employment action* is actually a pretext for discrimination.") (emphasis added) (internal citations and quotation marks omitted); *Thomas v. Am. Sec. Ins. Co.*, C/A

No. 4:21-2301-JD-KDW, 2022 WL 19402466, at *17 (D.S.C. Dec. 19, 2022) ("Importantly, under either [the mixed-motive/direct evidence or the *McDonnell Douglas*] framework, Plaintiff must show some adverse employment action to prevail on his discrimination claim.") (citations omitted), *R&R adopted by* 2023 WL 2674397 (D.S.C. Mar. 29, 2023); *see also Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 703 (4th Cir. 2023) (adverse employment action required for prima facie Section 1981 discrimination claim); *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (noting that plaintiffs bringing Section 1981 claims must proceed under either the same mixed motive or *McDonnell Douglas* framework as with Title VII claims).

For these claims, "[a]n adverse employment action is a discriminatory act that adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (citation and internal quotation marks omitted). The Supreme Court of the United States has recently held that a plaintiff does not have to show that the harm incurred was significant. *Muldrow*, 144 S.Ct. at 974-76. She must simply show "some harm respecting an identifiable term or condition of employment." *Id.*

The defendants argue that the plaintiff voluntarily resigned from employment, so she was therefore not subject to an adverse employment action (docs. 92; 100). While the law is clear that a voluntary resignation from employment is not an adverse employment action, *see Benjamin v. Sparks*, 986 F.3d 332, 352 (4th Cir. 2021), the plaintiff does not contend that this event is the basis of her claim. Rather, the plaintiff argues that she experienced adverse employment actions when (1) BMW decided to remove her from TX-60 and (2) BMW decided to transfer her to TX-64 (doc. 97 at 21). The plaintiff contends that these actions easily meet the standard for "some harm" to the terms and conditions of her employment (*id.* at 21-24; doc. 110 at 4-5). The defendants, however, argue that these decisions are not adverse employment actions because, at the time the plaintiff resigned,

13

she had neither been removed from TX-60 nor transferred to TX-64 (docs. 100 at 5-10; 111 at 2-4).

The undersigned agrees with the defendants. The plaintiff is essentially alleging that being notified of a planned, future reorganization is an adverse employment action. However, she has failed to point to any case law in support of this proposition. The cases that the plaintiff does rely on in support of her argument do not having any bearing on the issue here, as all of those cases deal with when the statute of limitations accrues and not what constitutes an adverse employment action (*see* doc. 97 at 19-20) (citing *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981); *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256-58 (1980); *Smith v. Univ. of Md. Baltimore*, 770 F. App'x 50, 50 (4th Cir. 2019); *Hospodor v. Burlington Indus., Inc.*, C/A No. No. 99-2017, 2000 WL 203933, at *1 (4th Cir. Feb. 23, 2000); *Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982)).

A district court addressed a similar issue in *Ratcliff v. Spencer*, C/A No. 1:18-cv-757, 2019 WL 2375131 (E.D. Va. June 4, 2019). In that case, the plaintiff worked as a chief human capital officer ("CHCO") in Naval Intelligence. *Id.* at *1. The plaintiff applied for and received a joint duty assignment ("JDA"), whereby she was detailed to a position in another Intelligence Community element for the purpose of gaining a wider understanding of the missions and functions of the various components of the Intelligence Community. *Id.* at *1-2  A JDA is required before being considered for promotion to the senior intelligence executive corps. *Id.* at *1. The plaintiff learned that, upon the expiration of her JDA, she would not be permitted to return to her CHCO position. *Id.* at *2-3. A cyber workforce position was proposed for her. *Id*. Before her JDA expired, the plaintiff resigned from Naval Intelligence. *Id.* at *3. The plaintiff sued, alleging various discrimination claims. *Id.* at *1. The district court found that the plaintiff could not show that an adverse employment action had occurred because she resigned "before any action was taken." *Id.* at 4. Specifically, the district court stated that the plaintiff "speculates on the impact of

reassignment if she had not resigned, but she cannot cobble together an adverse employment action based on what might have been." *Id.*; *see also James*, 368 F.3d at 377 (although using the "significant detriment" test for an adverse employment action, which was subsequently overturned by *Muldrow*, the court noted that "[s]peculation about the future adverse consequences of a reassignment may not rise to the level of a genuine dispute" and that it was "left to guesswork and conjecture").

