**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA, SPARTANBURG DIVISION**

---

**KELLY DAWSEY,**

**Plaintiff,**

**v.**

**BAYERISCHE MOTOREN WERKE**
**AKTIENGESELLSCHAFT and BMW**
**MANUFACTURING CO., LLC collectively**
**d/b/a "BMW GROUP",**

**Defendants.**

**7:22-03738-TMC-KFM**

---

**EXPERT REBUTTAL REPORT OF NICHOLAS R. HARRIS**

**NOVEMBER 20, 2025**

**CONFIDENTIAL**

Nicholas R. Harris
Partner
GreerWalker LLP

BMW MC 001946

# TABLE OF CONTENTS

I.    **QUALIFICATIONS** ........................................................................................... 1

II.   **SCOPE OF THIS ENGAGEMENT** ............................................................... 1

III.  **BACKGROUND** ............................................................................................ 2

     A.   Parties ................................................................................................. 2

     B.   Ms. Dawsey's Position with BMW Manufacturing ......................... 2

     C.   BMW's Alleged Wrongdoing .......................................................... 4

     D.   Ms. Dawsey's Post-BMW Employment ........................................ 5

IV.  **SUMMARY OF MR. GIBSON'S REPORT AND OPINIONS** ....................... 6

V.   **SUMMARY OF OPINIONS** .......................................................................... 7

VI.  **BASIS FOR OPINIONS** ............................................................................... 7

     A.   Mr. Gibson's Calculation is a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, not BMW's alleged wrongdoing .................................... 7

     B.   BMW's alleged wrongdoing did not damage Ms. Dawsey. ........... 10

     C.   Even as a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, Mr. Gibson's Calculation is unsupported and overstated because of errors and omissions that, if corrected, would drastically reduce his Calculation. ............... 13

          *1.   Mr. Gibson ignores important components of Ms. Dawsey's mitigating earnings from GSP.* ................................................................... 13

          *2.   Mr. Gibson understates Ms. Dawsey's mitigating bonus income.* .................... 14

          *3.   Mr. Gibson ignores key information regarding the BMW Retirement Income Account.* ................................................................... 15

          *4.   Mr. Gibson's analysis of "retiree medical payments" is unsupported.* .............. 17

VII.  **INFORMATION RELIED UPON** ......................................................... 18

VIII. **COMPENSATION** ............................................................................... 18

IX.  **PURPOSE AND USE** .......................................................................... 18

## I.  Qualifications

I am a Partner at GreerWalker LLP ("GreerWalker") where I lead GreerWalker's Forensic and Valuation Services practice.  GreerWalker is a public accounting and business advisory firm based in North Carolina and South Carolina.

I have more than eighteen years of accounting and finance experience, including more than sixteen years dedicated to forensic accounting and valuation services.  I have served as a consultant or expert witness on accounting matters in hundreds of disputes.  That experience includes the valuation of economic damages to businesses and individuals, along with other forms of forensic accounting, business valuation, and intellectual property valuation.  I have prepared expert reports and testified as an expert witness in state court, federal court, and arbitration.  I frequently provide opinions and analysis on the valuation of lost wages resulting from alleged wrongful termination, alleged wrongful death, and other similar or related claims.

I hold a Bachelor of Business Administration from the University of Michigan.  I am a Certified Public Accountant ("CPA"), Accredited in Business Valuation ("ABV") with the American Institute of Certified Public Accountants ("AICPA").  I hold the Chartered Financial Analyst ("CFA") charter.  I am a Certified Fraud Examiner ("CFE").  My curriculum vitae is included with this report as Appendix A.  It includes a list of matters in which I have testified as an expert witness at trial or by deposition in the last four years and publications that I have authored in the past ten years.

## II.  Scope of This Engagement

GreerWalker was retained by Jackson Lewis, counsel for BMW Manufacturing Co., LLC ("BMW Manufacturing"), to opine on Kelly Dawsey's ("Ms. Dawsey" or "Plaintiff") alleged damages, if any, related to her allegations against BMW.  As part of that scope of work, I was asked to review and critique, if necessary, the report prepared by John E. Gibson, Jr., ("Mr. Gibson") dated October 31, 2025 (the "Gibson Report" or "Mr. Gibson's Report").  I refer to Bayerische Motoren Werke Aktiengesellschaft ("BMW AG") and BMW Manufacturing collectively as "BMW or "Defendants."

If necessary and requested, I will respond to Mr. Gibson's, or other witnesses, future amended opinions, conclusions, findings, reports, or testimony.  Such responses may not be limited to the topics included in this report.  If requested by Jackson Lewis, I will testify at

deposition and trial.

I understand that liability, and findings of fact, will ultimately be determined by the trier of fact in this matter. My opinions on Ms. Dawsey's alleged damages are intended to assist the trier of fact.

I have personally supervised and reviewed the work performed by staff working with me on this matter. When used in this report, "I" refers to me and my staff working under my direct supervision and control.

## III. Background

In this section, I provide selected background that is relevant to my scope of work and opinions. I do not express any opinions in this section.

### A. Parties

BMW AG is a foreign corporation with a principal place of business in Munich, Bavaria, Germany.[1] BMW Manufacturing was incorporated in the State of Delaware with a principal place of business in Spartanburg County, South Carolina.[2] BMW AG indirectly owns BMW Manufacturing.[3]

Ms. Dawsey is a former employee of BMW Manufacturing. On June 5, 1995, Ms. Dawsey joined BMW Manufacturing as a staff recruiter.[4] During Ms. Dawsey's employment at BMW Manufacturing, she held various positions, including roles within the HR department.[5] On January 3, 2022, Ms. Dawsey submitted her letter of resignation to BMW Manufacturing.[6] Her resignation was effective on January 14, 2022.[7]

### B. Ms. Dawsey's Position with BMW Manufacturing

BMW Manufacturing uses a hierarchy of "Function Levels" to classify employee skills or positions. At BMW Manufacturing, there is one Function Level I Position which is occupied by Robert Engelhorn ("Mr. Engelhorn"), a German citizen.[8] Function Level II is a Vice President

---

[1] Amended Complaint, par. 3.
[2] Amended Complaint, par. 4.
[3] Amended Complaint, par. 6 and Answer to Amended Complaint, par. 6.
[4] Amended Complaint, par. 39 and BMW MC 1879-1880.
[5] Amended Compliant, par. 39.
[6] Ms. Dawsey's resignation letter (BMW_MC_000435).
[7] Ms. Dawsey's resignation letter (BMW_MC_000435).
[8] Amended Complaint, par. 35 and Answer to Amended Complaint, par. 35.

("VP") position.[9]  The VP of HR at BMW Manufacturing is the only Function Level II employee within the Human Resources ("HR") department.[10]  At the time of Ms. Dawsey's allegations, Christine Petrasch ("Ms. Petrasch"), a German National, was the VP of HR.[11]  Function Level III is the next highest position at BMW Manufacturing after Function Levels I and II.[12]

Within this Function Level structure, BMW Manufacturing labels specific positions.  For example, Ms. Dawsey's latest role at BMW Manufacturing was the "TX-60" position, in which she was responsible for HR planning and for benefits and employee compensation.[13]  The following snapshot depicts the organizational leadership structure of HR at BMW Manufacturing as of October 2020.

