```
                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF SOUTH CAROLINA
                         SPARTANBURG DIVISION
                  CASE NO.  7:22-cv-03738-TMC-KFM
```

Kelly Dawsey,
     Plaintiff,
 vs.
Bayerische Motoren Werke
Aktiengesellschaft and BMW
Manufacturing Co., LLC,
collectively d/b/a "BMW Group",

     Defendants.

_____

DEPOSITION OF SCOTT MEDLEY
_____

DATE TAKEN:            January 12, 2024

TIME BEGAN:            9:59 a.m.

TIME ENDED:            2:11 p.m.

LOCATION:              Jackson Lewis, PC
                       15 South Main Street, Suite 700
                       Greenville, South Carolina  29601

REPORTED BY:           Traci L. Barr, RPR

_____

```
                 EXPEDITE COURT REPORTING, LLC
                    Traci L. Barr & Associates
                      Post Office Box 25882
                  Greenville, South Carolina 29616
                    info@expeditereporting.com
                        (864) 509-0914
```

Scott Medley                                                    January 12, 2024

1    A.    Kelly was good in the role.

2    Q.    Is there any role that Kelly was in that you

3          thought she wasn't good in?

4    A.    Reflecting on Kelly now, yes.  I would say that I

5          question a number of things that she did,

6          discussions that we had that I would say that I was

7          uncomfortable with the decisions based on my

8          reflection now.

9    Q.    What roles was she not good in based on your

10         reflection now?

11   A.    When I was in recruiting, we would have discussions

12         about offers that would be made to candidates.  We

13         would have discussions about head count that we

14         would be looking for.  And when I look through the

15         lens that I have now, I question whether she was

16         doing the right things or whether I was being

17         played at the time in terms of her pushing back and

18         not really -- not being substantive with it.

19   Q.    Anything else?

20   A.    As far as when Kelly left the organization, I would

21         say that my frustration level was and still is very

22         high, and that's where I look at what -- how the

23         relationship ended and those times before when she

24         wasn't maybe forthcoming or honest in terms of her

25         approach when we talked about how we were going to

Scott Medley                                                    January 12, 2024

39

1      be running the business.

2  Q.  Anything else?

3  A.  Nothing else without a specific question.

4  Q.  When did you first form these opinions that Kelly

5      did not do a good job?

6  MR. MOODY:  Objection to form.

7                    EXAMINATION RESUMED

8  BY MR. MURPHY:

9  Q.  Let me break it down.

10     The first area you talked to me about was, when I

11     was in recruiting we had discussions about offers

12     to candidates.

13     When were you in recruiting?  What time period are

14     you referring to?

15 A.  So when I was the recruiting manager in TX-64 and

16     when I had the recruiting responsibilities in

17     TX-61, Kelly's responsibility was for putting

18     together offers.

19 Q.  So just what years are we talking about?  That's

20     all I'm asking right now.

21 A.  So the 2010 really through the -- basically, the

22     time that she had left.

23 Q.  So 2010 to 2022 is the time frame we're talking

24     about?

25 A.  Yes.  The time that I was in recruiting until the

1           time that she left.
2      Q.   So who were the candidates that you were discussing
3           with Kelly where you believed she was not being
4           forthright and honest with you?
5      A.   I don't have specific names.
6      Q.   What positions?
7      A.   So in recruiting, we would recruit for a variety of
8           positions.  We would recruit for maintenance
9           positions.  We would recruit for engineers.  We
10          would recruit for --
11     Q.   I understand that.
12          I'm asking, with regard to her not being honest or
13          forthright with you, which positions was she not
14          being honest or forthright with you about?
15     A.   I don't have specific positions.
16     Q.   What years did these discussions occur that you
17          later formed the belief that she wasn't being
18          honest or forthright with you?
19     A.   When Kelly left and I reflected on the time that we
20          had and candidates that we had over the years, now
21          looking back on it, I have concerns that Kelly was
22          looking out for Kelly and that she may not have
23          been doing what needed to be done and the
24          discussions that we would have when we lost a
25          candidate because of a salary or things like that.

