**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION**

| | | |
|---|---|---|
| Kelly Dawsey, | ) | Civil Action No. 7:22-cv-3738-TMC |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| Bayerische Motoren Werke | ) | |
| Aktiengesellschaft and BMW | ) | |
| Manufacturing Co., LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I. Introduction**

Plaintiff Kelly Dawsey ("Plaintiff") brought this action against her former employer Defendant BMW Manufacturing Co. LLC ("BMW MC"), which is based in Spartanburg, South Carolina, and its parent company Defendant Bayerische Motoren Werke Aktiengesellschaft ("BMW AG"), a German corporation headquartered in Munich. Plaintiff asserted claims against Defendants for national origin, race and sex discrimination in violation of Title VII, and race discrimination in violation of 42 U.S.C. § 1981. On February 17, 2026, Plaintiff's case against Defendants proceeded to trial before a jury. (ECF No. 198). On February 25, 2026, the jury returned a verdict in favor of Defendant BMW AG on all claims, concluding that it was not an integrated employer and, therefore, was not liable on the employment discrimination claims asserted by Plaintiff. (ECF No. 216). As to Defendant BMW MC, the jury returned a verdict in favor of Defendant BMW MC on Plaintiff's claims for race and sex discrimination under Title VII and race discrimination under § 1981. *See id*. However, on Plaintiff's claim against Defendant

BMW MC for national origin discrimination in violation of Title VII, the jury returned a verdict in favor of Plaintiff and awarded compensatory damages in the amount of $100,000 and punitive damages in the amount of $5 Million. *See id*.

Following trial, BMW MC, with the consent of Plaintiff and BMW AG, filed a motion to amend the $5,100,000 judgment amount to conform to the damages cap set forth in 42 U.S.C. § 1981a. (ECF No. 231). For companies with more than 500 employees, non-economic damages in a Title VII action are capped by statute at $300,000. 42 U.S.C. § 1981a(a)(1) and (b)(3)(D). The parties agreed the statutory cap applies in this case. The court entered an order finding that the award of compensatory and punitive damages must be reduced to a total of $300,000 and granting BMW MC's consent motion to amend the judgment to apply the statutory damages cap under 42 U.S.C. § 1981a. (ECF No. 235). The court then entered an amended judgment consistent with the ruling. (ECF No. 236).

## II. Economic Damages Hearing

This matter is now before the court on the issue of whether, and to what extent, Plaintiff should be awarded economic damages. The question of attorneys' fees and costs is the subject of a separate motion, (ECF No. 225), which the court shall address after the parties have completed briefing as to all post-trial motions in this case. *See* (ECF Nos. 230, 232).

Prior to trial, the parties agreed that, should the jury return a verdict in favor of Plaintiff as to liability on one or more claims against Defendants, the question of the amount of economic damages to award to Plaintiff, if any, should be decided by the court rather than the jury. (ECF No. 182). Back pay and front pay are equitable remedies to be determined by the court. *See Hylind v. Xerox Corp.*, 481 F. App'x 819, 824 (4th Cir. 2012) (noting that "determination of back pay is an equitable matter for the judge"); *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991) (noting

that, like Title VII, the award and amount of front pay under the ADEA is a question "for the court sitting in equity to consider and not the jury"). As noted, the jury determined that BMW MC is liable to Plaintiff for national origin discrimination in violation of Title VII. Accordingly, on March 13, 2026, the court conducted a hearing on the question of economic damages. (ECF No. 226).

