

**In the United States District Court**
**District of South Carolina**
**Spartanburg Division**

| | | |
|---|---|---|
| Kelly Dawsey, | ) | 7:22-03738-TMC |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Plaintiff's Opposition to BMW MC's** |
| | ) | **Motion for Judgment as a Matter of** |
| | ) | **Law or, in the Alternative, for a New** |
| Bayerische Motoren Werke | ) | **Trial [ECF 237]** |
| Aktiengesellschaft and BMW | ) | |
| Manufacturing Co., LLC collectively | ) | |
| d/b/a "BMW Group," | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## I. Introduction

As the Undersigned understands it, BMW seeks judgment as a matter of law on liability, based solely on the assertion that Dawsey did not show an adverse employment action. BMW also seeks judgment as a matter of law as to punitive damages. It seeks a new trial based on claims that the Court should not have admitted the Expat Guidelines, because the Court charged the jury on adverse employment action, and because of the Court's response to a jury question that BMW approved.

BMW failed to preserve several of these new arguments, and none of them establish error.

## II. Argument

### A. BMW tries to set the bar too high.

BMW suggests that a verdict winner has a heavy lift to overcome a Rule 50(b) motion. [ECF 237-1 at 2-3]. Not so. BMW has the heavy lift. BMW can prevail only if no reasonable conclusion supports the verdict after the Court views all evidence in the

1

light most favorable to Dawsey, and it draws every reasonable inference in her favor. *Carter v. Ascend Performance Materials Holdings*, 8:20-cv-04379-TMC, ECF 229 at 2-3 (D. S.C. Oct. 30, 2024) (quoting *Int'l Ground Transp. v. Mayor & City Council of Ocean City*, 475 F.3d 214, 218-19 (4th Cir. 2007)).

The Court should "accord the utmost respect to jury verdicts and tread gingerly in reviewing them." *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001) (quoting *Price v. City of Charlotte*, 93 F.3d 1241, 1250 (4th Cir. 1996)).  And the Court should "disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000) (emphasis added).

BMW's challenge in seeking a new trial also is daunting:

> A new trial should be granted only where the court is convinced the jury verdict was a "seriously erroneous result" and where denial of the motion will result in a "clear miscarriage of justice." *Sedgwick v. Giant Food, Inc.*, 110 F.R.D. 175, 176 (D.D.C. 1986). Furthermore, "The standard for granting a new trial is not whether minor evidentiary errors were made, but rather, whether there was a "clear miscarriage of justice." 9 Moore's Federal Practice, Paragraph 204.12[1] at 4-67 (1987).

*Perrin v. O'Leary*, 36 F. Supp. 2d 265, 267 (D.S.C. 1998).

## B.    Punitive damages

### 1.    BMW misstates *Kolstad* and its progeny.

#### a. The issue under *Kolstad* is whether BMW knew that discrimination was unlawful, not whether BMW knew that it was discriminating.

BMW's punitive damages argument suffers from a faulty premise.  BMW argues, "Plaintiff presented no evidence that any of the BMW MC managers involved in the pertinent decisions in this case – Robert Engelhorn, Christine Petrasch, and Sherry

McCraw – were aware that their actions would potentially violate federal law." [ECF 237-1 at 6]. That is not the analysis.

*Kolstad* did not create a defense for an employer that believes that its decision were lawful. The Court focused on whether employer might believe that its "**discrimination** is lawful." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 537 (1999) (emphasis added). That is very different. The *Kolstad* Court cited examples where the employer discriminated, but an affirmative defense applied. *Id.*[1] The *Kolstad* Court never said a jury cannot assess punitive damages if an employer claims it did not discriminate. This Court should not second-guess the jury's assessment of what BMW subjectively believed. *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445-46 (4th Cir. 2000).

### b.      BMW's new *Muldrow* punitive damages argument is unpreserved.

BMW now argues that the Court should not have allowed punitive damages because the law changed after Dawsey's claim arose. [ECF 237-1 at 6-7]. BMW somehow relies on *Burr* -- a Fair Credit Reporting Act ("FCRA") case -- to assert that BMW could not have known it was violating the law before *Muldrow*. [ECF 237-1 at 7 (citing *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47(2007))]. BMW never made this argument in its Rule 50(a) motion, so the Court should not consider it now. *See Carter*, 8:20-cv-04379-TMC, ECF 229, at 4-5.

---

[1]      In *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316 (4th Cir. 2024), for example, the employer did not deny discriminating based on religion. It successfully argued that the ministerial exception applied. Other examples would include a joint or integrated employer case where an employer may agree it failed to hire a woman for a position because of her sex and age but believed that such discrimination is lawful because the particular entity employed less than fifteen employees.

A moving party "is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its Rule 50(b) motion after trial if the Rule 50(a) motion proves unsuccessful." *Price v. City of Charlotte,* 93 F.3d 1241, 1248–49 (4th Cir. 1996) (citing *Singer v. Dungan,* 45 F.3d 823, 828–29 (4th Cir. 1995)).

To ensure that the grounds for Rule 50(a) and 50(b) motions are the same, the moving party must "**specify** the judgment sought and the law and facts that entitle the movant to the judgment." Fed. R. Civ. P. 50(a)(2) (emphases added); *United States v. Awni Shauaib Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014); *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 157 (4th Cir. 2012). It is not a "horseshoes and hand grenades" standard. The moving party cannot make different arguments in on the same subject matter: It has must be the same argument. *Plyler v. Cox*, 145 F.4th 501, 509 (4th Cir. 2025).

### c.     Even pre-*Muldrow* case law shows that Dawsey incurred adverse employment actions

BMW's afterthought argument also makes no sense. BMW's actions in removing Dawsey from her position and telling her that she would be demoted to a lower-level position constituted adverse employment actions even before *Muldrow*. [*Infra* § II(C)(3)].

### d.     FCRA authority has no utility here.

*Burr* is not a case involving 42 U.S.C. § 1981a or the applicable standard for awarding punitive damages. Nor is the FCRA punitive damage standard coextensive with the *Kolstad* standard. *See Burr*, 551 U.S. at 69 (requiring a showing based on common-law principles that the defendant "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."). But even if the standards were the same, *Burr* is of no help to BMW.

4

Title VII has no ambiguity or dearth of case law like there was in the FCRA. [2] BMW's policy and practice facially violates Title VII, especially Section 703(a)(2). 42 U.S.C. § 2000e-2(a)(2).

And BMW laid no foundation for its new argument. Nobody testified that BMW could remove an American from TX-60, because a subsequent move to TX-64 did not constitute an adverse employment action. That was never BMW's argument. And courts should not veto jury determinations because, a month after the verdict, lawyers dream up a new argument.