Here, the plaintiff resigned before she was ever removed from TX-60 or transferred to TX-64, so the undersigned is similarly left to speculation about future potential harms. Moreover, the plaintiff resigned before Ms. McCraw was scheduled to be transferred from TX-4 to TX-6. The HR reorganization plan changed throughout the course of the latter part of 2021, and it may have changed again. While the Supreme Court lowered the standard for showing an adverse employment action in *Muldrow*, the plaintiff still is required to show "some harm." 144 S.Ct. at 974-76. At the time that the plaintiff resigned, she simply had yet to experience any harm to the terms and conditions of her employment (*see* doc. 110 at 4) ("Here, the announced transfer *would have* reduced [the plaintiff's] rank from FL III to FL IV. [The plaintiff] *would have* gone from a high-level strategy position to a non-departmental manager position that does not require any experience in HR") (emphasis added) (internal citations and quotation marks omitted). Based on the foregoing, the undersigned recommends that the district court grant the defendants' motions for summary judgment on these claims.[3]

---

[3] The plaintiff also makes clear that she is not bringing a claim for constructive discharge (doc. 97 at 24, 33) ("that is not the theory"). However, even if she had brought such claim, the undersigned would recommend that it be dismissed as well because no reasonable jury could find that her working conditions were sufficiently intolerable based on a future job transfer. *See Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) ("A claim for constructive discharge has two elements. First, a plaintiff must show that his working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Second, a plaintiff must actually resign because of those conditions.") (internal citations and quotation marks omitted).

Regarding the plaintiff's national origin discrimination claim in violation of Section 703(a)(2) of Title VII, the plaintiff argues that her claim should survive summary judgment because BMW MC only addresses her Section 703(a)(1) claim in its motion (doc. 97 at 17-18; *see also* doc. 20 ¶¶ 67-68). However, BMW MC moves for summary judgment on all of the plaintiff's claims and addresses her Section 703(a)(2) claim in its reply (docs. 92 at 1; 100 at 10-11), so the undersigned has considered BMW MC's arguments on the plaintiff's Section 703(a)(2) claim herein.

Section 703(a)(2) provides that it is unlawful for an employer "to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court of Appeals for the Fourth Circuit has made clear that claims under both Section 703(a)(1) and Section 703(a)(2) require the existence of an adverse employment action. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (noting, in the context of Title VII Section 703(a)(1) claims and Section 703(a)(2) claims, that "[r]egardless of the route a plaintiff follows in proving a Title VII action, . . . the existence of some adverse employment action is required"), *abrogated on other grounds by Muldrow v. City of St. Louis, Mo.*, 144 S.Ct. 967 (2024). Moreover, as discussed above, the plaintiff resigned before she was removed from TX-60 or transferred to TX-64. Accordingly, because the plaintiff's status as an employee had not yet been affected and she had not yet been denied any employment opportunities, the undersigned further recommends that the district court grant summary judgment on the plaintiff's Section 703(a)(2) claim. *Compare Conn. v. Teal*, 457 U.S. 440, 448 (1982) (finding that black employees presented a cognizable claim under Section 703(a)(2) when they failed their employer's examination, passage of the examination was required to attain permanent status as a supervisor, and the examination had not been

shown to be job related); *Nashville Gas Co. v. Satty*, 434 U.S. 136, 141 (1977) (finding that an employer's policy, which resulted in the plaintiff losing all of her seniority because she went on maternity leave, deprived the plaintiff of employment opportunities and adversely affected her status as an employee); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 444 (4th Cir. 1981) ("Armstrong demonstrated that she was a member of a protected class, that she was employed in a job expressly limited to the protected class[,] and that she was excluded from a higher paid classification whose duties she satisfactorily performed. The [defendant's] segregation of jobs by sex adversely affected her status as an employee and deprived her of the opportunity to reach the maximum salary payable to salesmen.").

### III. CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the district court grant the defendants' motions for summary judgment (docs. 92; 102).

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

June 21, 2024
Greenville, South Carolina

**The attention of the parties is directed to the important notice on the next page.**

### *Notice of Right to File Objections to Report and Recommendation*

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 250 East North Street, Suite 2300
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).