**Figure 1**
**Organizational Structure – BMW Manufacturing HR Leadership[14]**



BMW requires approval (called "verification") of the corporate office in Germany for any promotion of a BMW Manufacturing employee to a Function Level II or Function Level III

---

[9] Amended Complaint, par. 36.
[10] Amended Complaint, par. 36.
[11] Amended Complaint, par. 33 and https://www.bmwgroup-werke.com/spartanburg/en/news/2018/bmw-manufacturing-announces-management-change-petrasch.html.
[12] Answer to Amended Complaint, par. 38.
[13] Answers to Amended Complaint, par. 40.
[14] BMW MC 000248-262 at 253.

position.[15]  I understand from BMW Manufacturing that Ms. Dawsey had not received the requisite verification for a Level II position.[16]

### C.  BMW's Alleged Wrongdoing

Ms. Dawsey alleges that BMW discriminated against her based on her national origin, race, and sex.  In support of these allegations, Ms. Dawsey cites the following events in her Amended Complaint:

- On or about September 15, 2021, Ms. Petrasch told Ms. Dawsey that BMW had determined that Sherry McCraw ("Ms. McCraw"), a White American woman, would be the next VP of HR in Spartanburg.[17]

- BMW has a rule that if there is a United States citizen as VP, there must be one German national next in line, which would be a Function Level III position.[18]

- On or around September 29, 2021, Ms. Dawsey was informed that the only way BMW Group could get a local into the VP of HR position was to have a German in Plaintiff's position (TX-60) to serve as a "bridge to Germany."[19]

- On November 11, 2021, Ms. Petrasch reiterated that Ms. Dawsey was being removed from TX-60 (Function Level III) because a German national needed to be put in that position since the VP of HR was now a United States citizen.[20]

- Later in 2021, Ms. Petrasch began to encourage Ms. Dawsey to look for jobs outside of HR.[21]

- Ms. Petrasch told Ms. Dawsey that BMW was considering moving Ms. Dawsey to different positions, but that the positions would possibly be designated as Function Level IV.[22]

- Ms. Petrasch, through her assistant, arranged for Ms. Dawsey to interview for other positions in other departments outside of HR. [23]

---

[15] Amended Complaint, par. 20.
[16] Deposition Transcript of Kelly Dawsey, p. 87.
[17] Amended Complaint, par. 42.
[18] Amended Complaint, par. 42.
[19] Amended Complaint, par. 43.
[20] Amended Complaint, par. 50.
[21] Amended Complaint, par. 56.
[22] Amended Complaint, par. 56.
[23] Amended Complaint, par. 58.

- BMW never offered Ms. Dawsey a position and never promised her one.[24]

- BMW also employed a black male, Corey Epps, a Function Level IV employee. BMW told Ms. Dawsey that, while they might move Ms. Dawsey to a Function Level IV position (which they never did), they were going to promote Mr. Epps from Function Level IV to Function Level III.[25]

Ms. Dawsey complains that BMW told her that "her best-case scenario might be a demotion to Level IV" and she resigned from BMW Manufacturing "to accept the best available employment opportunity."[26]  Ms. Dawsey asserts that she began looking for positions outside of BMW because she had no offers at BMW and she wished to continue her career in human resources.[27]  She adds that, to ensure continued employment "in her field," she had no reasonable alternative but to resign.[28]  Based on these allegations, Ms. Dawsey she asserts the following legal claims: (1) National Origin Discrimination Title VII; (2) Race Discrimination Title VII; (3) Race Discrimination Section 1981; and (4) Sex Discrimination Title VII.[29]

### D.  Ms. Dawsey's Post-BMW Employment

On or around December 10, 2021, nearly four weeks before Ms. Dawsey's notice of resignation to BMW, Ms. Dawsey received an offer for employment as Director of Human Resources at Madewell Home Services, LLC ("Madewell").  On January 31, 2022, Ms. Dawsey started her new position at Madewell Home Services, LLC ("Madewell").[30]

On or around July 1, 2022, only five months after starting her position with Madewell, Ms. Dawsey received an offer for employment as Vice President – Chief Human Resources Officer with the Greenville-Spartanburg Airport District ("GSP").[31]  Ms. Dawsey's employment with GSP started on or around August 1, 2022.[32]

---

[24] Amended Complaint, par. 59.
[25] Amended Complaint, par. 60.
[26] Amended Complaint, pars. 56 and 61.
[27] Amended Complaint, par. 61.
[28] Amended Complaint, par. 63.
[29] See Amended Complaint.
[30] Madewell Concrete Driveway Company - Compensation detail report (Dawsey 2832-872, at 872).
[31] Dawsey 2864-5.
[32] Dawsey 002873.

### IV. Summary of Mr. Gibson's Report and Opinions

Ms. Dawsey retained John E. Gibson, Jr., CPA/ABV, CVA (the "Plaintiffs Expert or Mr. Gibson"), to offer opinions on Ms. Dawsey's alleged lost earnings damages caused by BMW's alleged wrongdoing. The Gibson Report describes Mr. Gibson's "Scope of Engagement" as follows:

> I have been engaged by the law firm Stephenson and Murphy, LLC, acting as counsel for Mrs. Dawsey, to evaluate and render opinions regarding the economic remedies due Mrs. Dawsey, if any, in connection to Mrs. Dawsey's employment with BMW. For the purposes of my analyses, I have been asked to assume liability, but express no opinions on such.[33]

The following figure is a summary of Mr. Gibson's opinion of Ms. Dawsey's alleged damages from the Gibson Report.

**Figure 2**
**Summary of Ms. Dawsey's Alleged Losses Per Mr. Gibson[34]**

| Type | Period | | Present Value of Lost Future Compensation |
|---|---|---|---|
| | Beginning Date | Ending Date | |
| Back Pay[i] | 01/18/22 | 12/31/24 | $    414,624 |
| Front Pay (Pre-Retirement)[ii] | 01/01/25 | 07/05/28 | 207,192 |
| Front Pay (Post-Retirement)[ii] | 07/06/28 | 07/05/33 | 40,886 |
| **Total** | | | **$    662,702** |

I refer to Mr. Gibson's analysis, summarized above and detailed in the Gibson Report, as Mr. Gibson's "Calculation."

---

[33] Gibson Report, p. 3.
[34] Gibson Report, p. 4.

## V.  Summary of Opinions

Mr. Gibson's Calculation is a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, not BMW's alleged wrongdoing.  In my opinion, BMW's alleged wrongdoing did not damage Ms. Dawsey.