1          That would have been now -- looking at it, I'm
2          suspect of that.
3    Q.    What candidate did you lose?
4    MR. MOODY:  Objection to form.
5    THE DEPONENT:  I don't have a specific name of a
6          candidate I lost.  It's my reflection.
7                         EXAMINATION RESUMED
8    BY MR. MURPHY:
9    Q.    Well, what are you -- what facts are you reflecting
10         on when you say Kelly was looking out for Kelly?
11         What does that mean?
12   A.    We would have discussions about the fact that a
13         candidate would be coming in to -- you know, come
14         into the organization, and then we would go through
15         the process of getting an offer letter, because the
16         TX-60 function, Kelly would have an offer letter.
17         We would find that the candidate -- that the offer
18         was too low for the candidate, and then we would go
19         back and have the discussions, and Kelly would come
20         in and say, we're sticking with this offer.
21         We would lose the candidate, and my concern is that
22         we could have potentially saved the candidate if we
23         would have been able to make sure that the proper
24         offer was on the table.  So I don't know what
25         benchmarking was done.  I don't know what she was

1          times that we had more poignant discussions about a

2          head count target that she was trying to achieve or

3          something else that was out there, my reflection

4          now is that she may not have been honest with me.

5     Q.   Okay.  When she said that we needed to offer

6          somebody a certain salary level, you thought she

7          wasn't being honest with you?

8     A.   When we would go and get candidates and bring

9          candidates in, and then we would arrive at a

10         candidate that was the best candidate for the

11         position, and the offer would come back from TX-60,

12         and the offer was something that the candidate

13         would not accept, and then we would go back and

14         have the discussions, and Kelly would say that

15         based on what she's evaluated, this is the offer

16         that's going to be there.  When we would lose a

17         candidate, that meant that we had to go back out

18         into the market and start looking again or look at

19         some other candidates that may be in the talent

20         pipeline.

21    Q.   Is it your contention, now looking back on it, that

22         Kelly was lying when she said, based on my

23         evaluation, this is the appropriate salary to

24         offer?

25    A.   When I look back on it now, I'm suspect on a number

```
1              of decisions that were made by Kelly.
2     Q.    That's not what I'm asking you.
3              You said that she was not being honest with you.
4              Do you believe she was telling you, I think this
5              should be the proper offer based on my evaluation,
6              and she didn't mean it?  Do you think she was lying
7              to you?
8     MR. ROZELSKY:  Object to the form.
9     MR. MOODY:  Objection to form.
10    THE DEPONENT:  I believe she was not being honest with
11             me.
12                         EXAMINATION RESUMED
13    BY MR. MURPHY:
14    Q.    Why would she lie about that?
15    A.    I don't know.
16    MR. ROZELSKY:  Object to the form.
17                         EXAMINATION RESUMED
18    BY MR. MURPHY:
19    Q.    Do you know any facts to suggest she ever lied
20             about any of that?  Did she ever say, I believe the
21             evaluation shows we should offer this salary, when
22             she knew that the evaluation showed it should be a
23             different salary?
24    MR. MOODY:  Objection to form.
25    THE DEPONENT:  I don't know why she not being honest.
```