<u>Summary of Evidence Presented as to Economic Damages</u>

At the hearing, Plaintiff offered her own testimony as well as the testimony of her economic damages expert John Gibson. In making a determination on this issue, the court also considers relevant evidence presented during the jury trial.[1]

Plaintiff began her employment with BMW MC in 1995 as an employee relations representative. (Pl. Ex. 1). In 2015, Plaintiff became the Department Manager for Human Resources (HR) Planning Compensation and Benefits Organization and Associate Well-Being-Medical Facilities (i.e., the TX-60 position). Plaintiff remained in this position until she resigned from her employment at BMW MC in January 2022. On December 10, 2021, while still employed at BMW MC, Plaintiff accepted an offer to become Director of Human Resources for Madewell Concrete at a reduced salary. On January 3, 2022, Plaintiff gave BMW MC a formal two-week notice of her resignation. Plaintiff testified that she resigned and accepted employment elsewhere because, as the jury found, BMW MC had discriminated against her. Plaintiff indicated she had planned to continue her employment at BMW MC until retirement at age 60. Plaintiff conceded, however, that she first made contact with Ms. Miller, an employment recruiting agent, in September 2021 before she learned BMW MC intended to transfer her to a position that she

---

[1] At the economic damages hearing, the parties consented to the court considering the evidence presented at the jury trial.

considered less desirable and replace her with a German national.  Plaintiff indicated at that time, she was looking for job that would permit her to maintain a better work-life balance.  Trial testimony established that in late September 2021, Plaintiff learned that Sherry McCraw, an American, would be moving to Vice President of HR, triggering an internal "guideline" that the next line in the HR leadership structure would be German.  More specifically, Plaintiff learned that Eva Burgmeier, a German employed by BMW AG at that time, would be coming to take Plaintiff's TX-60 position.

Plaintiff testified that her last day at BMW MC's Spartanburg plant was January 14, 2022, and that her last day of employment was January 17, 2022.  At the time Plaintiff left her employment at BMW MC, her salary was $202,450 per annum. (Pl. Ex. 53).  Plaintiff explained that other forms of compensation she received from BMW included certain bonuses, including a plant bonus, an individual bonus and a discretionary high-performer bonus, all of which she received in 2021 for performance in 2020 (Pl. Ex. 19); an automobile allowance; a 401K plan with matching funds paid by BMW MC; and a retirement investment account.  (Pl. Ex. 19, 53, 54); (Def. Ex. 55).

Plaintiff agreed that BMW MC never reduced her salary, her personal grade or her job function level during her employment.  Two weeks after she left BMW MC, Plaintiff began her job with Madewell Concrete as Head of HR at a starting annual salary of $150,000. (Tr. 3/13/26 at 24).  Plaintiff worked for Madewell Concrete for only part of 2022; in August 2022, Plaintiff began new employment as Vice President and Chief Human Resources Officer at Greenville Spartanburg International Airport ("GSP"), with a starting annual salary of $175,000.  (Def. Ex. 36).  Plaintiff agreed that her position at GSP constitutes a higher-level position than she ever attained while employed at BMW MC.  Plaintiff agreed her total compensation at GSP—which

would include bonus compensation, vehicle allowance and 401K employer match—had grown to $298,416.80 by 2024 and that she earned more at GSP in 2025 than she did in 2024. (Pl. Ex. 57).

Plaintiff next offered the testimony of John Gibson, a certified public accountant retained to determine the earnings Plaintiff might have if she had stayed in the same position at BMW versus the compensation or earnings she had after she left BMW.  Mr. Gibson testified that he holds a bachelor's degree in accounting and economics from Wofford College and is a member of the American Institute of Certified Public Accountants and the South Carolina Institute of Certified Public Accountants.  *See* (Pl. Ex. 62).  Recently retired in 2025, Mr. Gibson last worked as a shareholder in Elliott Davis LLC where he led the forensic valuation litigation support team.  The litigation support team performed business appraisals, income analysis, retirement account valuations and asset assessments for tax cases, merger and acquisition disputes, shareholder disputes, and family law cases.  Mr. Gibson indicated that he has previously been qualified as an expert in the area of economic damages, and he presented a list of ten (10) cases in which he testified as an expert witness.  (Pl. Ex. 62).  Mr. Gibson testified that no court has ever refused to qualify him as an expert. He conceded that, prior to the instant litigation, he had never given expert testimony in an employment discrimination case; however, Mr. Gibson noted that he had previously been retained and offered opinions on cases that involved calculating lost income and lost wages and that there was nothing unique to calculating lost income that requires any special or additional training other than what Gibson acquired during his career.