> **e.** **The jury already resolved whether BMW's polices protect BMW from the imposition of punitive damages.**

BMW implicitly argues that it did all it could to avoid the discrimination perpetrated by its top executives. It seeks shelter under a policy it never bothered to introduce or explain to the jury. This Court charged the jury that company policies are not conclusive proof of good-faith efforts to avoid discrimination:

> [T]the mere existence of a compliance policy will not alone insulate an employer from punitive damages liability. Rather, in order to avoid liability for the discriminatory acts as one of its managerial officials, an employer

---

[2] The issue in *Burr* was whether the term "willful" in the FCRA covered only knowing violations, or whether it also included violations that also recklessly disregard the Act. *Id.* at 56-59. The FCRA requires notification to a consumer when an adverse credit action is based on a consumer credit report and that anyone willfully violating the act is subject to suit. Id. at 52 (citing 15 U.S.C. §§ 1681(m)(a), 1681(n)). Safeco was the appellant in *Burr*. Safeco used credit reports to set insurance premiums. It did not notify consumers if their rates were set higher based on consumer credit reports. *Id.* at 55. The Supreme Court recognized both the ambiguity of the term "willful" when combined with subparagraph text and the lack of case law as to how that term is used in the FCRA. *Id.* at 59. The *Burr* Court determined: "Given this dearth of guidance and the less-than-pellucid statutory text, Safeco's reading was not objectively unreasonable, and so falls well short of raising the 'unjustifiably high risk' of violating the statute necessary for reckless liability." *Id.* at 70.

maintaining such compliance policy must also take affirmative steps to ensure its implementation.

[Feb. 25 DUT 139:22 – 140:2].[3] BMW never objected to this provision. Nor could it. The parties submitted a joint charge on this point. [Exh. 1]. It is too late for BMW to complain now. *See Plyler*, 145 F.4th at 509 (noting the absence of an argument during the jury charge stage in addition to the failure to specify the issue in a directed verdict motion).

BMW cites *Ward v. AutoZoners, LLC*, 958 F.3d 254 (4th Cir. 2020). But even that case shows the meritless nature of BMW's argument. *Ward* hinged on the third prong of the vicarious liability test from *Kolstad* to impute liability to an employer based on coworker sexual harassment.[4]   The Fourth Circuit distinguished that situation from these circumstances:

> *Kolstad* and *Lowery* support an employer's vicarious liability for punitive liability **when the manager carries out the intentional discrimination**. They provide no support for punitive damages liability when the employee who carries out the intentional discrimination is not a manager and the alleged managers did not carry out the intentional discrimination.

---

[3]    Citations to "DUT" are to the daily uncertified transcripts provide by the court reporter.

[4]    In *Ward*, a coworker sexually harassed the plaintiff in front of a sales manager to whom the plaintiff also complained. *Id.* at 260-61. Not only did the sales manager respond inappropriately, but the store manager and district manager also failed to take appropriate action. *Id.* at 261. The issue on appeal was whether the employer was vicariously liable based on the theory that the sales manager, store manager, and district manager were "served in a managerial capacity and was acting within the scope of employment." *Id.* at 263 (citing *Kolstad*, 527 U.S. at 542-43). The Fourth Circuit found that only the latter two could qualify for this prong. *Id.* at 263, 264-66. The *Ward* Court logically held that the plaintiff in that case "must first present sufficient evidence showing that [the managers to whom the plaintiff complained] themselves engaged in intentional discrimination in order to hold AutoZone vicariously liable for punitive damages." *Id.* at 266.

6

*Id.* at 267 (emphasis added). *Ward* is not instructive because BMW executives "carrie[d] out the intentional discrimination." *Id.*[5]

BMW also cites *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536 (4th Cir. 2003) for no purpose other than to show that, under different circumstances, the Fourth Circuit did not allowed punitive damages. In *Bryant*, the Fourth Circuit relied on policies and training to find that the employer tried to prevent the discrimination at issue. The Fourth Circuit later cited *Bryant* and clarified that the existence of such policies is one factor for the jury to consider. *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008) ("*FedEx*").[6]

The *FedEx* Court highlighted *Lowery* to illustrate that discrimination by high-level executives negates any notion that company policy is sacrosanct. In *Lowery*, the Fourth Circuit explained why policies sometimes aren't worth the paper on which they are written:

> [T]he sincerity of Circuit City's commitment to a company-wide policy against racial discrimination in the workplace is called into question when one considers the racially discriminatory attitudes of two top Circuit City executives and the implementation of a promotional system by one of those

---

[5]     Nor is *United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 151 (4th Cir. 2017) of any use. *Consolidated Energy* is a religious accommodation case that involves none of the arguments BMW raises. There, an employee objected to using a hand scanner, which he contended violated his religious beliefs. The employer offered an accommodation that was not agreeable to the employee. It also allowed other employees to bypass the scanner for non-religious reasons. At the end of the day, the *Consolidated Energy* Court found that, while the employer's accommodations offer fell short of the ADA's requirements, that did not suggest that the employer understood that its efforts ran the risk of violating the plaintiff's rights. *Id.* at 151. There is no parallel to be drawn between the poor handling of an accommodation request in *Ward* and BMW's discriminatory policy and practice that, on its face, violates Title VII.

[6]     BMW also cites *Harris v. L&L Wings*, 132 F.3d 978 (4th Cir. 1997) as to when punitive damages are appropriate. But *Harris* is pre-*Kolstad*. *Kolstad* rejected the egregiousness standard. *Lowery*, 206 F.3d at 436. That is a standard recited in *Harris*. 132 F.3d at 983.

executives having the capacity to mask race discrimination in promotional decisions.

*Lowery*, 206 F.3d at 446.

BMW's witnesses never claimed that its policies were an effort to prevent the discrimination they perpetrated. BMW never mentioned the policies, other than in passing during Petrasch's testimony. And it never introduced its policy as an exhibit. BMW is changing tracks post-trial, hoping that something resonates.

### 2. BMW's *Duvall* argument

BMW never argued that Petrasch, its vice president of HR, was unaware that discrimination was unlawful. But even if it had, BMW's *Duvall* argument fails for several reasons. [ECF 237-1 at 3-8].

### a. BMW did not preserve a *Duvall* argument.

BMW's punitive damage argument was limited to an argument as to whether it intended for Dawsey to resign. [Feb. 24 D& at 96:9 – 100:11]. Specifically, BMW argued that it did not recklessly violate Dawsey's rights because it "wanted to keep her" and did not want her to resign. [*Id.* 97:17-20; *see id.* 99:6-9]. That argument bears no resemblance to BMW's current argument.

Moreover, the parties jointly submitted a punitive damages charge. [Exh. 1]. It contains no language requiring a plaintiff to prove that the discriminators knew their actions violated Title VII. [*Id.* at 2–3]. At the charge conference, BMW argued only that punitive damages should not be available, but did not advocate for different language.[7] After the charge, BMW merely repeated that it did not believe the facts warranted a

---

[7]     BMW never made any argument about punitive damages to the jury. [Feb. 25 DUT 53:25 - 92:11].

punitive damages charge.  [Feb. 25 DUT 147:25 – 148:4].  Again, BMW did not make the argument it now poses.