Even as a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, Mr. Gibson's Calculation is unsupported and overstated because of errors and omissions that, if corrected, would drastically reduce his Calculation.  Mr. Gibson's Report does not provide enough detail about his assumptions, sources, and calculations to fully correct his Calculation. However, if these details can be provided through Mr. Gibson's testimony, the production of documents from Ms. Dawsey, or otherwise, I may present a corrected version of Mr. Gibson's Calculation at trial.  To that end, I specifically request, by way of this report, that Ms. Dawsey or her counsel provide Ms. Dawsey's 2023 and 2024 year-end pay statements that reflect her full-year medical, retirement, and other benefits received from GSP.  I also request any documentation or information on retiree medical (or similar) benefits available to Ms. Dawsey through GSP.

A more detailed discussion of my opinions is provided below.

## VI. Basis for Opinions

### A.  Mr. Gibson's Calculation is a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, not BMW's alleged wrongdoing.

The American Institute of Certified Public Accountants ("AICPA") issues forensic and valuation services practice aids.  These practice aids provide, for example, technical guidance to practitioners in the valuation of economic damages.  The AICPA practice aid titled "Measuring Damages Involving Individuals," states:

> The forensic practitioner who is hired to calculate economic damages involving individuals determines monetary amounts that would have been realized "but for" the damage incident, and then applies reductions for amounts actually realized or received. A further reduction may apply for amounts that would have been received had the claimant mitigated damages, depending on the facts of the case.[35]

In other words, Ms. Dawsey's alleged damages are her economic losses caused by BMW's

---

[35] AICPA Practice Aid, Measuring Damages Involving Individuals, 2020, p. 19.

alleged wrongdoing.  They do not include losses caused by other factors that would have existed but for BMW's alleged wrongdoing.

This concept is widely accepted among damages experts and supported by other treatises on economic damages valuation, such as the Litigation Services Handbook which states:

> An expert retained to measure damages must therefore understand and be prepared to explain the following:
>
> - The defendant's wrongful conduct;
> - How the plaintiff alleges the defendant's wrongful conduct caused damages to the plaintiff and how the defendant alleges that it did not cause the damages;
> - The logic that connects the defendant's alleged wrongful conduct and the plaintiff's damages;
> - Other factors that could have caused or exacerbated the plaintiff's damages, and
> - Whether the plaintiff's damages were reasonably expected to result from the defendant's alleged wrongful conduct.[36]

The Gibson Report fails to even identify BMW's alleged wrongful conduct.  In fact, the Gibson Report does not state *any* alleged wrongdoing by BMW.  Nor does it cite, reference, or footnote Ms. Dawsey's Complaint, Amended Complaint, or any other document that states Ms. Dawsey's allegations against BMW.  Moreover, the Gibson Report fails to explain how BMW's alleged wrongful conduct caused *any* damages to Ms. Dawsey let alone the alleged damages that he calculated.

Instead, Mr. Gibson's Calculation quantifies losses attributable to Ms. Dawsey's resignation from BMW.  Indeed, his analysis compares (a) Ms. Dawsey's projected compensation at BMW to (b) Ms. Dawsey's compensation from other employers after her resignation from BMW.   This assumes that BMW's alleged wrongdoing forced Ms. Dawsey to resign.  It also assumes that BMW's alleged wrongdoing forced Ms. Dawsey to resign precisely when she did *and* take a purportedly lower-paying position with another employer.

These assumptions conflict with available evidence.  For example, testimony from Sherrill Miller, Ms. Dawsey's headhunter, suggests that Ms. Dawsey resigned from BMW because of her own desire to reduce her job responsibilities, not BMW's alleged wrongdoing.  For instance,

---

[36] Litigation Services Handbook, The Role of the Financial Expert, 6th ed., p. 4.3.

Ms. Miller testified that, in September 2021, Ms. Dawsey was looking for employment outside of BMW because "she wanted to lessen her load of responsibilities."[37]  Ms. Miller further testified that the only reason Ms. Dawsey was considering employment outside of BMW Manufacturing was to "slow down from all the responsibilities" and "do something different."[38]  Ms. Miller's testimony also suggests that Ms. Dawsey was willing to accept a reduced salary for such a reduction in job responsibilities.  Ms. Miller testified that Ms. Dawsey was willing to accept a salary as low as $150,000 annually compared to her $202,450 salary with BMW at that time.[39]  Thus, Mr. Gibson's quantification of losses attributable to Ms. Dawsey's resignation, rather than her would-be reduction in compensation associated with her alleged "demotion" by BMW, is unsupported.

Furthermore, I have seen no evidence that BMW's alleged wrongdoing forced Ms. Dawsey to resign when she did, as Mr. Gibson's Calculation assumes.  Rather, it seems that the timing of Ms. Dawsey's offer from Madewell did.  In other words, regardless of BMW's alleged wrongdoing, Ms. Dawsey could have continued her employment with BMW, perhaps until her retirement, or at least until her eventual employment with GSP.  As discussed below, when Ms. Dawsey's full retirement, medical, and other benefits from GSP are considered, Ms. Dawsey's current compensation from GSP is comparable to, and perhaps even more than, her "but-for" compensation from BMW.  Thus, had Ms. Dawsey simply continued her employment with BMW until she commenced her employment with GSP, her alleged lost earnings would be nominal, if anything.

Relatedly, I have seen no evidence that BMW's alleged wrongdoing forced Ms. Dawsey to experience gaps in employment between her positions with BMW, Madewell, and GSP, as Mr. Gibson's Calculation assumes.  Rather, these short times of unemployment seem attributable to Ms. Dawsey's desire to change positions and employers, and/or her desire to take personal time between those positions, not BMW's alleged wrongdoing.[40]

In summary, Mr. Gibson's Calculation quantifies losses caused by Ms. Dawsey's decision to resign from BMW, not BMW's alleged wrongdoing.  Therefore, Mr. Gibson's opinions are irrelevant and inapplicable as a measure of Ms. Dawsey's alleged damages.

---

[37] Deposition Transcript of Sherrill Miller, p. 34.
[38] Deposition Transcript of Sherrill Miller, p. 39.
[39] Deposition Transcript of Sherrill Miller, p. 48.
[40] Deposition Transcript of Kelly Dawsey, pp. 299-300.

### B. BMW's alleged wrongdoing did not damage Ms. Dawsey.

Contrary to Mr. Gibson's Calculation, a properly constructed damages analysis would compare (a) Ms. Dawsey's would-be earnings at BMW, but for her alleged demotion, to (b) Ms. Dawsey's would be earnings at BMW after her alleged demotion. As discussed below, these two amounts are the same. Thus, Ms. Dawsey has not been damaged.

On December 10, 2021, the same date as Ms. Dawsey's offer letter from Madewell, Ms. Dawsey received an email that attached a slide presentation depicting a new organizational structure for BMW Manufacturing HR.[41] In fact, Ms. Dawsey testified that she presented this proposed structure to the employees in her department.[42] The following images are snapshots of two sequential slides from that document.

**Figure 3**
**Snapshot of Organizational Restructure for BMW Manufacturing HR[43]**



---

[41] Deposition Transcript of Kelly Dawsey, pp. 252-253 and 288-289.
[42] Deposition Transcript of Kelly Dawsey, pp. 252-253 and 288-289.
[43] BMW _MC_000468-82. BMW MC 000248-62.