Scott Medley                                                    January 12, 2024

47

```
 1                    EXAMINATION RESUMED
 2     BY MR. MURPHY:
 3     Q.    Well, you don't know that she wasn't being honest,
 4           do you?
 5     MR. MOODY:  Objection to form.
 6                    EXAMINATION RESUMED
 7     BY MR. MURPHY:
 8     Q.    You just now disagree with her after the fact?
 9     MR. ROZELSKY:  Object to the form.
10     MR. MOODY:  Objection to form.
11     THE DEPONENT:  As I reflect on this now, when I see how
12           she left --
13                    EXAMINATION RESUMED
14     BY MR. MURPHY:
15     Q.    I'm not asking about how she left.
16     MR. MOODY:  Let him testify.
17     MR. MURPHY:  No, because he keeps moving around.
18     MR. MOODY:  No, you're interrupting him.
19     MR. MURPHY:  No, I'm asking a question.
20                    EXAMINATION RESUMED
21     BY MR. MURPHY:
22     Q.    With regard to these offers --
23     MR. MOODY:  And you're interrupting, for the record.
24     MR. MURPHY:  You can say, object to the form, and then
25           shut up.
```

```
 1                       EXAMINATION RESUMED
 2     BY MR. MURPHY:
 3     Q.    With regard --
 4     MR. McCOY:  Brian, settle down.  Don't tell him to shut
 5           up.
 6     MR. MURPHY:  No, you guys aren't going to stop.  No, you
 7           guys aren't going to keep interrupting.  He said
 8           something -- when I tried to ask him a question
 9           about it, he's moving off it.
10                       EXAMINATION RESUMED
11     BY MR. MURPHY:
12     Q.    I'm asking you a specific question about these
13           offers.
14     MR. McCOY:  Let him finish his answer --
15     MR. MURPHY:  He wasn't answering the question.
16     MR. MOODY:  Objection to form.
17     MR. MURPHY:  You may say that.  Thank you.  Now I get to
18           ask the question.
19                       EXAMINATION RESUMED
20     BY MR. MURPHY:
21     Q.    With regard to these offers that you say you're
22           reflecting back on and you don't believe she was
23           being honest, are you saying that Kelly was telling
24           you that her evaluation led to this result to offer
25           a certain amount of money, but she really knew that
```

Scott Medley                                                          January 12, 2024

49

| | |
|---|---|
| 1 | it didn't, that she was supposed to offer a |
| 2 | different amount of money?  Is that your testimony? |
| 3 | MR. MOODY:  Objection to form. |
| 4 | MR. ROZELSKY:  Object to the form. |
| 5 | THE DEPONENT:  I don't know what Kelly did to determine |
| 6 | what that was. |
| 7 | EXAMINATION RESUMED |
| 8 | BY MR. MURPHY: |
| 9 | Q.   Then how do you know she was lying about it? |
| 10 | MR. MOODY:  Objection to form. |
| 11 | THE DEPONENT:  Because when I reflect on it now, I |
| 12 | question a number of things that have happened over |
| 13 | the years as it relates to an offer or a head |
| 14 | count.  We would talk about head count needs that |
| 15 | were out there, and we would be told that the head |
| 16 | count needed to be at a certain number, and then we |
| 17 | would discuss that number, and I would say, no, we |
| 18 | really need to look for something maybe a little |
| 19 | bit higher or change the approach that we have. |
| 20 | And now, when I look back on it, I'm concerned that |
| 21 | Kelly was not being completely honest with me. |
| 22 | EXAMINATION RESUMED |
| 23 | BY MR. MURPHY: |
| 24 | Q.   I'm not asking you about the head count |
| 25 | information. |

59

```
 1        in to look more favorable on her side, creating a
 2        problem on my side, now on my reflection, I wonder,
 3        was Kelly going in and doing that for Kelly and
 4        making herself look so much better and then putting
 5        the burden on myself and the team to be able to
 6        manage that situation?  Could it have been avoided
 7        if the head count had been more transparent.
 8    Q.  My question was, what years are we talking about?
 9    A.  It's over the time that Kelly and I had worked
10        together.  It's my reflection as far as the time
11        that we had worked together.
12    Q.  Well, you worked together for a very long time.
13    A.  Yes.
14    Q.  Are you talking about the 12-year period that you
15        were in 61 or 64?
16    A.  When she was in TX-60 as the person managing the
17        org management, the head count, the offers and
18        things like that, and when I was in recruiting.
19    Q.  Okay.  Can you be any more specific as to any
20        particular year you thought Kelly Dawsey was being
21        dishonest with regard to head count information?
22    A.  No.  It's based on my reflection from when she was
23        here.
24    Q.  Is there any communication or any document, e-mail,
25        anything in which you ever told her you did not
```

1          agree with something with regard to a head count

2          number?

3    MR. MOODY:  Objection to form.

4    THE DEPONENT:  I don't recall a specific e-mail.  Kelly

5          and I would have a number of discussions about head

6          count or offers or positions.

7                        EXAMINATION RESUMED

8    BY MR. MURPHY:

9    Q.   Right now I'm just talking about this head count

10         issue.  We're not back to the offers.  Okay?