BMW MC objected to Plaintiff's motion to qualify Mr. Gibson as an expert on the purported economic losses Plaintiff incurred in connection with the cessation of her employment at BMW, arguing that Mr. Gibson had "never been offered or testified as an expert in employment

litigation." The court overruled BMW MC's objection and found Mr. Gibson to be qualified to testify as an expert in the field for which he was proffered. In finding Mr. Gibson qualified, the court confirmed that the type of calculations he made and the methods he used to develop his report are consistent with and similar to the types of calculations Mr. Gibson made and presented in other cases for which he has been qualified to testify.

Mr. Gibson then testified about the findings and conclusions contained in his Report. (Pl. Ex. 62). With respect to back pay, Mr. Gibson measured Plaintiff's purported damages from January 18, 2022, the day following Plaintiff's last day of employment at BMW MC, to February 17, 2026, the first day of trial in this case. (Pl. Ex. 2 at 4). According to Mr. Gibson, Plaintiff's lost compensation totaled $1,246,952. *Id*. Mr. Gibson arrived at this amount using Plaintiff's base salary at BMW MC and applying an annual increase of 3.27% derived from the historical growth of her salary from 2017 through 2021. *Id*. at 5. Also included in this amount was "additional compensation" based upon annual bonuses received each year by Plaintiff; the BMW vehicle benefit for employees; BMW MC's 401(k) match of up to 6.00% of Plaintiff's base salary; and the employer-funded Retirement Income Account to which BMW MC contributes 8.00% of base salary for employees aged 50-54, 9.00% for employees aged 55-59, and 10.00% for employees aged 60 and above. *See id*. at 5–6. Mr. Gibson determined that this "additional compensation" averaged 30.36% of Plaintiff's base salary from 2017 through 2022. *Id*. at 5.

Mr. Gibson then reduced the lost compensation amount by $857,045 in compensation earned at Madewell Concrete and GSP. (Pl. Ex. 62 at C-1). In calculating this mitigating compensation, Mr. Gibson used Plaintiff's base salary at Madewell Concrete in 2022 and at GSP from 2022-2026. *Id*. Ultimately, Mr. Gibson opined that Plaintiff's lost compensation for purposes of back pay totaled $389,907. *Id*.

With respect to front pay, Mr. Gibson divided Plaintiff's claim into two components: "pre-retirement" front pay and "post-retirement" front pay. For his "pre-retirement" calculation, Mr. Gibson, assuming Plaintiff would retire at 60 years of age, measured Plaintiff's expected future compensation from February 18, 2026, to July 5, 2028, the date on which Plaintiff would turn 60 years of age. (Pl. Ex. 62 at ex.C-1). Mr. Gibson determined her future total compensation at BMW during this "pre-retirement" period would be $798,873; this amount was reduced by $621,737 in total compensation that Mr. Gibson determined Plaintiff would earn at GSP during this period, yielding a figure of $177,136 in lost future "pre-retirement" income. Mr. Gibson then discounted this total to present value for a final amount of $169,851. In making the "post-retirement" future income calculation, Mr. Gibson used the same methodology to make projections for a five-year period starting July 6, 2028, and concluding July 5, 2033. *Id*. This five-year period was intended to capture retiree medical payments that would have been paid by BMW MC which, discounted to present value, amounted to $45,360 according to Mr. Gibson.

BMW MC did not present any evidence during the economic damages hearing. BMW MC's case consisted of the cross-examination of Plaintiff and Mr. Gibson. During cross examination, Mr. Gibson conceded that he had issued multiple revised reports during the litigation of this matter. He indicated that there were several reasons for the revised preliminary reports, including the receipt from Plaintiff of supplemental information, his discovery of errors, and his substantial revision of his calculations after reviewing a report issued by BMW MC's economic expert. As BMW MC did not call its economic expert at the hearing, his report is not in evidence and is not before the court. Mr. Gibson agreed that he did not factor "causation" into his calculations but noted that, for his analysis, it did not matter whether Plaintiff was fired or voluntarily resigned because he had been engaged solely to determine what Plaintiff would have