### b.     BMW also did not preserve an argument that it complied in good faith with Title VII.

BMW also did not move under Rule 50(a) on the ground that it made good-faith efforts to prevent discrimination.  Thus, it has not preserved this issue.

Even if BMW had preserved the issue, it would have borne the burden of proof. *Golson v. Green Tree Fin. Servicing Corp.*, 26 F. App'x 209, 214 (4th Cir. 2002).  BMW offers no argument as to how it could have met its burden of proof as a matter of law.  So it has not preserved that issue either.

### c.     The record dispels BMW's belated *Duvall* argument

The Record refutes BMW's belated efforts to compare this case to *Duvall v. Novant Health, Inc.*, 95 F.4th 778 (4th Cir. 2024).  In *Duvall*, the plaintiff offered no evidence that the decision-maker knew of the law's existence.  The plaintiff merely argued that, as 'a "highly educated . . . executive with a long career in corporate America, [the decision-maker] must have understood that Title VII prohibits firing an employee because of his race or gender such that his termination of Duvall's employment necessarily entailed acting in the face of a perceived risk of violating Title VII."  *Duvall*, 95 F.4th at 792.

In *Carter*, this Court rejected the same argument BMW poses.  This Court relied on the fact that the defendant's HR manager had training in the law.  *Carter v. Ascend Performance Materials Holdings*, 8:20-cv-04379-TMC, ECF 229 at 6-7 (D. S.C. Oct. 30, 2024).  Although that evidence is also present here, Dawsey has more than that.

BMW maintains a policy against national origin discrimination, which it published in the employee handbook.  [Feb. 18 DUT 84:9-21; Feb. 20 DUT 39:24 – 40:4; *id.* 83:18-

9

21].   Petrasch knew of BMW's policy against discrimination based on national origin. [Feb. 20 DUT 83:22 – 84:2].   Petrasch also acknowledged that her department and BMW's legal department conducted anti-discrimination training.   [Feb. 20 DUT 84:7-11; Feb. 18 DUT 84:22 – 85:2].   Petrasch was ultimately responsible for enforcing BMW's anti-discrimination policies. [Feb. 18 DUT 85:3-5].   She was also responsible for handling discrimination matters, such as EEOC charges.   [*Id.* 85:6-9].   And BMW knew its policy was illegal when it developed and implemented them because Dawsey told BMW so. [Feb. 18 DUT 33:15-21].   Not only does the amount of evidence here eclipse that in *Duvall* and *Carter*, it also surpasses the evidence deemed sufficient in other Fourth Circuit cases.

A plaintiff need only show that the discriminator(s) had "rudimentary knowledge" of the law.   *Duvall*, 95 F.4th at 792 (citing *FedEx,* 513 F.3d at 372–73).   That is not a high bar to clear.

In *FedEx*, the Fourth Circuit focused on the senior operations manager's knowledge because he had ultimate responsibility for the ramp at BWI airport.   *FedEx*, 513 F.3d at 373; *see id.* at 365.   The Fourth Circuit found that the EEOC proved perceived risk because the manager: (1) was aware of the employer's policy, (2) had been trained on the ADA, (3) was "responsible for all personnel matters," and (4) was aware of the employee's disability.   *Id.* at 373.

Dawsey provided evidence on all four examples provided in *FedEx*, even though the Fourth Circuit does not require such.   Like the manager in *FedEx*, Petrasch was aware of BMW's policy.   Like the manager in *FedEx*, Petrash had been trained on the law.   Like the manager in *FedEx*, Petrasch was responsible for all personnel matters.   And like the manager in *FedEx*, Petrasch was aware of Dawsey's membership in a classification

10

protected by law. So Dawsey's proof suffices under *FedEx* even though she need to prove all this.

*FedEx* does not even represent the lower end of what suffices under *Kolstad*. In *Anderson v. GDC, Inc.*, 281 F.3d 452 (4th Cir. 2002), the Fourth Circuit found that the employer perceived the risk when a harasser admitted seeing an anti-discrimination poster but denied reading it. And it emphasized that a jury has no obligation to believe such a witness. *Id.* at 460 ("Although Cooper denied having read the poster, a reasonable jury could nevertheless infer that Cooper's awareness of the poster suggested at least a rudimentary knowledge of its import.").

If a plaintiff can prevail because a non-HR decision-maker "glanced at" a poster, then Dawsey provided more than enough evidence to support an award of punitive damages.

### d.     BMW's Duvall argument contradicts its good-faith compliance argument.

Any effort in reply by BMW to recast its argument to say that Petrasch didn't know that discrimination was unlawful would run into another problem. BMW now also argues that it made good-faith efforts to comply with the law. [ECF 237-1 at 5]. BMW apparently believes that hedging its bets with contradictory arguments is its best chance of something working. But neither argument could warrant judgment as a matter of law, even if BMW were allowed to make them belatedly.

11

### 3.     BMW's brazen violation of Title VII is stunning.

BMW snips words like "high standard" from *Consolidated Energy*[8] to suggest that Dawsey must prove something more than what *Kolstad*, *FedEx*, and *Anderson* require. [ECF 237-1 at 4].    But BMW ignores *Consolidated Energy*'s explanation of what that means.  The *Consolidated Energy* Court cited two cases to illustrate what suffices under *Kolstad*: *FedEx* and *Anderson*.  *Consol. Energy,* 860 F.3d at 151–52.  As shown above, Dawsey provided more than what *FedEx* and *Anderson* require.  [*Supra* § II(B)(2)(c)].

That said, this case is a rare bird.  The highest-level HR executive at BMW MC gave a facially-unlawful reason for the adverse employment actions.    "[D]irect evidence of intentional discrimination is hard to come by."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 272 (1989) (O'Connor, J., concurring); *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716-17 (1983) ("There will seldom be "eyewitness" testimony as to the employer's mental processes.")[9]

There can be no more denying that BMW has an established practice of slotting jobs by nationality.  It documented this practice years ago, and it follows the unlawful practice to this day. [Pl. Exh. 17].  BMW's efforts to characterize this as some run-of-the-mill dispute also ignore the verdict itself.  The jury returned what is likely the largest verdict in South Carolina for a Title VII case.   And that is fitting, as BMW's in-your-face discrimination requires serious condemnation.

---

[8]     *EEOC v. Consol.* Energy, 860 F.3d 131 (4th Cir. 2017).

[9]     *See also Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 717 (4th Cir. 2013); *Richards v. Schaeffler Grp. U.S.*, No. 0:20-02024-SAL-KDW, 2021 U.S. Dist. LEXIS 249365, at *16-19 (D.S.C. Dec. 21, 2021).

BMW admitted that it used nationality in filling positions in 2021. Engelhorn was candid about his desire for a local in TX-6, which Burgmeier confirmed. [Feb 19 DUT 209:13-19; Feb 24 DUT 45:17-18]. He and Petrasch testified that he wanted a combination of an American and a German in TX-6 and TX-60 because it is his experience that a local one and German would be a perfect fit. [*Id.* 209:4-7; Feb. 20 DUT 169:14-17]. Engelhorn instructed Petrasch to bring in a German, which is why they brought Burgmeier in to Dawsey's job. [Feb 20 DUT 9-11].