## TX-6 Organizational overview – Changes starting date 02/22.



These images show that, starting in February 2022, Scott Medley would move from his TX-64 position to a TX-6 Project position, and Ms. Dawsey would move from her TX-60 position to the TX-64 position vacated by Mr. Medley.[44]  In other words, Ms. Dawsey was going to stay within HR.

Nonetheless, Ms. Dawsey alleges that this transfer from TX-60 to TX-64 constituted a demotion because it would have coincided with a "demotion" from Function Level III to Function Level IV.[45]  Yet, such a "demotion" is organizational and would not have affected Ms. Dawsey's compensation.  At BMW Manufacturing, "Personal Grade," not Function Level, determines employees' salary, bonus and benefits.[46]  Ms. Dawsey acknowledged this fact in her deposition.[47]  As of her resignation from BMW Manufacturing, Ms. Dawsey was Personal Grade 11.[48]  The following snapshot from BMW's Implementation of Exempt Grading, Salary, Bonus and Benefits Structures shows that Function Level III and Function Level IV positions can both receive compensation at Personal Grade 11.

---

[44] BMW_MC_000468-482, at 480.
[45] Amended Complaint, par. 56.
[46] BMW Manufacturing Corp. Human Resources – Implementation of Exempt Grading, Salary, Bonus and Benefit Structure, p. 5 (Dawsey 0291-301, at 297).
[47] Deposition Transcript of Kelly Dawsey, p. 72.
[48] Dawsey 0051.

**Figure 4**
**Function Level to Personal Grade Mapping for BMW Manufacturing[49]**



| Supervisory/Management Career Path | Technical/Professional Career Path | Function Level | *Personal Grade |
|---|---|---|---|
| President | N/A | I | 15 |
| | | | 14 |
| VP / General Manager | N/A | II | 13 |
| | | | 12 |
| Department Manager | Advisor | III | 11 |
| | | | 10 |
| Section Manager | Lead Specialist | IV | 9 |
| | | | 8 |
| Assistant Manager | Senior Specialist | V | 7 |
| | | | 6 |
| Section Leader | Specialist | VI | 5 |
| | | | 4 |
| N/A | Associate Specialist | VII | 3 |
| | | | 2 |

Prior to Ms. Dawsey's anticipated transfer into the TX-64 position in February 2022, Scott Medley ("Mr. Medley") held the TX-64 position.[50]  Ms. Dawsey and Mr. Medley were both Function Level III and Personal Grade 11 while in the TX-60 and TX-64 positions, respectively.[51] In fact, as of Ms. Dawsey's resignation from BMW Manufacturing, Ms. Dawsey's TX-60 annual salary was identical to Mr. Medley's TX-64 annual salary with each earning $202,450 annually.[52] Furthermore, based on my review of Ms. Dawsey and Mr. Medley's historical compensation from BMW Manufacturing, Mr. Medley and Ms. Dawsey received comparable compensation from 2019 through 2021.[53]

In other words, BMW's alleged demotion of Ms. Dawsey from Function Level III to Function Level IV had no apparent financial impact to Ms. Dawsey.  Rather, as discussed above, it was Ms. Dawsey's own decision to resign from BMW Manufacturing, and accept an outside position, that caused a change in Ms. Dawsey's financial position.

---

[49] BMW Manufacturing Corp. Human Resources – Implementation of Exempt Grading, Salary, Bonus and Benefit Structure, p. 5 (Dawsey 0291-301, at 297).
[50] BMW MC 000248-62, at 53.
[51] Dawsey 2861.  BMW MC 000707.
[52] Dawsey 2861.  BMW MC 000707.
[53] As such, for the purposes of my analysis, I used Mr. Medley's compensation as a proxy for Ms. Dawsey's "but-for" earnings from BMW Manufacturing.  BMW MC 1928.  BMW MC 1929.  BMW MC 1930.  BMW MC 1911-1912.  BMW MC 1913.  BMW MC 1914.

**C. Even as a measure of losses attributable to Ms. Dawsey's decision to resign from BMW, Mr. Gibson's Calculation is unsupported and overstated because of errors and omissions that, if corrected, would drastically reduce his Calculation.**

In this section, I discuss additional critiques of Mr. Gibson's Calculation, setting aside the critical shortfalls discussed above.  <u>The critiques discussed in this section are not intended to validate Mr. Gibson's Calculation, or a corrected version thereof, as a reasonable measure of Ms. Dawsey's alleged damages.</u>

**1. Mr. Gibson ignores important components of Ms. Dawsey's mitigating earnings from GSP.**

The following image is a snapshot of Exhibit C-3 to the Gibson Report.

**Figure 5**
**Snapshot of Gibson Report, Exhibit C-3**

| Period | Base Compensation [1] | Bonus Compensation [2] | Vehicle Allowance [3] | Total Mitigating Compensation |
|---|---|---|---|---|
| **DOI: January 17, 2022** | | | | |
| **Back Pay [4]** | | | | |
| 01/18/2022 - 12/31/2022 | $ (135,037) | NA $ | (2,500) $ | (137,537) |
| 2023 | $ (183,429) $ | (13,439) $ | (6,000) $ | (202,868) |
| 2024 | (195,489) | (19,527) | (6,000) | (221,016) |
| 2025 | (205,105) | (16,408) | (6,000) | (227,513) |
| Total | $ (513,955) $ | (32,966) $ | (14,500) $ | (561,421) |
| **Front Pay [5]** | | | | |
| 2026 | (215,114) | (17,209) | (6,000) | (238,323) |
| 2027 | (227,375) | (18,190) | (6,000) | (251,565) |
| 01/01/2028 - 07/05/2028[6] | (116,838) | NA | (3,000) | (119,838) |
| Total | $ (559,327) $ | (35,399) $ | (15,000) $ | (609,726) |
| **Total** | $ (1,073,282) $ | (68,365) $ | (29,500) $ | (1,171,147) |

In this exhibit, Mr. Gibson attempts to quantify Ms. Dawsey's "mitigating compensation and benefits" from Madewell and GSP.  As shown above, Mr. Gibson includes Ms. Dawsey's base compensation, bonus compensation, and vehicle allowance.[54]  Notably, he excludes other benefits that Ms. Dawsey apparently received.  These benefits include employer-sponsored health coverage, life insurance, and retirement benefits reflected in Ms. Dawsey's W-2s and available pay statements.  They also include a $120 monthly cell phone allowance as referenced in Ms. Dawsey's offer letter from GSP.[55]

These mitigating benefits that Mr. Gibson omitted from his Calculation appear to be

---

[54] Gibson Report, Exhibit C-3.
[55] Dawsey 2864-5.

substantial. For instance, Ms. Dawsey's 2023 W-2 from GSP reflects $71,067 of employer-sponsored health coverage, $17,019 of "SCRS," $4,863 of "S125," and $689 of life insurance.[56] Ms. Dawsey's 2024 W-2 from GSP reflects $75,587 of employer-sponsored health coverage, $18,107 of "SCRS," $4,875 of "S125," and $751 of life insurance.[57] While I am not certain that all of these benefits were employer-paid, the substantial portion appears to be. Indeed, Ms. Dawsey's available partial-year pay statements for 2022 and 2025 reflect substantial employer-paid medical, dental, SC retirement, 401(k), and life insurance benefits.[58] The "working at GSP" section of gspairport.com refers to "generous employee benefits" including South Carolina Retirement Defined Benefit Plan, South Carolina Deferred Compensation plan "with a generous company match," health insurance, life insurance, and disability insurance.[59] Yet, Mr. Gibson's Calculation includes none of these benefits.