11   A.   Uh-huh.  Yes.

12   Q.   Can you give me any specific discussion which you

13        had with Kelly in which you and she disagreed at

14        all with regard to proposed head count?

15   A.   Not a specific discussion.

16   Q.   And you can't point me to any specific written

17        communication in which you ever disagreed with any

18        information about head count?

19   A.   I don't have a specific e-mail.

20   Q.   Did you ever have a discussion with anybody else,

21        including one of the vice presidents, I think the

22        head count should be different?

23   A.   No, I did not have a discussion with a vice

24        president.  Kelly and I would have those

25        discussions at our level, and we would reach the

Scott Medley                                                    January 12, 2024

61

| | | |
|---|---|---|
| 1 | | agreement of how we were to manage the business. |
| 2 | Q. | Okay. |
| 3 | A. | And in doing that, I would trust that what she was |
| 4 | | telling me was accurate and that it was in the best |
| 5 | | interest of the business and the company.  When I |
| 6 | | reflect on that trust now, that's where I see that |
| 7 | | I have to question myself as to whether I should |
| 8 | | have trusted some of those discussions that we had |
| 9 | | as it related to head count. |
| 10 | Q. | When you say, I would trust that what she was |
| 11 | | telling me was accurate, can you give me any |
| 12 | | example of any statement made by Kelly that you now |
| 13 | | believe to be not accurate? |
| 14 | A. | I don't have a specific statement that she made. |
| 15 | | It's based on my reflection after she left. |
| 16 | Q. | Do you understand the process Kelly had to go |
| 17 | | through to get approval for head count numbers? |
| 18 | A. | I do not know the whole process that she had to go |
| 19 | | through. |
| 20 | Q. | Do you know who was involved in that process? |
| 21 | A. | Kelly would lead the process. |
| 22 | Q. | Okay.  You understood Kelly was not the final word |
| 23 | | in what head count approvals would be at BMW? |
| 24 | | MR. MOODY:  Objection to form. |
| 25 | | THE DEPONENT:  What is the question? |

Scott Medley                                                        January 12, 2024

62

```
 1                    EXAMINATION RESUMED
 2   BY MR. MURPHY:
 3   Q.    Is it -- let me put it this way.  Is it your belief
 4         that Kelly had final say over what the head count
 5         numbers would be at Spartanburg?
 6   A.    Kelly, as the head count steerer that was there,
 7         she would have inputs, for sure, from other peers
 8         or colleagues that were there, but as it related to
 9         the target management side for TX-60, she was the
10         head count steerer for those numbers.
11   Q.    That wasn't my question.
12         My question is, do you believe Kelly Dawsey had the
13         final say in what the head count numbers would be
14         at Plant Spartanburg?
15   A.    No.
16   Q.    Who had the final say?
17   A.    Kelly would have coordinated that with multiple
18         people.
19   Q.    Correct.  Who?
20   A.    I don't know what her process was for that
21         coordination, but she would have talked with
22         finance colleagues.  She would have talked with her
23         technology colleagues.  She would have talked
24         within the TX-6 group.
25   Q.    Anybody else?
```

63

1  A.    No one else I can think of right now.  Those would
2        be key process partners.
3  Q.    So you had no knowledge that BMW in Germany
4        approved all the head count numbers?
5  MR. MOODY:  Objection to form.
6                    EXAMINATION RESUMED
7  BY MR. MURPHY:
8  Q.    You didn't know that?
9  MR. MOODY:  Objection to form.
10  THE DEPONENT:  BMW in Germany -- Plant Spartanburg would
11        set its head count.  The BMW in Germany -- I don't
12        know the process that she had, but BMW in Germany
13        would not be dictating what the head count would be
14        as it relates to that target that we would have.
15                    EXAMINATION RESUMED
16  BY MR. MURPHY:
17  Q.    You were never over compensation or head count,
18        correct?
19  A.    I was not.
20  Q.    Do you know what involvement the T circle had in
21        determining head count at the Spartanburg plant?
22  MR. ROZELSKY:  Object to the form.
23  THE DEPONENT:  I don't know what the T circle would have
24        as far as head count.
25                    EXAMINATION RESUMED

Scott Medley                                              January 12, 2024

1   BY MR. MURPHY:

2   Q.   Have you ever seen a document entitled T Vorhalt

3        Request?

4   A.   What is the -- Vorhalt?

5   Q.   V-O-R-H-A-L-T.

6   A.   No, I don't know what that word is.

7   Q.   And I understand you may not know what the word is,

8        but have you -- have you ever seen a document

9        entitled, T Vorhalt Request?