7

received had she stayed in the same position at BMW versus what she made in alternative employment. As for front pay, Mr. Gibson acknowledged that he assumed an uninterrupted BMW MC career path and did not include risk for voluntary departure, restructuring or performance changes in his model; agreed the bonuses he projected Plaintiff to receive in the future are discretionary in nature; conceded that his front pay determination did not account for employment risk; and agreed that he did not take into account the mitigating effect of income from the South Carolina Retirement System because, based on the information Mr. Gibson received, he concluded Plaintiff would not be eligible to receive it at age 60— the age she gave for her intended retirement from BMW.

Plaintiff seeks to recover a total of $605,118 in economic damages, consisting of $389,907 in back pay; $109,851 in pre-retirement front pay; and $45,360 in post-retirement front pay. BMW MC, on the other hand, contends that Plaintiff is not entitled to any back pay because she resigned voluntarily and that she should not be awarded front pay because such an award would amount to a windfall and would be based on unreasonable speculation.

### III. Discussion

### A. Back Pay

Title VII provides that if a court finds that a defendant has intentionally engaged in an unlawful employment practice, "the court may . . . order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer . . . ), or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g)(1). "Title VII's philosophical purpose is to provide remedies to make victims of discrimination whole." *Banks v. City of Virginia Beach*, No. 2:24-cv-149, 2025 WL 2856523, at *1 (E.D. Va. Oct. 8, 2025). Back pay should "make the victims of unlawful

discrimination whole" by restoring them, "so far as possible . . . to a position where they would have been were it not for the unlawful discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).

"[B]ack pay is a core component of make whole relief, and is presumptively available to those injured by an unlawful employment practice." *United States v. Baltimore Cnty., Maryland*, Civ. No. CCB-19-2465, 2021 WL 2000480, at *8 (D. Md. May 19, 2021); *Banks,* No. 2:24-cv-149, 2025 WL 2856523, at *1 ("The United States Supreme Court has recognized that back pay should presumptively be awarded to prevailing plaintiffs in Title VII cases." (citing *Albemarle Paper Co.*, 422 U.S. at 421)).  Back pay should only be denied for reasons which "would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co.*, 422 U.S. at 421.  An award of back pay, however, should not result in a "windfall" to the plaintiff. *See, e.g.*, *McMurray v. Tallant*, No. 20-cv-0919-TDC, 2025 WL 1489636, at *10 (D. Md. May 23, 2025) (citing *Cline v. Roadway Exp., Inc.*, 689 F.2d 481, 490 (4th Cir. 1982)), *appeal dismissed*, No. 25-1782, 2025 WL 4038019 (4th Cir. Aug. 29, 2025).  Accordingly, a back-pay award is subject to a plaintiff's duty to mitigate damages and must be offset by the amount of any "earnings or amounts earnable with reasonable diligence." 42 U.S.C. § 2000e-5(g)(1); *see Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985) ("[T]he right of a successful Title VII plaintiff to claim back pay is limited in degree by the statutory duty to mitigate employer damages, and . . .  [42 U.S.C. § 2000e–5(g)].").

Back pay is calculated by totaling the employee's lost wages and benefits, less amounts earned through other employment or wages that could have been earned through "reasonable diligence." *EEOC v. Key Mgmt. Partners, Inc.*, No. 21-cv-02496-PX, 2024 WL 4569875, at *2