This is also a rare Section 703(a)(2) segregation and classification scenario.[10] Such cases were common in the early days of Title VII when employers would advertise for and maintain racial and gender norms for various jobs and departments. *See* EEOC Guidance § 618.1(c).[11] That doesn't happen today, except at BMW. To the extent dicta

---

[10]    Section 703(a)(2) prohibits classifying and limiting employees because of their national origin:

> It shall be an unlawful employment practice for an employer . . . to limit. . . or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(2); 1 Barbara T. Lindemann, Paul Grossman, and Geoff Weirich, Employment Discrimination Law 6-9 (6th ed. 2020). "Classification in this respect means to categorize the employee or the job for a reason, or in a manner, prohibited under Title VII." EEOC Guidance CM-618: Segregating, Limiting, and Classifying Employees § 618.7(a) (10/1/83) ("EEOC Guidance");[10] *id.* § 618.1(a). Limiting employees . . . means limiting the actual number of individuals in a position based on a prohibited basis. EEOC Guidance § 618.6(a).

[11]    Title VII became effective in 1965. 42 U.S.C. § 2000e-15(a). Limitation and classification claims were a frequent focus of early Title VII litigation. *See, e.g.*, *United States v. Chesapeake & O. R. Co.*, 471 F.2d 582, 586 (4th Cir. 1972) (overt practice of hiring by race for various positions); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) (high school diplomas and intelligence tests); *see also United Steelworkers v. Weber*, 443 U.S. 193, 202-03 (1979) (noting that legislative history of Title VII showed that the primary concern of the drafters was the practice of employers segregation and classifying black

about punitive damages being proper in "extraordinary" cases somehow governs, this case easily qualifies, especially when compared with the rather standard claims in *FedEx* and *Anderson*.

## C.     BMW's JMOL adverse employment action argument

BMW argues that Dawsey failed to show any adverse employment action. [ECF 237-1 at 8-14]. At the same time, it complains that the Court instructed the jury that Dawsey was required to do so. [*Id.* at 17–21]. Neither is a serious argument.

BMW continues to argue post-*Muldrow* that transfers or demotions are not adverse employment actions. [ECF 237-1 at 8-14]. But nothing has changed since the Court rejected such arguments.

### 1.     BMW continues to ignore one of the adverse employment actions.

BMW still pretends this is a single adverse employment action. [*See* ECF 97 at 21 (pointing out that there are two adverse employment actions)]. BMW informed Dawsey that it was removing her from TX-60 *before* telling her it would demote her to a FL IV position.

### 2.     BMW subjected Dawsey to an unlawful policy.

BMW subjected Dawsey to its facially unlawful policy, even before it announced her removal from TX-60 and planned demotion to TX-64. This alone constitutes an

---

employees to relegate them to lower-paying jobs). The experience in this district and circuit was no different. *E.g., Armstrong v. Index Journal Co.*, 647 F.2d 441, 445 (4th Cir. 1981) ("The sole difference in qualifications, as demonstrated by the advertisements soliciting applicants, is that one position was reserved for women and the other for men."); *Brown v. Gaston Cty. Dyeing Mach. Co.*, 457 F.2d 1377, 1381 (4th Cir. 1972); *United States by Clark v. Dillon Supply Co.*, 429 F.2d 800, 801 (4th Cir. 1970); *EEOC v. Korn Indus., Inc.*, No. 74-1029., 1978 U.S. Dist. LEXIS 18015 (D.S.C. May 2, 1978); *United States v. Med. Soc'y of S.C.*, 298 F. Supp. 145, 149 (D.S.C. 1969); *Miller v. Sch. Dist.*, 256 F. Supp. 370, 378 (D.S.C. 1966).

adverse employment action under *Muldrow*. *Chambers v. District of Columbia*, 35 F.4th 870, 878 (D.C. Cir. 2022), *cited in Desmarais v. Granholm*, 2024 U.S. Dist. LEXIS 146248, at ** 15-16 (D. D.C. Aug. 16, 2024).

> **3.      Nothing has changed since this Court rejected BMW's *Muldrow* arguments on Dawsey's demotion/transfer.**

The parties previously filed supplemental briefs on the application of *Muldrow*. [ECF 110-11]. They again briefed the issues as to Dawsey's objections to the Magistrate Judge's Report and Recommendation. [ECF 115 at 1-13; ECF 16 at 4-13]. This Court determined that the jury must decide whether there was an adverse employment action. [ECF 119, at 6-7, 11-14].

BMW cites no later cases that change the analysis. District courts continue to reject efforts to limit or cabin *Muldrow*. *E.g.*, *Desmarais v. Wright*, 2026 U.S. Dist. LEXIS 38813, at **13-16 (D. D.C. Feb. 25, 2026). Even the assignment of less prestigious tasks meets "some harm" standard of *Muldrow* and *Herkert*. *Makalou v. ABCD & Co.*, 2026 U.S. Dist. LEXIS 46972, at *12 (D. Md. March 6, 2026).

BMW continues to ignore the standard and the evidence. BMW focuses, for example, on whether it cut Dawsey's pay. [ECF 237-1 at 9-10]. But both *Muldrow* and *Herkert* establish that a pay reduction is *not* the touchstone to whether a transfer constitutes an adverse employment action. *Muldrow v. City of St. Louis*, 601 U.S. 346, 351 (2024) ("Muldrow's rank and pay remained the same in the new position"). Instead, the jury determines whether a transfer constitutes an adverse employment action, even

15

if the move "entail[s] no diminution in pay grade, salary, or benefits." *Herkert v. Bisignano*, 151 F.4th 157, 165 (4th Cir. 2025).[12]

So all BMW can do is rehash its argument that the announced transactions had not occurred at the time Dawsey resigned. That argument fails because BMW cannot overcome *Ricks*,[13] *Chardon*,[14] *Corner Post*,[15] *Green*,[16] and their progeny. BMW's *announcement* of the moves constituted the adverse employment action. [ECF 119 at 11-14; *see* ECF 97 at 19-20; ECF 115:3-8]. And law has not changed since the Court last rejected BMW's argument. *See, e.g.*, *Topolski v. Wash. State Dep't of Licensing*, No. 3:24-cv-05878-TMC, 2025 U.S. Dist. LEXIS 44011, at ** 12-13 (W.D. Wash. Mar. 11, 2025); *Westover v. Washington*, No. 3:24-cv-05872-TMC, 2025 U.S. Dist. LEXIS 91168, at ** 19-27 (W.D. Wash. May 13, 2025).