The inclusion of any of these benefits in mitigating income would drastically reduce Mr. Gibson's Calculation. In fact, they could entirely offset many of the annual "lost future compensation" amounts reflected in Mr. Gibson's Calculation. In other words, Ms. Dawsey's compensation from GSP is approximately equal to, if not greater than, her alleged lost compensation from BMW Manufacturing. As stated above, if additional information can be provided on these benefits, specifically the amount of those which were paid by GSP as compensation to Ms. Dawsey, I may present an adjusted version of Mr. Gibson's Calculation at trial. To assist in that effort, I am formally requesting, by way of this report, Ms. Dawsey's detailed pay statements for 2023 and 2024 which, to my knowledge, have not been produced.

### 2. Mr. Gibson understates Ms. Dawsey's mitigating bonus income.

The figure above shows the mitigating bonus compensation that Mr. Gibson included in his Calculation. This mitigating bonus compensation appears to be understated for several reasons. First, Mr. Gibson includes no mitigating bonus compensation for 2022. However, this lack of bonus compensation results from Ms. Dawsey's resignation from Madewell to accept employment at GSP, not BMW's alleged wrongdoing. Indeed, Ms. Dawsey's offer letter from Madewell states, "Should your employment end with Madewell Home Services, your right to receive salary and all benefits and incidents of employment, including any bonuses, compensation and benefits, shall cease."[60]

---

[56] Dawsey 002875. Code DD = Cost of employer-sponsored health coverage. Code C = Taxable cost of group-term life insurance over $50,000. https://www.irs.gov/instructions/iw2w3.
[57] Dawsey 002873-83 at 76.
[58] Dawsey 002877. Dawsey 2870.
[59] https://gspairport.com/working-at-gsp/.
[60] Madewell 000003.

Second, Mr. Gibson provides no reasonable explanation for why Ms. Dawsey's expected bonus compensation will decrease in 2025 and continue to under-perform her 2024 bonus in 2026 and 2027.  For 2023 and 2024, Mr. Gibson used Ms. Dawsey's actual bonus compensation.[61]  However, for 2025 through 2027, Mr. Gibson assumed that Ms. Dawsey's bonus will be 8.00% of her projected base compensation.[62]  However, Ms. Dawsey's 2024 bonus was 9.989% of her base compensation.[63]  Moreover, available evidence shows that the GSP incentive plan payout ranges from 5% to 10%.[64]  I see no reason why Ms. Dawsey cannot continue to receive bonuses near the top end of that range.

Third, the Gibson Report does not explain his assumption that Ms. Dawsey will not receive any bonus compensation in 2028.  Meanwhile, in Exhibit C-2, Mr. Gibson's Calculation assumes that Ms. Dawsey's alleged lost compensation and benefits from BMW Manufacturing includes a partial year bonus for 2028.  I see no reason for this inconsistency, particularly since available evidence suggests that GSP pays bonuses based on a fiscal year ending June 30th, i.e., five days prior to Ms. Dawsey's assumed retirement date.[65]

Adjustment for these unsupported assumptions would materially reduce Mr. Gibson's Calculation.

### 3. Mr. Gibson ignores key information regarding the BMW Retirement Income Account.

The following image is a snapshot from Exhibit C-2 to the Gibson Report.

---

[61] Gibson Report, p. 7.
[62] Gibson Report, p. 7.
[63] Dawsey 002873-83 at 83.  Gibson Report, Exhibit C-3.  [9.989% = 19,527 / 195,489]
[64] Dawsey 002873-83 at 82.
[65] Dawsey 002873-83 at 81.

**Figure 5**
**Snapshot of Gibson Report, Exhibit C-2**

| Period | Base Compensation [1] | Additional Compensation [2] | Retirement Income Account (RIA) [5] |
|---|---|---|---|
| **DOI: January 17, 2022** | | | |
| **Back Pay [7]** | | | |
| 01/18/2022 - 12/31/2022 | $ 197,390 | $ 59,928 | $ 18,752 |
| 2023 | 212,707 | 64,578 | 21,250 |
| 2024 | 219,663 | 66,690 | 23,065 |
| 2025 | 226,846 | 68,870 | 23,819 |
| Total | $ 856,606 | $ 260,066 | $ 86,886 |
| | | | |
| **Front Pay (Pre-Retirement) [8]** | | | |
| 2026 | 234,264 | 71,123 | 24,598 |
| 2027 | 241,924 | 73,448 | 25,402 |
| 01/01/2028 - 07/05/2028 [9] | 127,648 | 38,754 | 14,029 |
| Total | $ 603,836 | $ 183,325 | $ 64,029 |

In this exhibit, Mr. Gibson attempts to quantify Ms. Dawsey's alleged lost compensation from BMW Manufacturing. For 2028, despite his assumption that Ms. Dawsey would have retired on July 5, 2028, Mr. Gibson assumes that Ms. Dawsey would have been eligible to receive a $14,029 Retirement Income Account ("RIA") contribution for 2028. However, BMW's RIA policies seemingly would have precluded this contribution. They state:

> You are eligible to receive an RIA Contribution if you are hired or rehired by BMW on or after March 1, 2012; you are not eligible to participate in the BMW Pension Plan; and you are still employed on December 31 of the Plan Year (or last day of any other period) for which the RIA Contribution is made.[66]

Ms. Dawsey acknowledges the fact that RIA contributions are contingent on employment at the end of the year in her deposition.[67] Additionally, to calculate "Additional Compensation" as shown in the figure above, Mr. Gibson applies a 30.36% markup to Ms. Dawsey's projected base compensation.[68] I note that the Gibson Report provides no calculations in support of that percentage. Thus, Mr. Gibson's 30.36% mark-up *may* include employer contributions to Ms. Dawsey's retirement account.

Yet, as shown above, in addition to "Additional Compensation," Mr. Gibson also included BMW Manufacturing's alleged would-be RIA contributions to Ms. Dawsey's retirement account. Mr. Gibson describes these contributions as follows:

---

[66] Dawsey 1282-318 at 85.
[67] Deposition Transcript of Kelly Dawsey, pp. 289-290.
[68] Gibson Report, p. 5.