10  A.   I don't know what the term Vorhalt is, so I don't

11       know what the form is.  I don't know what the

12       document is.

13  Q.   And you've never seen it?

14  A.   No.

15  Q.   Okay.  During the time that Kelly Dawsey was

16       employed at BMW, did you ever complain to anybody

17       about her?

18  A.   When Kelly and I would have disagreements, the

19       disagreements were between her and I.  If I had a

20       question about something that was done by herself,

21       then I would go and talk to Kelly.  As leaders in

22       the organization, we need to be able to work that

23       out between us, so I would -- I would go and talk

24       to Kelly.

25  Q.   My question is, did you ever complain to anybody at

Scott Medley                                                          January 12, 2024

65

| | | |
|---|---|---|
| 1 | | BMW about Kelly? |
| 2 | A. | No. |
| 3 | Q. | How often did you and Kelly have disagreements? |
| 4 | A. | It depends on the topic that we would have, but |
| 5 | | Kelly and I could talk frequently about a |
| 6 | | disagreement that we might have. |
| 7 | Q. | Okay.  How often were these disagreements? |
| 8 | A. | I don't know how often they were. |
| 9 | Q. | How many were there over the -- all the years that |
| 10 | | you and her worked together? |
| 11 | A. | I don't know how many there were over the years |
| 12 | | that we've worked together. |
| 13 | Q. | Would you say you frequently disagreed with her, |
| 14 | | you rarely disagreed with her? |
| 15 | MR. MOODY:  Objection to form. | |
| 16 | THE DEPONENT:  What is frequently? | |
| 17 | EXAMINATION RESUMED | |
| 18 | BY MR. MURPHY: | |
| 19 | Q. | Sir, I don't know.  I'm trying to figure out what |
| 20 | | you're going to get up at the trial and say to this |
| 21 | | jury. |
| 22 | | Tell me -- let's start this way.  What was the last |
| 23 | | disagreement you had with Kelly?  We'll just work |
| 24 | | through them. |
| 25 | MR. MOODY:  Objection to form. | |

Scott Medley                                                    January 12, 2024

68

1      number should be at whatever she's setting that
2      target at.
3   Q.    And, again, you don't know the process for setting
4      that target?
5   A.    I don't know the specifics of that process.
6   Q.    But you would advocate for more, and it made your
7      life easier if we did more at that time rather than
8      having to catch up later and add more people after
9      the fact; is that right?
10  MR. MOODY:  Objection to form.
11  THE DEPONENT:  Absolutely not.  I wouldn't advocate for
12      more that was there.  I would look at what we would
13      experience for attrition or for people not taking
14      the position and trying to be proactive on that,
15      but I don't -- I wouldn't say that we would go to
16      some extreme number just to have an extreme number.
17                    EXAMINATION RESUMED
18  BY MR. MURPHY:
19  Q.    I didn't suggest extreme number.  I'm just trying
20      to understand --
21  A.    You said advocate for more.
22  Q.    Okay.  You believe there needed to be more offers
23      made in order to satisfy the needs of the company?
24  A.    In order to compensate for those people that would
25      attrit out or not accept the position.