(D. Md. Oct. 24, 2024) (quoting 42 U.S.C. § 2000e-5(g)(1)). Typically, a back pay award is calculated by determining "the difference between what the employee would have earned had the wrongful conduct not occurred . . . and the actual earnings during that period." *Crump v. United States Dep't of Navy*, 205 F. Supp. 3d 730, 760 (E.D. Va. 2016) (internal quotation marks omitted). In determining back pay, "the Court should include other kinds of employment compensation, such as fringe benefits and reasonably anticipated salary increases, in addition to plaintiff's base wages or salary." *Id.* at 747 (citing *Long v. Ringling Bros.-Barnum & Bailey Combines Shows, Inc.*, 9 F.3d 340, 343 (4th Cir. 1993). The back pay period is ordinarily calculated from the date the discrimination occurred until the date the discrimination is remedied—typically the date judgment is entered. *Crump*, 205 F. Supp. 3d at 742. In cases where, as here, the plaintiff was not terminated or constructively discharged but voluntarily resigned, courts have "[begun] the back pay calculation at the point when [the] plaintiff begins to suffer financial loss" as a result of the unlawful employment practice. *Id.* at 743; *see Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651–52 (4th Cir. 2002) (affirming award of backpay for plaintiff who quit voluntarily immediately after being denied a promotion). Significantly, the Fourth Circuit Court of Appeals has declined to follow the majority rule barring an award of back pay for an employee who voluntarily quits his job unless the circumstances amounted to a constructive discharge. *See Dennis*, 290 F.3d at 651 ("In reviewing awards of back pay, the Fourth Circuit does not apply the 'constructive discharge rule' denying such pay to persons who leave an employer who has committed intentional discrimination unless it is under conditions of a constructive discharge."); *Spagnuolo v. Whirlpool Corp.*, 641 F.2d 1109, 1114 (4th Cir. 1981). Instead, the Fourth Circuit "simply appl[ies] the general statutory duty located at 42 U.S.C. § 2000e–5(g) to mitigate employer damages." *Dennis*, 290 F.3d at 651.

Plaintiff bears the burden of proving the amount of back pay to which she is entitled. *Crump*, 205 F. Supp. 3d at 761.  Damages under Title VII must be established with reasonable certainty, *Pittington v. Great Smoky Mountain Lumberjack Feud*, LLC, 880 F.3d 791, 799 (6th Cir. 2018) (internal quotation marks omitted), but mathematical certitude is not required, *MacGregor v. Mallinckrodt, Inc., et al.*, No. 01-828, 2003 WL 23335194, at *5 (D. Minn. July 21, 2003), *aff'd*, 373 F.3d 923 (8th Cir. 2004) ("[Title VII] damages need only be proven to a reasonable degree of certainty and mathematical precision is not required.").  The employer "bears the burden of demonstrating that the plaintiff has failed to fulfill the duty to mitigate."  *Miller v. AT & T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001).

The jury in this case found that BMW MC discriminated against Plaintiff on the basis of her national origin.  Plaintiff testified at the economic damages hearing that she ultimately resigned her long tenure at BMW MC because she had been discriminated against.  The court found her testimony to be credible and consistent with the evidence presented at trial and the economic damages hearing.  Although the evidence reflected that Plaintiff had engaged a recruiter to identify potential jobs shortly before learning that she would be replaced in her TX-60 position by a German, the court finds that Plaintiff would not have resigned from BMW MC absent the discriminatory conduct.[2]

### *Dennis* and *Spagnuolo*

As *Dennis* and *Spagnuolo* both make clear, in this circuit an employee who suffers discrimination and then voluntarily resigns may still be entitled to recover back pay; constructive

---

[2] In so concluding, the court is mindful that "[w]hen a party exercises their right to a jury trial on an issue, courts must resolve any equitable claim in light of the jury's determination of the legal claim."  *Med-Therapy Rehab. Servs., Inc. v. Diversicare Corp. of Am.*, 16 F.3d 410, at *3 (4th Cir. 1994), *cert. denied*, 464 U.S. 826 (1983). "The facts on which the judge bases his equitable relief must not contravene the facts as found by the jury." *Id*. at *3 (4th Cir. 1994).

discharge is not required. *See Dennis*, 290 F.3d at 651; *Spagnuolo*, 641 F.2d at 1114. BMW MC's position, however, seems to be that *Dennis* and *Spagnuolo* are limited to the fact patterns presented in those cases. In *Dennis*, the plaintiff resigned her position immediately after she did not receive a promotion to a supervisory position that was awarded instead to a male applicant. After quitting her job, the *Dennis* plaintiff sought and obtained comparable alternative employment where she earned more than she would have earned in her old job over the three-year period leading up to trial. The Fourth Circuit concluded that the *Dennis* plaintiff had *reasonably mitigated* Defendant's damages and affirmed an award of back pay. *Id*. at 652–51. In doing so, the *Dennis* court noted that the facts before it were parallel to those in *Spagnuolo*—where the plaintiff had voluntarily resigned his position for higher pay—and, as a result, found the plaintiff in *Dennis* also to have mitigated the defendant's damages. *See id*.