BMW also continues to mischaracterize the evidence, as it did during the directed verdict arguments. For example, BMW claims that Dawsey testified that Petrasch told

---

[12]  BMW's argument is factually flawed as well. Dawsey did not say she could not answer how a reduction in function level would affect her "from a financial standpoint." [ECF 237-1 at 9]. Dawsey testified as to how benefits, including salary level bonus multiplier, vehicle allowance, are affected by one's personal grade. [Feb. 18 DUT 45:5-15]. What Dawsey could not specify is how much her pay would be reduced in future years because she cannot say where her salary would fall within the applicable pay band. So what? There can be no question that her pay would be lower as a PG 9 than it would be at level at PG 11.

[13]  *Delaware State College v. Ricks*, 449 U.S. 250 (1980).

[14]  *Chardon v. Fernandez*, 454 U.S. 6 (1981).

[15]  *Corner Post, Inc. v. Bd. of Governers of the Fed. Rsrv. Sys.*, 603 U.S. 799 (2024).

[16]  *Green v. Brennan*, 578 U.S. 547 (2016).

her there would be a move "at some unidentified time in the future." [ECF 237-1 at 9]. Dawsey never said that.

There are significant differences in stature between TX-60 and TX-64. BMW's own job descriptions and Exempt Guidelines make that clear. TX-60 requires 10+ years of progressive leadership in HR and active affiliations with HR networks. [Pl. Exh. 8 at 3]. TX-64 does not require any prior HR experience or affiliations with HR networks. [BMW Exh. 13 at 2].

BMW also rated TX-60 and TX-64 at different function levels. BMW's Exempt Guidelines explain the significance of function levels. "Function Levels (FL) define the value of the job and are designated based on competencies, accountabilities, and requirements." [Pl. Exh. 12 at 4]. As a FL III position, for example, TX-60 is designated as a department manager role, while FL IV is designated only as manager [*Id.* at 6; Feb. 17 DUT 93:21; Feb. 18 DUT 42:11-16]. BMW's policy describes the difference between FL III and IV as follows:

| FL III | FL IV |
|---|---|
| Management Level responsibility for multiple functional areas and/or leads a single functional area with full operational control. Typically manages multiple managerial direct reports. | Manages one or several fuctional areas (LL only) or works highly independently on specialized tasks. |

[Pl. Exh. 12 at 6].

BMW tried to convince the jury that it really needed Dawsey in the critical role of TX-64 because of her extensive experience and skills, which met a critical need for "hiring

17

a thousand people" for a new plant.  [Feb. 19 DUT 171:19 – 172:21;[17] *id.* 179:18].  These efforts likely backfired because, after Dawsey resigned, BMW put two individuals in TX-64 (Bailey and Gilmore) with little to no experience in managing recruiting or HR, and TX-64 did not even handle recruiting of nonexempt employees while Bailey was in the position.  [Feb 24 DUT 13:13-17; *id.* 22:13-22].

Relegation to FL IV also affects one's ability to advance to FL II.   Contrary to BMW's argument [ECF 237-1 at 10], not only did Dawsey provide this testimony, but Eva Burgmeier emphatically agreed.  [Feb. 24 DUT 56:4-7 ("No, no.  I have never heard or know a case like this, no.")].  BMW's only response is that its witnesses "uniformly rejected" Dawsey's assessment.  [ECF 237-1 at 10].  To illustrate this "uniform rejection," BMW cites only the testimony of McCraw, who did not testify on this point.  McCraw merely testified that BMW bases promotions on personal grades.  [Feb. 23 DUT 189:18-23].  That is a different issue.

BMW can disagree all it wants.  But it offered no evidence of *anyone* demoted to FL IV who BMW then promoted to FL II.  Even if it had, this is just one point.  Whether the sum of Dawsey's evidence proved an adverse employment action is still a jury issue.

BMW's fixation on the function level designation for TX-64 before Dawsey's resignation also carries no weight.  BMW designated TX-64 as FL III solely for the benefit of Scott Medley while he was in the position.  [Feb. 18 DUT 59:7-15].  Under the 2021-22

---

[17]     Engelhorn repeatedly referred to BMW's $1.7 Billion investment in a new plant and the critical hiring needs for a new plant. [Feb. 19 DUT 121:20-24; *id.* 170:11-17; *id.* 171:21 – 172:11; 179:22 – 180:4; *id.* 187:4-10; id. 188:20 – 189:18].  After repeatedly discussing how critical TX-64 was to this $1.7 Billion investment, however, Engelhorn did not know who filled the position.  [*Id.* 174:22 – 175:10].  Nor could Engelhorn explain why someone with no HR experience was put in this critical position.  [*Id.* 185:18 – 186:9].

reorganization, TX-64 became a FL IV position. And there is nothing speculative about that. On October 4, 2021, Petrasch told Dawsey TX-64 would be FL IV. [Feb. 18 DUT 25:3-5; BMW Exh. 19 at 4]. Epps said it was. [Feb. 23 DUT at 37:23 – 38:2; *id.* 38:11-17]. Even McCraw says it was. [Feb. 23 DUT 219:16-24; *id.* 222:3-10]. Petrasch documented that TX-64 would be a FL IV in her communications to Germany. [Pl. Exh. 41]. And the position has been at FL IV since. [Pl. Exh. 49; Feb. 24 DUT 9:24 – 10:5 (Bailey); Pl. Exh. 50; Feb. 24 DUT 18:1-3 (Gilmore)].

   **4.    Demotion were adverse employment actions before *Muldrow*.**

Dawsey filed this case pre-*Muldrow*. Although *Muldrow* lowered the bar from the prior Fourth Circuit standard,[18] Dawsey could have easily cleared the pre-*Muldrow* bar.

As for the removal from TX-60, BMW's decision was actionable because the most fundamental term or condition of employment is the job one holds. *Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022); *Threat v. City of Cleveland*, 6 F.4th 672, 678-79 (6th Cir. 2021); *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000); *see Ortiz-Diaz v. United States HUD*, 867 F.3d 70, 81 (2016) ("As I see it, transferring an employee because of the employee's race (or denying an employee's requested transfer because of the employee's race) plainly constitutes discrimination with respect to 'compensation, terms, conditions, or privileges of employment' . . . .") (Kavanaugh, J., concurring).

---

[18]    The *Muldrow* Court cited Fourth Circuit cases to illustrate how courts set the bar too high. *Id.* at 355-56 (citations omitted). *See Herkert v. Bisignano*, 151 F.4th 157, 160 (4th Cir. 2025).

19

Further, a transfer to a lower-level position was always an adverse employment action. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007); *E.g.*, *Webster v. Rumsfeld*, 156 F. App'x 571, 579 (4th Cir. 2005).[19]

BMW's announcement to Dawsey and others of Dawsey's transfer/demotion to TX-64 affected "level of responsibility," "compensation," and "opportunity for promotion." And a resulting personal grade reduction (under BMW policy) also constitutes an adverse action because it directly affects salary, bonus, and benefits. So the announced demotion that affected pay and benefits constituted an adverse employment action under *Holland* and *James* even before *Muldrow*. And, as noted aboe, this was not even the only adverse employment action.