Mrs. Dawsey was entitled to receive additional employer contributions to her retirement account beginning at the age of fifty. As part of the program, BMW contributes 8.00% of base salary for employees aged 50 – 54, 9.00% for employees aged 55 – 59 and 10.00% of base salary when reaching age 60.[69]

The Gibson Report then seems to contradict this statement by stating:

In determining the future employer retirement contribution, I used the average of 9.50% until Mrs. Dawsey were to reach the age of fifty-five and then used 10.50% for the retirement contribution. Upon the year of Mrs. Dawsey reaching the age of sixty, I used 11.50% for the retirement contribution.[70]

These percentages are inexplicably higher than the additional contribution amounts of 8%, 9%, and 10%, unless they also include contributions from the standard 401(k) matching program that may be included in Mr. Gibson's 30.36% "Additional Compensation" markup. Thus, Mr. Gibson may be overstating Ms. Dawsey's alleged lost earnings by double-counting these alleged lost benefits. I reserve the right to update or amend this opinion if Mr. Gibson provides additional information on his Calculation.

### 4. Mr. Gibson's analysis of "retiree medical payments" is unsupported.

Mr. Gibson's Calculation includes $40,886 for the present value of alleged lost post-retirement benefits.[71] The only discussion in the Gibson Report related these alleged lost post-retirement benefits is the following statement:

As part of Mrs. Dawsey's employment with BMW she would have received retiree medical payments but for the Incident. Mrs. Dawsey would have received these payments from age 60 to 64, after her retirement. As of 2022, retiree medical payments were $717 per month, and I applied annual increases of 2.5%.[72]

For the $717 monthly benefit amount, Mr. Gibson cites "discussions with Mrs. Dawsey" and no other sources.[73] This amount, or the inflation-adjusted equivalent, seems to be the premium payment that BMW Manufacturing purportedly would have paid on Ms. Dawsey's behalf from age 60 to 64. Mr. Gibson's Calculation merely totals the present value these payments. It does not consider the portion of medical insurance premiums for which Ms. Dawsey would have been responsible. Nor does it consider the cost of alternative coverage that Ms. Dawsey will have to acquire following her retirement from GSP, or another employer, if any. Under the premises of Mr. Gibson's Calculation, which again are not reasonable or relevant as discussed above, these

---

[69] Gibson Report, p. 6.
[70] Gibson Report, p. 6.
[71] Gibson Report, Exhibit C-1.
[72] Gibson Report, p. 6.
[73] Gibson Report, footnote 10.

should have been considered.  I reserve the right to present this information at trial in a "corrected" version of Mr. Gibson's Calculation or otherwise.

## VII.    Information Relied Upon

In addition to my years of experience as a financial professional, the expert opinions contained in this report are based on the facts and circumstances of this matter and the documents that I received, reviewed, and relied upon during the course of my retention on this matter.  The documents upon which I relied in forming the opinions contained in this report are listed in **Appendix B** and in the footnotes to this report.

The opinions contained in this report are based on currently available information.  I reserve the right to supplement or amend my opinions should new or additional information that is relevant to my opinions become available.

In connection with this report, I prepared supplemental work papers that serve as an integral basis for the opinions contained herein.  The information contained in this report may be used to develop illustrative exhibits for use at trial.

## VIII.    Compensation

GreerWalker is being compensated for my work on this matter at a rate of $590 per hour. Rates for personnel that may assist me vary from $165 to $690 per hour.  Since this engagement is not yet complete, it is not now possible to determine the total compensation that will be paid to GreerWalker for this engagement.  My compensation is not contingent on the outcome of this case.

## IX. Purpose and Use

This report should not be used for any purpose other than as stated herein.  The analysis and opinions contained in this report are based upon documents, information, facts, and allegations that are unique to this case.  This report, including any portion thereof, shall not be distributed to any third party without my prior, written consent.

# Appendix A

BMW MC 001966



# GreerWalker

**Nicholas R. Harris, CPA/ABV, CFA, CFE**
*Curriculum Vitae*



**Partner, Forensic and Valuation Services**

227 West Trade Street, Suite 1100
Charlotte, NC  28202
Phone: (704) 816-7039
E-mail: nick.harris@greerwalker.com

## SUMMARY OF EXPERIENCE

Nick specializes in business valuation and forensic accounting including internal accounting investigations and the valuation of economic damages to businesses and individuals.  Nick frequently offers opinions and analysis in contract disputes, shareholder disputes, post-acquisition disputes, and divorce.  Nick also frequently conducts cost and billing audits involving construction and other commercial contracts.  Nick has valued damages resulting from wrongful death, wrongful termination, personal injury, business interruption, breach of contract, unfair and deceptive trade practices, intellectual property infringement, false advertising, and fraud.  Nick's opinions and analysis often involve lost profits, disgorgement, reasonable royalty, lost wages and earnings, and other accounting opinions.

Nick has testified as an expert witness in State Court, Federal Court, and Arbitration.  Nick has also presented damages calculations for mediation and settlement purposes.  Prior to joining GreerWalker in January 2017, Nick was a Principal in the Chicago office of a national consulting firm focused on litigation and business consulting.

## PROFESSIONAL HISTORY

| | | |
|---|---|---|
| 2017 - Present | GreerWalker LLP<br>Partner, Forensic and Valuation Services | Charlotte, NC |
| 2009 - 2016 | The Kenrich Group LLC<br>Principal | Chicago, IL |
| 2007 - 2009 | JPMorgan Chase Bank NA<br>Financial Analyst | New York, NY |
| 2006 | Deloitte<br>Audit and Enterprise Risk Intern | Detroit, MI |

## EDUCATION

| | |
|---|---|
| 2014 | Certificate in Specialized Studies, Audit and Forensic Accounting<br>Northwestern University |
| 2007 | Bachelor of Business Administration<br>University of Michigan, Ross School of Business |

---

**GreerWalker LLP  |  GreerWalker Corporate Finance LLC | greerwalker.com**
**Charlotte Office**   The Carillon | 227 West Trade St., Suite 1100 | Charlotte, NC 28202 | USA | Tel 704.377.0239
**Greenville Office**   Wells Fargo Center | 15 South Main St., Suite 800 | Greenville, SC 29601 | USA | Tel 864.752.0080

Nick Harris
Page 2

## PROFESSIONAL CERTIFICATIONS

| | |
|---|---|
| 2018 | Accredited in Business Valuation (ABV) |
| 2016 | Certified Public Accountant (CPA) |
| 2012 | Chartered Financial Analyst (CFA), Charter Holder |
| 2011 | Certified Fraud Examiner (CFE) |

## PROFESSIONAL AFFILIATIONS

Past President, Association of Certified Fraud Examiners (ACFE) Charlotte Chapter

Member, American Institute of Certified Public Accountants (AICPA)

Member, AICPA Forensic and Valuation Services Section

Member, North Carolina Association of Certified Public Accountants

Member, Financial Consulting Group (Business Valuation/Litigation Services)

Member, Chartered Financial Analyst Institute

## PUBLICATIONS

*How Contractors Can Avoid Claim Pricing Pitfalls*, published in CFMA (Construction Financial Management Association) Building Profits magazine (March/April 2019 Edition)

## COMMUNITY SERVICE

Charlotte Center for Legal Advocacy, Past Board of Trustees and Finance Committee Chair