Scott Medley                                                    January 12, 2024

71

| | | |
|---|---|---|
| 1 | | Kelly? |
| 2 | A. | Is there something more specific that you have? |
| 3 | Q. | No. |
| 4 | A. | No. |
| 5 | Q. | The way that happened, I'm not sure it's going to |
| 6 | | be clear, so let me ask the question again. |
| 7 | A. | Okay. |
| 8 | Q. | Prior to Kelly resigning, did you ever tell |
| 9 | | Ms. Petrasch that you had concerns about Kelly? |
| 10 | A. | No. |
| 11 | Q. | Prior to Kelly resigning did you ever tell Dr. |
| 12 | | Engelhorn that you had concerns about Kelly? |
| 13 | A. | I would not -- I would not speak to Dr. Engelhorn |
| 14 | | about that. |
| 15 | Q. | So the answer would be no? |
| 16 | A. | No. |
| 17 | Q. | Okay.  Prior to Kelly resigning, did you ever tell |
| 18 | | Ms. McCraw that you had concerns about Kelly? |
| 19 | A. | No. |
| 20 | Q. | Are you aware as to what paperwork or forms must be |
| 21 | | signed off before a salary is offered to a |
| 22 | | potentially new employee? |
| 23 | A. | I don't know the process for putting a salary for |
| 24 | | an offer letter together. |
| 25 | Q. | Is there any other instance in which you believe |

1        Kelly Dawsey was ever dishonest with you other than
2        the ones we've already spoken about today?
3    A.  When -- when Kelly left, when she resigned, there
4        was no impression that she was leaving, and she
5        certainly would not owe me an explanation other
6        than the fact that we had been colleagues, but I
7        was shocked by that.  And so if she had already
8        been working towards that, it certainly wasn't
9        something that was shared.  And the impression that
10       I had was that we were moving in a direction where,
11       yes, it was change, but we would have to manage the
12       change, and we were moving forward with the
13       organization as it was, stating the obvious that
14       that wasn't the case, and that's -- that's not how
15       we were moving in that direction.  She definitely
16       was not honest in terms of sharing where she --
17       where we were going as far as the organization was
18       concerned.  Everything was business as usual, and
19       we were heading in the direction of moving towards
20       the new org.
21   Q.  Did Kelly Dawsey ever tell you she wasn't going to
22       resign?
23   A.  I don't understand that question.
24   Q.  She resigned, correct?
25   A.  Did Kelly Dawsey resign?

Scott Medley                                          January 12, 2024

73

| | | |
|---|---|---|
| 1 | Q. | Yes. |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  Did she ever tell you she wasn't going to? |
| 4 | A. | I apologize.  I do not understand the question. |
| 5 | | That she was not going to resign? |
| 6 | Q. | Yes.  Did Kelly tell you, I'm not going to resign? |
| 7 | A. | No.  She told me she was resigning. |
| 8 | Q. | Okay.  So she told the truth about that? |

9      MR. MOODY:  Objection to form.

10     THE DEPONENT:  That she was resigning?

11                        EXAMINATION RESUMED

12     BY MR. MURPHY:

13     Q.    Yes.

14     A.    Yes.

15     Q.    Did Kelly Dawsey say anything to you about her

16           intentions to stay or leave that you contend was a

17           lie?

18     A.    Kelly was moving forward with the organization

19           change.  Kelly was -- we had all things in motion

20           in terms of what we needed to do.  Kelly, as a

21           leader in the organization, myself, as a leader in

22           the organization, we needed to go ahead with the

23           teams and get everything going.  When you asked me

24           about that honesty aspect, that was where that

25           fracture just completely came across.  In short

Scott Medley                                                    January 12, 2024

74

1          order, she says, I'm leaving in short notice, and
2          we had a gap that we had to cover, a significant
3          gap that we had to cover.
4     Q.   That wasn't my question.
5          My question was, did Kelly Dawsey say anything to
6          you that you believe is not true?
7     MR. ROZELSKY:  Object to the form.
8     THE DEPONENT:  Now, yes.
9                    EXAMINATION RESUMED
10    BY MR. MURPHY:
11    Q.   What did she say that you contend is not true?
12    A.   She was moving into the new year with the
13         reorganization as it was designed, and everything
14         for all the time that we had sat down and put plans
15         together, we were moving forward with that.  What
16         happened was she said, I'm leaving, and so that
17         created a problem with pretty much all of us
18         because we needed to figure out how we were going
19         to manage the situation.  She's somebody that had
20         been in the organization for a long time, and with
21         that, there was no indication that she was leaving.
22    Q.   Okay.  I'm not asking if there was an indication
23         she was leaving.
24         I'm asking, did she say something to you that you
25         contend was a lie?