BMW MC argues that because Plaintiff here did not leave BMW for a higher paying job and, therefore, does not present an identical fact pattern to those presented in *Dennis* and *Spagnuolo*, she may only recover back pay by establishing constructive discharge. This court cannot agree. BMW MC reads these opinions too narrowly. *Dennis* makes clear that the question is simply whether a plaintiff has fulfilled the duty to mitigate the defendant's damages; it does not state that the Fourth Circuit follows the constructive discharge rule outside of the circumstances presented in those cases. Thus, Plaintiff does not have to establish constructive discharge to recover back pay. Rather, she must show that she discharged her duty to mitigate economic damages resulting from the discrimination.

### Mitigation

The duty to mitigate requires a plaintiff to be reasonably diligent in "seeking and accepting new employment substantially equivalent to that from which he was discharged." *Duvall v. Novant*

12

*Health, Inc.*, 95 F.4th 778, 793 (4th Cir. 2024) (internal quotation marks omitted). BMW MC argues that Plaintiff failed to mitigate damages here because she accepted a job paying an annual salary of approximately $50,000 less than she had been making at BMW MC. Instead, BMW MC contends Plaintiff could have fully mitigated her damages by remaining in the Department Manager level position to which BMW MC intended to transfer her until comparable employment became available.

"Comparability in salary," however, "is only one fact to be considered" in determining the reasonable comparability of alternative employment for purposes of mitigation. *Williams v. Albemarle City Bd. of Ed.*, 508 F.2d 1242, 1243 (4th Cir. 1974). "Comparability in status is often of far more importance—especially as it relates to opportunities for advancement or for other employment—than comparability in salary." *Id*. BMW MC has not offered any authority indicating Plaintiff was required to remain employed at BMW MC where she experienced discrimination rather than accept the top HR position at Madewell Concrete in order to mitigate damages. BMW MC did not present any vocational or market evidence demonstrating that Plaintiff could have earned more elsewhere than she did at Madewell Concrete from the time she resigned at BMW MC until she began working at GSP. And, there is no evidence establishing that GSP would have hired Plaintiff had she not previously been head of HR— a position she held only at Madewell Concrete. Based on the testimony and evidence presented both at trial and at the damages hearing, the court finds that BMW MC has not carried its burden of showing that Plaintiff failed to mitigate damages.

### Calculation

As noted, the court qualified Mr. Gibson as an expert in the area for which he offered testimony. The court concludes that the methodology he employed was reasonable and generally

13

accepted.  Mr. Gibson's conclusions with respect to *back pay* accurately calculate Plaintiff's damages to a reasonable degree of certainty and are not unduly speculative.  BMW MC has not offered opposing evidence or testimony, expert or otherwise, challenging Mr. Gibson's back pay calculations or suggesting an alternative amount besides arguing Plaintiff was entitled to no damages.  Accordingly, the court adopts the back pay amount determined by Mr. Gibson of $389,907 and awards Plaintiff back pay in that amount.

### B. Front Pay

As noted herein, the purpose of the remedies available for a violation of Title VII are intended to "place a plaintiff in the position she would have occupied but for the discriminatory conduct." *Saulsberry v. Savannah River Remediation, LLC*, CA No. 1:16-cv-02792-JMC, 2020 WL 264259 at *5 (D.S.C. Jan. 17, 2020) (citing *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1422–23 (4th Cir. 1991)).  "Reinstatement and front pay provide ways for a court to achieve that goal by rectifying losses that will be realized from the time of judgment moving forward." *Id*.