**5.    BMW's reliance *Zienni* highlights the dearth of support for its arguments.**

BMW repeats its argument from the directed verdict hearing regarding the *Zienni* case. [Feb. 24 DUT 77:3 – 81:21; *see* ECF 237-1 at 12-13 (citing *Zienni v. Mercedes Benz U.S. Intl, Inc.*, No. 24-13932, 2025 U.S. App. LEXIS 33457 (11th Cir. 2025)]. *Zienni* involved a Muslim, who alleged that his employer "denied him a religious accommodation to take breaks to pray at specific times throughout the workday." 2025 U.S. App. LEXIS 33457, at *1. None of that was true. Team leaders would cover the plaintiff's breaks. *Id.* *4. Nobody stopped the plaintiff from taking prayer breaks. *Id.* *5. His employer "never disciplined or threatened to discipline" him. *Id.* The plaintiff's theory was not that the employer said it would discipline him, but that praying more than allowed break time merely "exposed [him] to the risk of discipline." *Id.*

---

[19]    Much of this rationale is based on pre-*Burlington Northern* caselaw regarding what is an "adverse employment action" for purposes of retaliation. *See id.*

The employer in *Zienni* never announced an adverse employment action, and it did not even "threaten[] to discipline" the plaintiff. *Zienni* cannot inform any decision here. BMW announced its decisions.

**D.     BMW cannot show error in admitting the Expat Guidelines.**

BMW complains that the Court erred in admitting the Expat Guidelines [Pl. Exh. 17], which contain a policy: (1) approved at the highest levels of BMW, (2) maintained by BMW, and (3) produced by BMW. [ECF 237-1 at 14-17]. This Court denied BMW's Motion in Limine on this topic because BMW "followed these guidelines consistently including when they filled the TX-60 position with a German national" and "[w]hether Defendants followed these Guidelines is relevant to Plaintiff's claim that Defendants discriminated on the basis of national origin." [ECF 185]. This Court added that it is "the function of the jury, not the court, to assess the credibility of the witnesses and weigh the evidence as to this issue." [*Id.*] The Court also overruled BMW's objections at trial. [Feb. 18 DUT 29:20-21].[20]

"When, as here, a new trial is sought based on purported evidentiary errors by the district court, a verdict may be set aside only if an error is so grievous as to have rendered the entire trial unfair." *United States EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (citing *Creekmore v. Maryview Hosp.*, 662 F.3d 686, 693 (4th Cir. 2011)).

BMW still has not shown that these rulings were incorrect. Johannes Trauth, Petrasch's predecessor, developed the Expat Guidelines. [Feb. 18 DUT 27:16-22; *id.* 32:22 – 33:3]. But he did not act alone. The senior management group (FL I & II)

---

[20]     This Court also relied on the Expat Guidelines in denying summary judgment. [ECF 119 at 4, 17].

reviewed the guidelines, which records presentations in its formal meeting minutes.  [*Id.* 28:13-19; id. 30:8-10].  BMW never revoked the Expat Guidelines.  [*Id.* 29:4-14].  And this rule was well known.  Corey Epps, who headed the succession-planning function, acknowledged the alternating-nationality requirement for TX-6 and TX-60.  [Feb. 23 DUT 36:6 – 37:2].

The Expat Guidelines color codes positions by nationality.  Green means international or domestic, red means domestic only, and orange means global.  [*See* Pl. Exh. 17 at 6 (right side)].  The Guidelines distinguish positions by whether they can be held by "domestics"/"locals" or "expats/internationals."  [*Id.*; *see also* Feb. 18 DUT 31:3 – 32:25].

And contrary to BMW's argument [ECF 237-1 at 17 & n.4], such terms as "local"/"domestic" and "expat," are established at BMW.  "Domestic" or "local" refers to U.S. citizens.  [Feb. 18 DUT 20:15-21; *id.* 31:14-16; Feb 19 DUT 112:14-15; id. 169:14-17; Feb. 20 DUT 116:18-19]. "Expat" and "international" refer to German nationals sent by BMW AG to work in Spartanburg.  [Feb. 17 DUT 114:21-24; see Feb. 20 DUT 116:21-23].  The term "global" means a candidate from any other country in the BMW Group network.  [Feb. 18 DUT 31:16-17; *id.* 31:24 – 32:2].  The term "inbound" means an expat/international or global employee transferred from another country.  [Feb. 18 DUT 30:16-17; *id.* 32:23].

The Expat Guidelines begins with an acknowledgment that BMW fills positions based on nationality: "In general there is an alternating reporting structure of international and domestic below the Senior Management level."  [PX 17 at 4 (second row of the second column)].  It then describes how that policy applies to TX-60.  [*Id.* at 6].  Along the

left column of BMW MC 236, "Option 1" and "Option 2" documents the alternating nationality requirement for TX-60 and TX-6.  [Pl. Exh. 17 at 6]21  The rationale for bringing in a German is stated in the top right corner of the page: "T[X]-60 has a need for an international inbound (Planner or Dept. Mgr ideally from AG – tie to network) and **should follow the status of T[X]-6**."  [*Id.* (emphasis added); *see* Feb. 18 DUT 32:5-12].

**1.      The Expat Guidelines show the "rule" Petrasch cited when removing Dawsey from TX-60.**

Petrasch recited the Expat Guidelines' terms when she told Dawsey there was a "rule" that, if the vice president of human resources is a domestic/local, the next line of leadership in human resources would have to have a German.  [Feb. 18 DUT 20:5-8; see also BMW Exh. 19 at 2 ("Only way to get Local TX-6 is have an intl TX-60 to be a bridge to Germany")].  The only written source of that "rule" is the Expat Guidelines.   [ECF 185 (noting the evidence that "followed these guidelines consistently"); *see* Feb. 18 DUT 27:23 – 28:1].

**2.      BMW continues to follow the Expat Guidelines and the rule cited by Petrasch.**

BMW cannot explain how it is unaware of a rule it follows to this day.  BMW has alternated the U.S./German nationality of TX-6 and TX-60 five times in a row:

| TX-6 | TX-60 |
|---|---|
| Anne Marie Higgins (American) | Moritz Kippenberger (German) |
| Johannes Trauth (German) | Kelly Dawsey (American) |
| Christina Petrasch (German) | Kelly Dawsey (American) |
| Sherry McCraw (American) | Eva Burgmeier (German) |
| Sherry McCraw (American) | Bianca Siemens (German) |

---

21      BMW MC 236 also illustrates how positions are color-coded based on nationality. [DE 45-1 ¶ 20(b); *see also* DE 46 at BMW MC 237-39].  "TS" has been changed to "TX" for the reasons explained in footnote 1.

[Feb. 18 DUT 35:9 – 36:16; Feb. 19 DUT 200:18 – 201:5; id. 201:17 – 202:1].