Larry King's Clubhouse, Past Board of Directors and Treasurer

Charlotte Area Chapter of the ACFE, Past Board of Directors and President

## TESTIMONY EXPERIENCE

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| Holmwood Capital Advisors, LLC and Holmwood Capital, LLC v. HC Government Realty Holdings, L.P. and HC Government Realty Trust, Inc. | Delaware State Chancery Court | Moore & Van Allen PLLC, John T. Floyd and Joseph M. Piligian | | 9/5/2025 |
| Randy Black, on behalf of himself, and as Attorney-in-Fact for Bruce Kiser v. Case Farms, LLC | United States District Court for the Western District of North Carolina, Statesville Division | Hamilton Stephens Steele + Martin, PLLC, Mark R. Kutny and Rebecca K. Cheney, Attorneys for Defendant | | 8/22/2025 |

Nick Harris
Page 3

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| Rev Tech Labs, LLC d/b/a Queen City Fin Tech and Carolinas Fintech Ventures, LP d/b/a CFV Ventures v. Cirrus Secure, Inc., Frideswide Square, Inc., and individually, David Brooks | United States District Court for the Western District of North Carolina, Charlotte Division | Wagner Hicks PLLC, Sean Wagner and Jonathon Townsend, Attorneys for Plaintiffs | | 8/5/2025 |
| ModoPayments, LLC v. Volvo Financial Services LLC | New York State Supreme Court | Stafford PLLC, Mark A. Stafford | | 7/9/2025 |
| John Griffing v. Gray, Layton, Kersh, Solomon, Furr & Smith, P.A. | North Carolina Superior Court | Bell, Davis & Pitt, P.A., Edward B. Davis and Kevin J. Roak, Attorneys for Defendants | | 6/17/2025 |
| New-Indy Catawba LLC v. Amec Foster Wheeler Kamtech, Inc. Amec Foster Wheeler Ventures, Inc., Wood Group US Holdings, Inc., and Wood Group USA, Inc. | American Arbitration Association | Robinson, Bradshaw & Hinson, P.A., Stephen M. Cox, David C. Kimball, Benjamin C. DeCelle, and Spencer T. Wiles, Attorneys for Respondents | | 6/16/2025 |
| PHO Kannapolis, LLC and BRC Kannapolis, LLC v. City of Kannapolis | North Carolina Superior Court | Cranfill Sumner LLP, Jack Wright, Attorney for Defendant | | 6/5/2025 |
| Truist Financial Corporation and Grandbridge Real Estate Capital, LLC v. Matthew Rocco, Joe Lovell, John Randall, Colliers Mortgage Holdings, LLC, and Colliers Mortgage LLC | North Carolina Superior Court | Buchanan Ingersoll & Rooney PC, Andrew Shapren and Robert Fitzgerald, Attorneys for Plaintiff | | 4/29/2025 |

Nick Harris
Page 4

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| William Wesley Livingston, Angela Baucom Livingston, and Jason Baucom individually and as Executor of The Estate of Amon L. Baucom, Jr. (all Plaintiffs individually and derivatively on behalf of Baucom's Nursery Company) v. Gary C. Baucom, Eric J. Baucom, Cory R. Baucom, Christopher C. Baucom, Baucom's Nursery Company (Nominal Defendant), Baucom's Leasing Company, LLC, and Green Gardens II, LLC | Arbitration | Hamilton Stephens Steele + Martin, PLLC, Mark R. Kutny, Attorney for Defendants | 4/9/2025 and 4/10/2025 | |
| Gree USA, Inc. v. L.G. Sourcing, Inc. and Lowe's Companies, Inc. 17-CVS-1999 | North Carolina Superior Court | Moore & Van Allen PLLC, Thomas D. Myrick, Scott M. Tyler, and William M. Butler, Attorneys for Defendant | | 10/14/2024 |
| Value Health Solutions Inc. and Nagarajan Parthasarathy v. Pharmaceutical Research Associates, Inc. and PRA Health Sciences, Inc. 2018-CVS-12318 | North Carolina Superior Court | Mainsail Lawyers, David Guidry, Attorney for Plaintiffs | | 9/12/2024 and 2/25/2020 |
| MB Charlotte, LLC (a.k.a. Monterrey Bay-Charlotte, LLC) v. Irvin Hart Naylor, Jr. and Takila Shamere Williams Naylor | American Arbitration Association | Rosenwood, Rose & Litwak, PLLC, Nancy Litwak, Attorney for Respondent | 6/17/2024 | |
| California Creative Solutions, Inc. v. Joseph Arakkal | JAMS Arbitration | Villmer Caudill, PLLC, Bo Caudill, Attorney for Respondent | 1/30/2024 | 12/1/2023 |
| Cleveland Construction, Inc., v. Arras Asheville Residences, LLC and MHG Asheville TR, LLC | American Arbitration Association | Bradley Arant Boult Cummings LLP, Avery Simmons and James F. Archibald, Attorneys for Respondents | | 10/10/2023 |
| Heidi Stanley v. Kevin Stanley | Arbitration | Bell Law Firm, Hannah Bell, Attorney for Plaintiff | 10/3/2023 | |
| Parul M. Madhiwala v. Manoj T. Madhiwala 23-CVD-1961 | North Carolina District Court | Hunt Law, PLLC, Gregory Hunt, Attorney for Plaintiff | 9/5/2023 | |

Nick Harris
Page 5

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| Dorinda Holaday, as Ancillary Administrator of the Estate of John Holaday v. Epicentre SPE (Charlotte), LLC; Epicentre (Charlotte), LLC; CIM Management, Inc.; CIM Group, LLC; Raheem Shacklette; and Universal Protection Service, LLC d/b/a Allied Security and/or Allied Universal 21-CVS-2396 | North Carolina Superior Court | Cranfill Sumner, LLP, Samuel H. Poole, Attorney for the Epicentre Defendants and Christopher J. Derrenbacher, Attorney for Allied Security | | 8/15/2023 |
| Securities and Exchange Commission v. Martin A. Sumichrast 3:22-CV-00246-FDW-DSC | United States District Court for the Western District of North Carolina, Charlotte Division | Carlton Fields, P.A., Ellyn S. Garofalo, and Bell Davis & Pitt, P.A., Mark A. Jones, Attorneys for Defendant | | 7/31/2023 |
| BluSky Restoration Contractors, LLC, v. Steven W. Brown 21-CVS-10032 | North Carolina Superior Court | Wagner Hicks PLLC, Sean Wagner and Tyler Peacock, Attorneys for Defendants | | 6/8/2023 |
| Ernest Cutter III, individually and derivatively on behalf of A Common Law General Partnership d/b/a Hot Dog Shoppe v. Gregory Vojnovic and Hot Dog Shoppe Holdings, LLC 21-CVS-10487 | North Carolina Superior Court | Nelson Mullins Riley & Scarborough LLP, Thomas G. Hooper and Mark A. Stafford, Attorneys for Defendants | | 2/17/2023 |
| Iredell Water Corporation v. City of Statesville 5:21-CV-00132-KDB-DSC | United States District Court for the Western District of North Carolina, Statesville Division | Hamilton Stephens Steele + Martin, PLLC, Keith J. Merritt and Mark R. Kutny, Attorneys for Defendant | | 12/20/2022 |
| John Bean Technologies Corporation v. B GSE Group, LLC and Bryan Bullerdick 1:17-cv-00142-RJS | United States District Court for the District of Utah, Central Division | Bell Davis & Pitt, P.A., Edward B. Davis and Joshua B. Durham, Attorneys for Defendants | 10/4/2022 | 3/26/2019 |
| MRK Ivey's Hotel, LLC, MRK Tryon NC, LLC, MRK Tryon NC 2, LLC v. Insurance Office of America, Inc., Thomas D. Dorsey, Robert Johnson Architects, Inc., and Burke Developer, LLC 20-CVS-2564 | North Carolina Superior Court | Wolfe Pincavage, LLP, Cristina Rodriguez, Attorney for Plaintiffs | | 9/21/2022 |