Scott Medley                                                    January 12, 2024

75

1    MR. ROZELSKY:  Object to the form.

2    THE DEPONENT:  Not before she left.

3                        EXAMINATION RESUMED

4    BY MR. MURPHY:

5    Q.    Did you ever ask Kelly, are you looking for another

6          job?

7    A.    No.

8    Q.    Are you aware of anybody else asking Kelly if she

9          was looking for a job?

10   A.    No.

11   Q.    Are you aware of Kelly Dawsey telling anybody else

12         that she was not looking for a job?

13   A.    No.

14   Q.    A few moments ago, you said she left on short

15         notice.

16         How much notice did Kelly Dawsey give?

17   A.    I think Kelly gave a two-week notice, but I don't

18         think the full two weeks was there.  I think she --

19         she had something that she had to do or wasn't

20         there for the full two weeks, but she did give a

21         two-week notice.

22   Q.    Was Kelly Dawsey required to give any notice?

23   A.    No.

24   Q.    Any other instance, other than the making of offers

25         that we talked about, the head count issue we

Scott Medley                                                    January 12, 2024

80

```
 1   Q.   Sure.
 2        Were you aware that Ms. Petrasch expressed to other
 3        people that Kelly Dawsey and Ms. McCraw could not
 4        work together?
 5   A.   No.
 6   Q.   Did you ever tell anybody at BMW that you believed
 7        Ms. Dawsey was being dishonest with regard to the
 8        manner in which she left the company?
 9   A.   No.
10   Q.   Did you ever tell anybody at BMW or have you told
11        anybody at BMW that you believe Ms. Dawsey was
12        being dishonest in the manner in which she handled
13        head count issues?
14   A.   I shared with you earlier that that was my
15        reflection after she resigned.
16   Q.   That wasn't my question.
17        My question is, have you shared that reflection or
18        opinion with anybody at BMW?
19   A.   No, I haven't shared that reflection with people
20        after she resigned.
21   Q.   Okay.  Well, did you share -- and you couldn't have
22        shared that reflection with people before she
23        resigned, right?
24   A.   Absolutely not.  I did not know that she was
25        resigning, and I did not -- until she -- when she
```

Scott Medley                                                    January 12, 2024

81

```
 1          resigned, it was that she was looking to go
 2          somewhere different.  When the -- when all of this
 3          legal aspect started, that's when I had the
 4          reflection that now I feel that something changed
 5          there, and when I looked back in time, that's when
 6          I started to question things that she had done.  So
 7          I couldn't have done that before.
 8   Q.     And I appreciate that.  That's what I thought you
 9          meant by your answer.
10          These opinions you're sharing with me are opinions
11          you formed after the lawsuit?
12   MR. MOODY:  Objection to form.
13                      EXAMINATION RESUMED
14   BY MR. MURPHY:
15   Q.     Is that what you mean by legal stuff, the lawsuit?
16   A.     Yeah.  When she resigned, I did not have those
17          reflections.
18   Q.     Okay.  Have you shared with anybody at BMW your
19          reflection or opinion that Ms. Dawsey was being
20          dishonest in the manner in which she arrived at the
21          salaries to make in offers to candidates?
22   A.     One more time.  There was several questions in
23          there.
24   Q.     I didn't mean for there to, be but I do want you to
25          stop me if a question is unclear, so thank you for
```

1        doing that.

2        One of the areas you said -- in fact, the first

3        area we talked about where you said you believe

4        Kelly was being dishonest was in making offers to

5        candidates and the amount of money she said was the

6        appropriate amount to offer.

7        Do you recall that?

8    A.   Yes.

9    Q.   Have you ever shared that opinion or reflection

10       with anybody at BMW?

11   A.   No, and I shared that earlier when you asked.  I

12       have not.

13   MR. MURPHY:  Can we take a quick break?

14   MR. MOODY:  Yes.

15            (Recess taken.)

16                  EXAMINATION RESUMED

17   BY MR. MURPHY:

18   Q.   When Kelly resigned, who was the vice president of

19       HR in Spartanburg?

20   A.   Christina.

21   Q.   Did you have any discussions with Ms. Petrasch

22       about Kelly's resignation?

23   A.   Not when she resigned.

24   Q.   Did you have discussions with Ms. Petrasch about

25       Kelly's resignation some other time?