Reinstatement is the preferred remedy in this Circuit. *Duke*, 928 F.2d at 1245. However, reinstatement is not always a viable, particularly where "intervening historical circumstances . . . make it impossible or inappropriate." *Id.* at 1243. The Fourth Circuit has noted that reinstatement may be inappropriate when the employer has demonstrated 'such hostility that, as a practical matter, a productive and amicable working relationship would be impossible'"; "when the litigation itself created such animosity between the parties that any potential employer-employee relationship was irreparably damaged[;] . . . or where there is no comparable position available." *Id.*  (quoting *EEOC v. Prudential Fed. Sav. & Loan Ass'n*, 763 F.2d 1166, 1172 (10th Cir. 1985), *cert. denied*, 474 U.S. 946 (1985)).

14

In her Amended Complaint, Plaintiff requested "make whole relief such as reinstatement to her former position and level" along with other forms of relief. (ECF No. 20 at 16). However, such Amended Complaint was filed in February 2023, several years before the multiple failed mediations and contentious week-and-a-half-long jury trial. At the juncture of trial and post-trial hearings, neither party asserted that reinstatement would be amenable or practical. As a practical matter, it has now been over four years since Plaintiff worked for Defendant. In that time, though there has been a lot of turnover in the HR Department at BMW MC, several individuals that were at least tangentially involved in the factual scenario that lead to this lawsuit are still employed with Defendant in high level positions – Dr. Robert Englehorn (President and CEO) and Sherri McCraw (VP of HR). If Plaintiff was to be reinstated in a comparable position from which she resigned in January 2022, she would directly report to Ms. McCraw, who would directly report to Dr. Englehorn. However, the adversarial nature of trial and of the testimony presented to discredit each side's theory of the case undoubtedly created some hostility between Plaintiff and these individuals, which would make reinstatement impracticable. From Defendant's perspective, Dr. Englehorn and Ms. McCraw both testified at trial that following Plaintiff's resignation, the company was left in a lurch due to unexpectedly losing Plaintiff's many years of insight and experience, and according to both witnesses, it took months for the company to recover from Plaintiff's abrupt departure. From Plaintiff's perspective, she testified that she suffered physically and mentally as a result of the Defendant's discrimination against her, and the jury ultimately determined that she did suffer and awarded her compensatory damages to that effect. Additionally, testimony at trial indicated that Plaintiff's former position, or one with a comparable function level and personal grade, may not be available for her to fill. Accordingly, the court finds that based on the facts and circumstances of this case, reinstatement is not an appropriate remedy.

As reinstatement is not a viable option, the court may consider an award of front pay, and such "award, as an adjunct or an alternative to reinstatement, must rest in the discretion of the court in shaping the appropriate remedy." *Duke*, 928 F.2d at 1424 (4th Cir. 1991). "[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001). While it is in the discretion of the district court whether to award front pay and, if so, in what amount, the Fourth Circuit has cautioned that the district courts "must 'temper' the use of front pay by recognizing the 'potential windfall' to the plaintiff." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 300 (4th Cir. 2009) (quoting *Duke*, 928 F.2d at 1424)). Accordingly, because of the potential for front pay to have an "unfair windfall for the plaintiff, it must be granted sparingly." *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 392 (D. Md. 1997).

As with other equitable remedies, front pay is intended simply to make the plaintiff whole. Accordingly, such relief may be awarded to "bridge a time gap when the court concludes the plaintiff is reasonably likely to obtain other employment." *Duke*, 928 F.2d a5 1424. In other words, when deemed appropriate, an award of front pay should be "for a reasonable future period required for the victim to reestablish her rightful place in the job market." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984). Additionally, while front pay is intended to give the plaintiff the time needed to seek and obtain other employment, such employment need not be identical to the plaintiff's prior employment; instead, courts have considered the time needed for plaintiffs to secure comparable employment opportunities. *See, e.g. Saulsberry*, 2020 WL 264259 at *9 (D.S.C. Jan. 17, 2020) (concluding that the duration of front pay represented sufficient time for the plaintiff to "obtain comparable employment" or " 'retraining … if that course is the one more suited to making . . . her whole[]") (quoting *Duke*, 928 F.2d at 1424)); *Ford*, 984 F. Supp. At 392

16

(determining that the duration of front pay gave the plaintiff time to "seek reasonably comparable employment").