BMW shoots itself in the foot by arguing that it created the Expat Guidelines years ago. [ECF 237-1 at 15, 16]. That BMW has maintained an unlawful policy for so long—that it continues to follow—is even more reason why punitive damages are appropriate. It is hardly a basis to exclude evidence.

### 3. The Expat Guidelines are admissible for other purposes.

BMW does not address all reasons why the Expat Guidelines are relevant. The Expat Guidelines also provided a foundation for Dawsey's testimony that she informed BMW that its practice was illegal. And BMW's knowledge of the illegality of its practice is directly relevant to its liability for punitive damages under *Duvall*.

### 4. BMW's efforts to disavow knowledge of the Expat Guidelines fell apart.

The jury assessed BMW's claim that its decisionmakers did not know about the Expat Guidelines. Once Dawsey laid a foundation for admissibility, it was for the jury to determine whether BMW's convenient denials were credible.

It does not matter if every BMW witness testified in lockstep. Defense witnesses usually do. The jury gets to decide whether they should be believed, even if defense testimony is unrefuted. *Hoffman v. Bear Chase Brewing Co., No.* 1:21-cv-1443, 2023 U.S. Dist. LEXIS 167862, at *6-9 (E.D. Va. Sep. 18, 2023) (citing *Gilliam v. Montgomery Ward & Co.,* 1997 U.S. App. LEXIS 19881, at *22-23 (4th Cir. July 31, 1997)); *United States ex rel. Cody v. Mantech Int'l,* 746 F. App'x 166, 181–82 (4th Cir. 2018).[22] And the

---

[22]    This includes typical employer denials that its management was aware of something. *Mantech,* 746 F. App'x at 181–82; *e.g., Morrisette v. MDV SpartanNash, LLC*, Civ. A. No. 2:15cv199, 2016 U.S. Dist. LEXIS 100946, at *26 (E.D. Va. Aug. 1, 2016)

Court should disregard BMW's evidence that the jury was "not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).   In denying BMW's Motion in Limine, this Court noted that "[i]t is the function of the jury, not the court, to assess the credibility of the witnesses and weigh the evidence as to this issue."   [ECF 185].   That is as true today as it was when the Court denied BMW's Motion in Limine.

BMW started the trial with an accusation that Dawsey "took" the Expat Guidelines "with her to help her build this case."   [Feb. 17 DUT 119:7-9].   That wasn't true.   Only BMW produced the document in discovery, and BMW offered no evidence that Dawsey took a copy.   [*Id.*  119:23 – 120:3].   So BMW was in a pickle.   How could BMW show that it knew nothing about the Expat Guidelines it produced?    It couldn't.    McCraw begrudgingly acknowledged that BMW maintained the Expat Guidelines in BMW's database of guidelines, policies, and procedures.   [Feb 23 DUT 236:20 – 237:8].

### 5.     BMW's extant policy is not a "stray remark."

BMW cites stray remark cases to essentially argue that the discriminatory terms of BMW's Expat Guidelines somehow expired.   [ECF 237-1 at 15-17].   Not surprisingly, BMW cannot cite any authority on point related to policies that an employer adopted, never revoked, and continued to follow.

BMW cites *Bandy* for the proposition that "the Fourth Circuit has held that such documentation must be both proximate in time to the adverse employment decision at issue and related to that employment decision."   [ECF 237-1 at 15 (citing *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023))].   *Bandy* has nothing to do with "documentation."

---

(finding in the context of a retaliation claim that a jury is not obligated to believe employer's claim that it was unaware of the plaintiff's protected activity).

25

Bandy's discussion of proximity relates to the test for whether an *oral* statement constitutes "direct evidence." *Bandy*, 59 F.4th at 711.[23]  That is not the issue here.  The direct evidence in this case is Petrasch's explanation for BMW's removal of Dawsey and its plan to demote her.  The Expat Guidelines corroborate the practice and policy Petrasch explained to Dawsey.

BMW's argument fails even if a written policy could be construed as a "stray remark."  Even old oral statements of intent are admissible as *circumstantial* evidence to explain the employer's discriminatory animus.  *Wannamaker-Amos* v. *Purem Novi*, Inc., 126 F.4th 244, 259 (4th Cir. 2025).[24]

### 6.     BMW still fails to explain its Rule 403 argument.

BMW again makes its perfunctory Rule 403 argument with no effort to meet its burden of showing that any prejudicial value of the Expat Guidelines far outweighs its probative value.  [*See* ECF 185].  At trial, BMW merely objected for reasons that we previously advised the Court."  [Feb. 18 DUT 26:13-16].  But BMW never previously

---

[23]     For the same reason, BMW's other cited authorities do not relate to the issues here.  [*See* ECF 237-1 at 16 (citing *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 155 (4th Cir. 2023) and *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512 (4th Cir. 1994)).  These cases also discuss whether oral statements constitute direct evidence.

[24]     *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (summary judgment reversed where history of animus and discriminatory comments raise issues of motive as to termination and pretext); Anderson v. Ziehm Imaging, GmbH, No. 7:09-cv-02574-JMC, 2011 U.S. Dist. LEXIS 39874, at *13 (D.S.C. Apr. 12, 2011) (noting that even "stray comments [may] provide circumstantial evidence of discriminatory animus"); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (citing *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007) and *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999)); *Rowland v. Am. Gen. Fin., Inc.*, 340 F.3d 187, 193 (4th Cir. 2003); *see also Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*, 365 F. App'x 432, 444 (4th Cir. 2010).

26

explained any grounds for its 403 argument other than to recite the standard.  [See ECF 160 at 8].

"[U]nfair prejudice requires a showing of 'a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence.'" *United States v. Contreras*, 149 F.4th 349, 365 (4th Cir. 2025) (quoting *United States v. Gartmon*, 146 F.3d 1015, 1021, 331 U.S. App. D.C. 74 (D.C. Cir. 1998)).  BMW never explains how a policy that describes what BMW has done for years could ever meet such a standard.

So BMW substitutes misleading arguments, such as its unsupported claim that Dawsey "authored" the Expat Guidelines.  [ECF 237-1 at 17; *see* ECF 160 at 8 (noting that BMW's characterization is unsupported)].  No witness testified to this.  Dawsey testified that the policy was a directive from Johnannes Trauth.  [Feb. 18 DUT 27:18].  Dawsey told Trauth that BMW cannot slot positions based on national origin.  [*Id.* 33:15-17].[25]  But what if Dawsey did "author" the Expat Guidelines?  As this Court noted, BMW's argument "goes to the weight of the evidence, not its admissibility."  [ECF 185].   And BMW unsuccessfully argued to the jury about Dawsey's role.  [Feb. 25 DUT 78:24 – 79:2].  BMW still does not explain how that shows that the prejudicial effect of the Expat Guidelines substantially outweighs any probative value.

BMW has not carried its burden of showing that the Court should have excluded this key evidence under Rule 403.  *Worldwide Network Servs., LLC v. DynCorp Int'l, LLC*, 365 F. App'x 432, 444 (4th Cir. 2010).  To the contrary, it made a perfunctory statement

---

[25]     BMW never even identified Trauth as a witness to refute such testimony.