Nick Harris
Page 6

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| Pediatrix Medical Group of Tennessee, P.C. v. United Healthcare Insurance Company, United Healthcare of Tennessee, Inc. United Healthcare Plan of the River Valley, Inc., and their other affiliates 01-21-0016-4975 | American Arbitration Association | Nelson Mullins Riley & Scarborough LLP, Mark A. Stafford and Candace S. Friel, Attorneys for Claimant | | 7/21/2022 |
| B&B Electrical and Utility Contractors, Inc. and Southern Electric Corporation of Mississippi v. Fluor Enterprises, Inc. and Fluor Daniel Caribbean, Inc. 6:20-CV-00832-JD | United States District Court for the District of South Carolina, Greenville Division | Hamilton Stephens Steele + Martin, PLLC, Tracy T. James, Attorney for Plaintiffs | | 1/19/2022 and 1/31/2022 |
| Piedmont Parking Solutions, LLC d/b/a Carolina Site v. William Sclater Heindl III and WSH Construction, Inc. f/k/a Carolina Site Concepts, Inc. 20-CV-11905 | North Carolina Superior Court | Johnston, Allison & Hord, P.A., B. David Carson and David V. Brennan, Attorneys for Plaintiff | | 8/17/2021 |
| Maaco Franchisor SPV, LLC v. Gregg A. Sadwick and Greba Corporation 3:20-CV-147 | United States District Court for the Western District of North Carolina, Charlotte Division | Moore & Van Allen PLLC, Benjamin E. Shook, Attorney for Plaintiff | | 5/25/2021 |
| EarthKind, LLC v. The Lebermuth Company Inc. and Robert M. Brown, United States 5:19-cv-00051-GCM | District Court for the Western District of North Carolina, Statesville Division | Moore & Van Allen PLLC, Scott M. Tyler and Christopher D. Tomlinson, Attorneys for Plaintiff and Counterclaim Defendant | | 11/18/2020 |
| Platinum Press, Inc. v. Danielle Douros-Hawk, 3C! Packaging, Inc., John Cullen, and Russell Hill 3:18-CV-00458-GCM | United States District Court for the Western District of North Carolina, Charlotte Division | Lewis Brisbois Bisgaard & Smith LLP, Kevin V. Parsons and Philip A. Hinson, Attorneys for Plaintiff | | 8/11/2020 |
| Belcher Pharmaceuticals, LLC v. Hospira, Inc. 8:17-cv-2353-T-30JSS | United States District Court for the Middle District of Florida | Buchanan Ingersoll & Rooney PC, S. Lloyd Smith, Attorney for Plaintiff | | 6/21/2019 |
| Frederike Hecht a/k/a Freddie Hecht and Bill Hecht v. Charleston Custom Homes and Remodeling, LLC and NBM Construction Company, Inc., Joint Venture 01-18-0003-9393 | American Arbitration Association | Womble Bond Dickinson (US) LLP, William Warnock, Jr., Attorney for Claimants | | 5/21/2019 |

BMW MC 001972

Nick Harris
Page 7

| Action or Proceeding | Forum | Clients' Attorneys | Trial / Hearing | Deposition |
|---|---|---|---|---|
| Y2 Yoga Cotswold, LLC v. Vinroy W. Reid; VR King Construction LLC; VR Investments, LLC; Baranko Enterprise Inc., and Spend Management Solutions, LLC 16-CVS-23179 | North Carolina Superior Court | Rabon Law Firm, PLLC, David Guidry, Attorney for Plaintiff | 10/26/2018 | |
| Alan Thomas Withrow 11-30117 | United States Bankruptcy Court for the Western District of North Carolina | Moon Wright & Houston, PLLC, Richard S. Wright, Attorney for Debtor | 6/13/2018 | |
| William Patrick Cune and Sallie Ann Cune 16-31409 | United States Bankruptcy Court for the Western District of North Carolina | Moon Wright & Houston, PLLC, Richard S. Wright, Attorney for Debtors | 5/16/2018 | |

# Appendix B

BMW MC 001974

**Kelly Dawsey v. Bayerische Motoren Worke Aktiengesellschaft and
BMW Manufacturing Co., LLC collectively d/b/a "BMW Group"
Documents Relied Upon**

Appendix B

*Pleadings and Other Legal Filings*
Amended Complaint, dated February 9, 2023
Answer of Defendant BMW Manufacturing Co., LLC to Plaintiff's Amended Complaint, dated February 23, 2023

*Bates Stamped Document*

| Beginning Bates | Ending Bates |
| --- | --- |
| Dawsey 0051 | Dawsey 0052 |
| Dawsey 0291 | Dawsey 0301 |
| Dawsey 1282 | Dawsey 1318 |
| Dawsey 2832 | Dawsey 2872 |
| Dawsey 002873 | Dawsey 002883 |
| BMW MC 1879 | BMW MC 1880 |
| BMW MC 1911 | BMW MC 1914 |
| BMW MC 1928 | BMW MC 1930 |
| BMW MC 000248 | BMW MC 000262 |
| BMW_MC_000433 | BMW_MC_000435 |
| BMW_MC_000468 | BMW_MC_000482 |
| BMW MC 000682 | BMW MC 000708 |
| Madewell 000003 | Madewell 000003 |

*Expert Reports*
Expert Report of John E. Gibson, Jr., dated January 18, 2023
Expert Report of John E. Gibson, Jr., dated October 31, 2025

*Deposition Transcripts*
Deposition transcript of Kelly Dawsey, dated August 30, 2023
Deposition transcript of Sherrill Miller, dated January 24, 2024

*Publicly Available Information*
AICPA Practice Aid - Measuring Damages Involving Individuals, 2020
Litigation Services Handbook, The Role of the Financial Expert, 6th ed
https://www.irs.gov/instructions/iw2w3
https://gspairport.com/working-at-gsp/
https://www.bmwgroup-werke.com/spartanburg/en/news/2018/bmw-manufacturing-announces-management-change-petrasch.html

BMW MC 001975