Plaintiff's last day of employment with Defendant was January 17, 2022. The jury returned its verdict, and judgment was entered on February 25, 2026. (ECF Nos. 216, 217). Prior to leaving her position with Defendant, Plaintiff secured a position with Madewell Concrete, and she began working for Madewell on January 31, 2022. It is undisputed that her salary at Madewell was a reduction in pay in relation to her position with Defendant. However, on July 1, 2022, she received an offer for a position with GSP as the Vice President—Chief Human Resources Officer. (Def. Ex. 36). According to Plaintiff's testimony at trial and at the damages hearing, she accepted this position and began working at GSP in August 2022. Plaintiff still remains employed with GSP.

At the March 13, 2026, hearing, the court heard evidence regarding Plaintiff's compensation packages both during her last year with BMW and over her last three years with GSP. The evidence reflects that in 2021, Plaintiff's last full year with BMW MC, her total compensation package was $266,999.73. (Def. Ex. 55 at Bates No. BMW MC 001914). In 2023, her total compensation at GSP amounted to $266,608.88, with $203,631.85 being her total earnings not including her employer-paid benefits and taxes. (Def. Ex. 52). In 2024, her total compensation at GSP amounted to $298,416.80, with $221,864.84 being her total earnings not including her employer-paid benefits and taxes. (Dev. Ex. 52). For 2025, the evidence presented included information only through November 26, 2025, with such showing that Plaintiff's total compensation at GSP amounted to $271,676.88, with her total earnings not including her employer-paid benefits and taxes being $195.322.40. (Def. Ex. 52). However, at the hearing, Plaintiff confirmed that her earnings for 2025 were greater than her earnings in 2024. Additionally, the table provided as Exhibit C-3 to Plaintiff's Expert's Report indicated that Plaintiff's total

mitigating compensation (earnings) for 2025 was $245,989. (Def. Ex. 41, Ex. C-3; Pl. Ex. 62, Ex. C-3). Accordingly, compensation-wise the court finds that Plaintiff's present position with GSP represents comparable employment to her position she held with BMW MC, at least as of February 18, 2026, the date listed in Plaintiff's expert's final report as the beginning of his front pay analysis, (Def. Ex. 41 at 4). Additionally, from a human resources perspective, it is uncontested that Plaintiff now holds the highest position in her department—the Vice President of Human Resources— which is at least comparable, if not more esteemed than her position as a manager in human resources with Defendant. In fact, at the March 13 hearing, Plaintiff confirmed that her current position is a higher-level position than she ever attained while under BMW MC's employ. Accordingly, the court finds that Plaintiff has already obtained comparable employment to that which she held with Defendant at the time of her departure.

By their very nature, front pay awards are forward-looking, as they seek to make the plaintiff whole for the time "between judgment and reinstatement or in lieu of reinstatement." *Pollard*, 532 U.S. at 846. However, as noted herein, by the time of judgment in this case, Plaintiff had already secured comparable employment with GSP Airport. Accordingly, the court finds that an award of front pay in this case would result in an unfair windfall for Plaintiff, as any discrepancy between her pay status with BMW MC from the time of her departure and up until the time she found comparable employment is already included in the award of backpay. Therefore, the court declines to award front pay in this case.

### IV. Conclusion

For the reasons set forth above, the court **AWARDS** Plaintiff $389,907 in **BACK PAY** and **ORDERS** that the Amended Judgment (ECF No. 236) be further **AMENDED** to reflect this amount.

The court **DECLINES**, however, to award **FRONT PAY**. As noted herein, the court will address attorneys fees and costs by way of a separate order once all briefing has concluded on post-trial motions.

**IT IS SO ORDERED**.

s/Timothy M. Cain
Chief United States District Judge

Anderson, South Carolina
April 6, 2026