27

in its Motion [ECF 154 at 6], added nothing at trial, and it still can't show how the Rule applies.

**E.      BMW's new trial arguments about the jury charge is unpreserved and frivolous.**

BMW also argues that the Court erred by charging the jury on adverse employment action.  [ECF 237-1 at 17-21].  BMW claims that charging the jury on what Dawsey's burden somehow prejudiced BMW.  And it claims that the Court's charge "misstates the legal standard . . . in *Muldrow*." [*Id.* at 19].  BMW even points to the Court's response to a jury note to which BMW never objected.

There are several problems with these arguments.

**1.      BMW failed to preserve any argument**

Rule 51 governs jury charge objections and issue preservation.  Fed. R. Civ. P. 51.  It provides that objecting parties must "stat[e] distinctly the matter objected to and the grounds for the objection."  *Id.* 51(c) (1).  Further, a party may only later complain about "an instruction actually given, if that party properly objected."  *Id.* (d)(1)(A).  Otherwise, "A court may consider a plain error in the instructions that has not been preserved as required by Rule 51(d)(1) if the error affects substantial rights."  *Id.* (d)(2).

At the charge conference, BMW sought to interject language into the charge that was unsupported by caselaw.  BMW requested that the Court add an insertion that the action communicated must be concrete and not cause speculation on the impact to a plaintiff. [Feb. 24 DUT 159:19-22].[26]  The Undersigned objected because BMW provided no authority for its insertion.  [*Id.* 162:15-22].

---

[26]      BMW initially objected generally to any charge on adverse employment action.

The Court took the arguments under advisement and crafted language to address BMW's argument. [Feb. 25 DUT 3:7-16]. BMW *approved* of the changes. [*Id.* 6:23-24]. And the Court charged the jury in accordance with the new language. [*Id.* 131:10-16]. BMW never objected to the new adverse employment action charge. [Feb. 25 DUT 147:25 – 148:4 (limiting its objection the charges on damages); *see also id.* 151:15-20].

Because BMW did not object or request a charge consistent with its post-trial complaints, it must show that the charge constitutes plain error under Rule 51(d)(2). That rule requires BMW to prove things it does not even argue. BMW must show that the error is plain, it affects substantial rights, and it seriously affects the fairness or integrity of the proceedings. *Quinton v. Toyota Motor Corp.*, Civ. A. 1:10-02187-JMC, 2014 U.S. Dist. LEXIS 16063, at *12 (D.S.C. Feb. 7, 2014) (citations omitted); *see Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 396-97 (4th Cir. 2004). In essence, BMW must show that the Court's instruction probably caused BMW to lose. "To affect an individual's substantial rights, 'there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" *Nicholson v. Durant*, 162 F.4th 417, 427 (4th Cir. 2025) (quoting *United States v. Cabrera-Rivas*, 142 F.4th 199, 213 (4th Cir. 2025)).

After expressing its satisfaction with the amended charge, BMW should not be heard to argue that the Court erred in giving it.

Likewise, BMW thought up a new argument about the second jury note [ECF 211]. BMW argues that the jury's second note shows that the Court confused the jury with the adverse employment action instruction. [ECF 237-1 at 20].

BMW's new argument also comes far too late.

29

> [I]n responding to a jury's request for clarification on a charge, the district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice. *United States v. United Medical and Surgical Supply Corp.*, 989 F.2d 1390, 1407 (4th Cir. 1993). The particular words chosen, like the decision whether to issue any clarification at all, are left to the sound discretion of the district court. *United States v. Horton*, 921 F.2d 540, 546 (4th Cir. 1990).

*United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995); accord *United States v. Frazier*, No. 22-4368, 2024 U.S. App. LEXIS 23258, at *5 (4th Cir. Sep. 11, 2024).

Even BMW had preserved this argument, it cannot show that the question proves the jury was confused.   The Court properly referred the jury to the applicable portion of the jury charge. [Id. 153:10-23].  BMW concurred in the Court's response. [*Id.* 154:2].

BMW's new speculation about jury confusion is illogical at best.  The jury's second note asked the Court to clarify its statement about the fact that Dawsey "never actually went to TX-64" and that "something about the potential move."  [Feb 25 DUT 153:2-8]. Of course, the Court never said these things.  The Court never used any derivation of the word "potential" in this context, and it never referenced TX-64 in the charge.  [*See* Feb 25 DUT 131:1-21].

There are only two possible sources of any potential "confusion." The first source is the language BMW insisted on, and that to which it did not object.  [*Id.* 131:14-16 (requiring that "the notice was of a non speculative disadvantageous change in an employment term or condition").  And the second is BMW's closing argument.  [See Feb. 25 DUT 65:25 – 66:4].  BMW cannot fairly fault the Court for either.

BMW makes one last self-defeating argument.  It notes that, once the Court issued the approved response to the second note, the jury promptly returned a verdict.  [ECF 237-1 at 20].  In other words, to the extent the jury was confused, the Court's approved clarification resolved that confusion.  That hardly helps BMW's cause.  But the Court

30

should not go down this hole.  BMW's argument about what the second jury note proves is improper speculation.  *North Ave. Corp. v. Ranger Sci., LLC*, 2025 U.S. Dist. LEXIS 181381, at *9 (S.D. Wva. Sept. 16, 2025).

Because BMW did not object to the Court's response to the second note, BMW must show plain error.  *Taylor v. Va. Union Univ.*, 193 F.3d 219, 239 (4th Cir. 1999) (citing *Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630-31 (4th Cir. 1997)); *accord United States v. Savoy*, 315 F. App'x 464, 469 (4th Cir. 2009).  BMW cannot show plain error as to the instructions to which it agreed.  And it preserved no argument about plain error, which it never mentions in its Motion.

### 2.    BMW cannot show that the Court's Charge prejudices BMW.

The prospect of negating the entire trial and starting a new one because the trial court properly summarized the law is staggering.  The Court should determine only whether the instructions, construed as a whole and considering the entire record, adequately informed the jury of the controlling legal principles without misleading or confusing it.  *United States v. Askew*, 98 F.4th 116, 121 (4th Cir. 2024).

BMW argues that the Court should not have charged that Dawsey was required to prove an adverse employment action.  [ECF 237-1 at 17-19].  That might be an interesting argument if Dawsey made it.  But how could charging the jury that Dawsey is required to prove something prejudice BMW?  BMW does not attempt to say.  Nor could it.  BMW's only argument to challenge the verdict as to liability is that Dawsey could not prove an adverse employment action.  [*See supra* § II(C)].  How then can it also complain that the Court charged that she was required to prove one?

31

### III.  Conclusion

BMW cannot show error either as to the jury's findings or as to this Court's rulings or charges.  The Court should deny BMW's Motion.

Respectfully submitted this 7th day of April 2026.

_s/ Brian P. Murphy_____
Brian P. Murphy
Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400

32